IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALTON WILLIAMS, BRANDON HERNDON, and MARKUS TOLSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., STATE FARM LIFE INSURANCE CO., STATE FARM FIRE AND CASUALTY CO., STATE FARM GENERAL INSURANCE CO., and STATE FARM BANK, F.S.B.,<br><br>Defendants. | Case No.<br><br>**Jury Trial Requested** |

## COMPLAINT

Plaintiffs Alton Williams ("Williams"), Brandon Herndon ("Herndon"), and Markus Tolson ("Tolson") (collectively "Plaintiffs"), through their counsel Stowell & Friedman, Ltd., and Leinenweber Baroni & Daffada, LLC, on behalf of themselves and all others similarly situated, file this complaint of race discrimination and retaliation against Defendants State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Co., State Farm General Insurance Co., and State Farm Bank, F.S.B., and in support state as follows:

## JURISDICTION AND VENUE

1.  Plaintiffs' claims arise under 42 U.S.C. § 1981, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

1

2.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). State Farm conducts business throughout this District, and Plaintiff Williams worked for and was harmed by State Farm in this District. The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

**PARTIES**

3.     State Farm Mutual Automobile Insurance Company is the parent company of State Farm Life Insurance Company, State Farm Fire and Casualty Company, State Farm General Insurance Company, and State Farm Bank, F.S.B., (collectively "State Farm," "the Firm," or "Defendants"). All of these entities are Illinois corporations with their principal place of business in Bloomington, Illinois.

4.     Plaintiff Alton Williams is African American and worked for State Farm as an Agent from 1999 until he was unlawfully terminated on December 31, 2017. Williams competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his dedication to his job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm subjected Williams to race discrimination throughout his employment.

5.     Plaintiff Brandon Herndon is African American and worked for State Farm as an Agent from 2010 until he was unlawfully terminated on March 17, 2017.  Throughout his employment, Herndon competently discharged all duties assigned to him and enjoyed an excellent reputation regarding the high quality of his work and his conscientious devotion to his job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm subjected Herndon to discrimination and retaliation for challenging discriminatory practices.

6. Plaintiff Markus Tolson is African American and worked for State Farm as an Agent from October 2009 until he was unlawfully terminated around August 2016. Throughout his employment, Tolson competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his devotion to his job. Pursuant to its discriminatory policies and practices, however, State Farm subjected Tolson to discrimination and retaliation for challenging discriminatory practices.

## FACTUAL ALLEGATIONS

**I.    State Farm Has and Is Engaged In Firm-Wide Systemic Discrimination Against African Americans.**

7. State Farm claims to insure more cars and homes than any other insurer in the United States, and it is currently ranked number 36 on the Fortune 500 list of largest companies in the United States. State Farm offers insurance and financial products to customers through the workforce of Agents that it employs across the United States. State Farm requires each of its Agents to sign nearly identical Agent Agreements that govern the employment relationship and dictate the conditions under which the Agents may offer State Farm's insurance and financial products to customers.

8. State Farm maintains strict, centralized control over its Agents from its company headquarters in Bloomington, Illinois, where an almost exclusively white team of senior executives issues mandatory company policies and practices that apply to all Agents in the State Farm workforce. State Farm is engaged in a firm-wide pattern and practice of discrimination against African American Agents in their terms and conditions of employment. State Farm designs and maintains uniform, company-wide policies and practices that discriminate against African American Agents and advantage non-African American Agents at the expense of African American Agents.

9. Among other things, State Farm's discriminatory policies and practices steer African Americans to less lucrative agencies and territories; deny them valuable business opportunities and resources; subject them to heightened scrutiny and differential discipline; and result in lower pay than Agents who are not African Americans.

**Territory and Agency Assignment**

10. State Farm employs company-wide policies and practices for assigning territories and agency locations that discriminate against African American Agents. Pursuant to these policies and practices, State Farm assigns the most lucrative territories and agency locations to Agents who are not African American while assigning African American Agents less lucrative and more problematic agencies and territories on the basis of their race.

11. State Farm disproportionately gives non-African American Agents a head start in their careers by allowing them to take over existing agencies with a book of business from Agents who have moved or who no longer work for the Firm. By contrast, State Farm generally requires African American Agents to start new agencies from "scratch" and without existing insurance policies or financial products.

12. In addition, State Farm disproportionately assigns non-African American Agents to territories and agency locations in areas with more affluent populations, while relegating African American Agents to areas with considerably less wealth. The Firm also engages in "race matching," by assigning African American Agents to areas with higher African American and minority populations.

13. State Farm's policy and practice of disproportionately assigning non-African American Agents to territories and agency locations in more affluent areas affords them greater opportunities to generate income, in part, because wealthy customers have more need for and

ability to purchase insurance and financial products than customers with lower incomes and less wealth. More affluent customers are also more likely to pay their bills on time, freeing the Agents who serve them from the need to hire employees and use resources to engage in collection efforts for overdue premiums, and allowing the Agents to devote more resources to sales.

14. State Farm also disproportionately authorizes non-African American Agents to expand their agencies to additional locations, while denying those income-generating opportunities to African American Agents.

**Insurance Policy and Financial Product Assignments**

15. State Farm's company-wide policies and practices for assigning insurance policies and financial products give the most lucrative business opportunities to Agents who are not African American, and assign African American Agents less lucrative business opportunities.

16. When an Agent retires or leaves the Firm, State Farm reassigns the Agent's customers and existing insurance policies to other Agents. Agents who receive these assignments gain not only the value of these policies and any financial products the customers may have, but also ongoing commissions and the opportunity to grow the customers' accounts or to gain new customers through leads and referrals. Thus, the discriminatory distribution of policies has a substantial impact on the number, value, and quality of policies and accounts that Agents manage, and on their compensation. Pursuant to State Farm's discriminatory policies and practices, African Americans are largely excluded from being assigned lucrative insurance policies, even when they achieve high-performance distinctions.

17. When State Farm does assign insurance policies to African American Agents, they are generally fewer in number, more problematic, and less lucrative than those that State Farm assigns to non-African American Agents.

18. Moreover, because of State Farm's discriminatory policies and practices regarding assignment of territories and agency locations, it is more difficult for African American Agents to retain any policy assignments they receive.

19. Similarly, in addition to denying African American Agents business opportunities, State Farm provides Agents who are not African American with valuable resources and support, which are denied to African American Agents.

**Compensation and the Scorecard Bonus**

20. State Farm employs intentionally discriminatory compensation policies and practices that provide widely divergent compensation to Agents depending on their race.

21. Among other discriminatory compensation practices, State Farm provides substantial compensation to its Agents pursuant to a uniform, nationwide compensation policy and practice called the "Scorecard Bonus." State Farm intentionally selects and relies on factors that disadvantage African Americans to calculate eligibility for and the amount of the Scorecard Bonus paid to Agents.

22. Because State Farm uses commission-based and cumulative-advantage systems to evaluate and compensate its Agents, a level playing field and fair distribution of resources and business opportunities are essential. However, State Farm's discriminatory policies and practices deny African American Agents opportunities, resources, and substantial compensation.

23. For example, State Farm steers African American Agents toward less affluent territories and/or assigns them to territories in which the clientele match the Agents' race.

African American Agents are therefore disadvantaged because many of the clients in their territories cannot afford to purchase financial service products and purchase fewer or less expensive insurance products. Further, the Firm intentionally distributes more, and more lucrative, policies and financial products to non-African American Agents, and denies similarly situated African American Agents such distributions. Moreover, State Farm targets African American Agents for compliance issues, denying African American Agents the opportunity to offer financial products to their clients.

24. Because of these and other company-wide policies and practices, African American Agents are substantially less likely than non-African American Agents to meet the requirements of the Score Card Bonus policy. State Farm employs these and other policies and practices to discriminate against African American Agents and to deny compensation to African American Agents.

**Compliance Auditing, Discipline, and the Termination Review Plan**

25. State Farm's company-wide policies and practices regarding performance, compliance, discipline, and termination discriminate against African American Agents. These discriminatory policies and practices are designed to target African American Agents and force them to either resign or be terminated.

26. Pursuant to its discriminatory policies and practices, State Farm subjects African American Agents to heightened scrutiny, holds them to higher compliance standards, and imposes greater discipline, including termination, on African American Agents for alleged violations of Firm policies than it does on similarly situated non-African American Agents. State Farm disproportionately audits and disciplines African American Agents.

7

27. Among other discriminatory practices, State Farm disproportionately denies or rescinds the right of African American Agents to offer financial products. The inability to offer financial products limits an Agent's compensation, and makes an Agent ineligible to open a second agency location or receive policy assignments. Non-African American Agents' policy violations are routinely ignored or result in lesser discipline, and they are routinely assigned lucrative policy assignments and eligible to offer financial products, compounding their success and the racial disparity in earnings.

28. State Farm employs a centralized practice called the "Termination Review Plan." Agents who have been informed that the Firm intends to terminate their Agent Agreement may request a termination review from State Farm's Chief Executive Officer ("CEO") pursuant to policies and practices approved by State Farm's Board of Directors.

29. A State Farm review team makes findings and/or recommendation for the CEO who makes the final decision of whether to terminate the Agent.

30. State Farm's centralized system for terminating Agents is poisoned by racial bias and intentional discrimination, and results in significant racial disparities between Agents whom State Farm elects to terminate and those it decides to continue to employ.

31. Moreover, when State Farm terminates African American Agents, their policies are disproportionately divided among non-African American Agents, further compounding the racial inequities within the Firm.

## II. Plaintiffs Were Subjected to and Injured By State Farm's Unlawful Conduct

<u>Plaintiff Alton Williams</u>

32. In 1992, State Farm hired Plaintiff Alton Williams, who had just graduated from college and was eager to make his mark and become a successful Agent. Williams had interned

for State Farm while in college and worked his way up to claim representative, and finally to Agent.

33. After qualifying to become an Agent, Williams applied to open his agency on Chicago's north side. There were two available locations, one in the prosperous Lakeview neighborhood and another in a more racially diverse, working class neighborhood further west. Williams requested the Lakeview location; however, pursuant to its discriminatory assignment practices, State Farm assigned a white Agent to the more lucrative Lakeview location and gave Williams the less lucrative location further west. Williams was forced to remain in his territory and State Farm did not offer him a more lucrative agency or location for the remainder of his employment.

34. Despite State Farm denying him the more lucrative agency location, Williams excelled as an Agent. He achieved President's Club and earned the President's Club Trophy award, among other achievements and accolades. Consistent with its treatment of other African American Agents, State Farm denied Williams business opportunities and valuable business resources and support, including but not limited to policy assignments, throughout his tenure because of his race.

35. Consistent with its discriminatory review and discipline practices, State Farm targeted Williams for heightened, unwarranted scrutiny and ultimately terminated his employment because of his race. Around September 2017, State Farm audited Williams's business. During the course of the audit, State Farm identified a small number of auto policies that had incorrect vehicle purchase dates listed on the applications. State Farm unfairly and inaccurately charged Williams with "rate manipulation" and terminated his employment. Any inaccuracies were the result of customer or clerical error, not intentional manipulation, as

they had no material impact on the price of the supposedly manipulated policies. Williams is aware of non-African American agents who were accused of similar "rate manipulation" and were subjected to far less or no discipline.

36. Williams participated in the discriminatory Termination Review Plan, and CEO Michael Tipsord decided to terminate Williams's employment. State Farm did not discipline, let alone terminate, non-African American Agents with similar or greater compliance issues.

37. On several occasions, Williams reported to his superiors at State Farm that he was being treated differently than his non-African American colleagues. For example, Williams explained to State Farm management the racial disparity in the level of compliance auditing and discipline to which State Farm subjects its African American Agents as compared to its non-African American Agents. Rather than investigate or otherwise address his concerns, State Farm targeted Williams for increased scrutiny, ongoing discrimination and harassment, and, ultimately, termination.

38. As a result of State Farm's unlawful conduct and discriminatory policies and practices, Williams has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

<u>Plaintiff Brandon Herndon</u>

39. Plaintiff Brandon Herndon joined State Farm as an Agent in June 2010, after a successful career in pharmaceutical sales. Despite Herndon being an experienced and successful sales leader, pursuant to its firm-wide discriminatory practices, State Farm denied Herndon business opportunities and resources it regularly provided to non-African American Agents at State Farm.

40. Herndon sought to open an agency in the Houston area, specifically in the affluent Sugar Land area where he and his wife lived. However, pursuant to its discriminatory assignment practices, State Farm required Herndon to instead locate his agency in southwest Houston, a less affluent community with a large African American population. State Farm placed Herndon in this territory because of his race. When Herndon expressed concern about his placement, State Farm told Herndon he would "fit right in" and "understand the demographic," or words to that effect. State Farm believed that Herndon "belonged" in a territory where many of the potential customers would be African American.

41. Shortly after Herndon opened his agency in southwest Houston, State Farm placed two non-African American Agents in Sugar Land, and State Farm gave a white Agent a sizeable existing book of business.

42. Because State Farm did not give Herndon an existing agency, he had to build his book of business from scratch. Moreover, because his community was predominately working-class and lacked wealth, Herndon's agency required significantly more overhead to operate than it would have in Sugar Land and other more affluent areas. Unlike the more affluent communities in and around Houston, the potential clients in Herndon's territory often had little disposable income, which made it difficult to sell life insurance policies or financial products and limited Herndon to selling fewer, less lucrative auto and home policies.

43. State Farm rejected Herndon's repeated requests to be assigned a more lucrative market or open an additional agency in another territory. State Farm made clear that its decisions were based on its race-matching of Agents with potential customers. State Farm told Herndon that he needed to hire a "black guy and a Hispanic guy" to be successful.

44. Despite these challenges, Herndon excelled as an Agent. In his first six months, Herndon was in the top 10 nationally for new Agent business, and within 18 months, he had built a $1.8 million book of business consisting of mostly auto insurance policies.

45. State Farm did not reward Herndon's successes in the same manner it did for his non-African American colleagues. Throughout Herndon's employment, State Farm denied Herndon a new agency or territory, as well as lucrative policy assignments and other business opportunities, resources, and support.

46. One of the only instances in which Herndon received any policy assignments was when an Agent in southwest Houston retired and Herndon received a small number of his policies, worth about ten thousand dollars per year. Meanwhile, several of Herndon's non-African American Agent colleagues received policies worth hundreds of thousands of dollars in a single year.

47. Indeed, when a 40-year agent with a considerable book of business located near Herndon announced his plan to retire, the retiring agent told Herndon that he wanted Herndon to inherit his book of business. It is common practice for retiring agents at State Farm to select an agent to inherit their book of business. State Farm refused to approve Herndon taking over the retiring agent's book of business. Indeed, State Farm refused to assign Herndon *any* accounts from his business. Herndon informed his manager of his belief that State Farm denied him policies and the book of business from the retiring agent because of his race. His manager did not deny this or investigate the issue, but just issued a warning to Herndon not to "go there" or words to that effect. After this complaint, State Farm retaliated against Herndon by denying him any policy assignments for the remainder of his time at the Firm, subjecting him to increased scrutiny, and ultimately terminating him.

48. In addition, State Farm awarded several of Herndon's non-African American colleagues permission to open second or even third agencies, lucrative business opportunities State Farm denied Herndon.

49. Pursuant to State Farm's discriminatory policies and practices and in retaliation for making a protected complaint of race discrimination, State Farm subjected Herndon to heightened, unwarranted, and discriminatory scrutiny and discipline. State Farm terminated Herndon after he sold some auto insurance policies to ride-share drivers. Herndon had sold the policies because a State Farm underwriter told him he was authorized do so. State Farm later informed Herndon that the underwriter had been mistaken, and that ride-share driver policies were not approved in Texas. Herndon immediately contacted his customers and informed them that their ride-share driver policies would be terminated. Nonetheless, State Farm refused to renew his contract and terminated his Agent Agreement. A few days later, State Farm announced it would immediately begin offering ride-share driver polices in Texas, plainly demonstrating the reason for Herndon's termination was pretextual.

50. State Farm did not similarly target, discipline, or terminate Agents who are not African American, even those who engaged in serious violations of State Farm policies.

51. As a result of State Farm's discriminatory practices and unlawful conduct, Herndon has suffered substantial damages. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

Plaintiff Markus Tolson

52. Plaintiff Markus Tolson became a State Farm Agent in October 2009, after he worked for several years as a licensed sales representative for another State Farm Agent in Houston.

13

53. Despite Tolson's significant experience with State Farm and in the sale of insurance products, State Farm denied Tolson business opportunities and resources regularly provided to non-African American Agents.

54. Tolson initially selected the River Oaks neighborhood in Houston for his agency location. At that time, State Farm needed to find a new Agent to take over an existing agency in River Oaks that had a considerable book of business. Consistent with its discriminatory policies and practices, however, State Farm instead gave the location to a non-African American Agent and placed Tolson back into a pool of Agents waiting for a location assignment. State Farm eventually assigned Tolson the less lucrative Greater Heights territory, where he was required to start an agency from scratch with no established book of business. Tolson was forced to remain in his territory, and State Farm did not offer him a more lucrative agency or location for the remainder of his employment.

55. Despite being assigned to a less lucrative territory without an existing book of business, Tolson worked hard to achieve success at State Farm. He earned President's Club and Chairman's Circle distinctions. Nevertheless, pursuant to its discriminatory practices, State Farm denied Tolson policy assignments and compensation. For example, Tolson received only a handful of policy assignments throughout his tenure at State Farm, while his non-African American colleagues received policy assignments worth hundreds of thousands of dollars, which generated substantial revenues, referrals, and additional business and compensation. Tolson often pointed out to State Farm management that non-African American agents in his region were receiving far more policy distributions than he was. State Farm never investigated or addressed Tolson's concerns and State Farm continued its policy of assigning non-African American agents the lion-share of policy assignments.

14

56. Despite State Farm's discriminatory policies and practices, Tolson continued to excel, especially in the sale of financial products. As Tolson sold more financial products, he grew concerned that State Farm, consistent with its policy and practice, would target him and subject him to increased scrutiny because of his race. Tolson expressed this fear to his manager that State Farm would single him out for increased scrutiny and discipline because he was a high-achieving African American Agent. To be diligent and attempt to protect himself, Tolson required his employees complete more compliance training than State Farm required.

57. However, consistent with State Farm's discriminatory practices, and in retaliation for complaining of racial discrimination, Tolson faced heightened scrutiny and unwarranted and differential discipline. State Farm terminated Tolson after one of his employees allegedly violated a State Farm policy, even though Tolson was unaware of the alleged violation and fired the sales representative as soon as he learned about the situation. State Farm did not similarly target, discipline, or terminate non-African American Agents, even those who engaged in serious violations of State Farm policies.

58. Tolson participated in the discriminatory State Farm Termination Review Plan, and CEO Michael Tipsord made the final decision to terminate him because of his race.

59. As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Tolson has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

## CLASS ALLEGATIONS

60. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who work or worked for State Farm as

15

Agents or Term Independent Contractor Agents. The proposed class meets all requirements for class certification under Federal Rule of Civil Procedure 23.

61. The class of African American employees and former employees is so numerous and geographically disbursed that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1).

62. There are numerous questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. FED. R. CIV. P. 23(a)(2).

63. The claims alleged by Plaintiffs are typical of the claims of the class members. FED. R. CIV. P. 23(a)(3).

64. Plaintiffs will fairly and adequately represent and protect the interests of the class, and they have retained competent and experienced counsel to represent the class. FED. R. CIV. P. 23(a)(4).

65. The proposed class meets the requirements for certification under Rule 23(b)(2) and Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3).

66. The issues of determining liability and equitable and injunctive relief, among other issues, are appropriate for certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF
### 42 U.S.C. § 1981

67. Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

68. 42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, and conditions of the contractual relationship.

69. State Farm maintains a nationwide set of uniform, discriminatory employment policies and practices and engaged in a pattern or practice of systemic race discrimination against African Americans that constitutes illegal intentional racial discrimination in violation of 42 U.S.C. § 1981.

70. Through the conduct alleged herein, State Farm denied Plaintiffs and other African American Agents opportunities and resources valuable to their careers because of their race. State Farm also discriminated against Plaintiffs and all other similarly situated African American Agents in compliance auditing, discipline, termination, compensation, performance evaluation, promotions, and in other terms and conditions of their employment.

71. Plaintiffs and all those similarly situated were subjected to and harmed by State Farm's systemic and individual discrimination.

72. On behalf of themselves and the class they seek to represent, Plaintiffs request the relief set forth below.

## COUNT II

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 1981

73. Plaintiffs Herndon and Tolson, individually, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

74. Plaintiffs engaged in protected activity by complaining of their unlawful treatment.

75. Plaintiffs suffered retaliation and harm because of their protected activity, in violation of 42 U.S.C. § 1981.

76. On behalf of themselves, individually, Plaintiffs Herndon and Tolson request the relief set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and the class they seek to represent and against Defendants as follows:

a. Certify this case as a class action;

b. Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c. Declare the State Farm acts, conduct, policies and practices alleged herein are unlawful and violate the federal statutes identified in the Counts alleged against them set forth above;

d. Declare that State Farm engages in a pattern and practice of racial discrimination against African Americans;

e. Order that State Farm stop discriminating and retaliating against African Americans;

f. Order Plaintiffs and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise make Plaintiffs whole;

g. Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of State Farm's unlawful conduct;

h. Award Plaintiffs and all other all others similarly situated compensatory and punitive damages;

i. Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs, and disbursements, as provided by law;

j. Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs;

k. Declare that State Farm's actions and conduct constitute unlawful retaliation as to Plaintiffs Herndon and Tolson, individually, pursuant to 42 U.S.C. § 1981; and

l. Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided for by Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

*s/ Suzanne E. Bish*

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com
Sbish@sfltd.com
Grobot@sfltd.com

Justin L. Leinenweber
LEINENWEBER BARONI & DAFFADA, LLC
120 N. LaSalle Street, Suite 2000
Chicago, Illinois 60602
(312) 380-6635
justin@ilesq.com

19