IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALTON WILLIAMS, BRANDON
HERNDON, MARKUS TOLSON,
JEFFREY FLOWERS, BROOKE CLUSE,
VVONAKA RICHARDSON, and VERA
DIXON, on behalf of themselves and all
others similarly situated,

               Plaintiffs,

        v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE CO., STATE FARM LIFE
INSURANCE CO., STATE FARM FIRE
AND CASUALTY CO., STATE FARM
GENERAL INSURANCE CO., and
STATE FARM BANK, F.S.B,

               Defendants.

No. 20-cv-01121
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Alton Williams, Brandon Herndon, Markus Tolson, Jeffrey Flowers, Vvonaka Richardson, Vera Dixon and Brooke Cluse (collectively, Plaintiffs), all former or current State Farm Agents, have filed a two-count Amended Complaint against State Farm Mutual Automobile Insurance Co., State Farm Life Insurance Co., State Farm Fire and Casualty Co., State Farm General Insurance Co., and State Farm Bank, F.S.B. (collectively, State Farm), on behalf of themselves and a similarly situated class,[1] alleging racial discrimination in violation of 42 U.S.C. § 1981

---

[1]The Class consists of "African Americans who work or worked for State Farm as Agents or Term Independent Contractor Agents." R. 31, FAC ¶ 114.

(Count I) and retaliation in violation of 42 U.S.C. § 1981 (Count II). R. 31, FAC.[2] State Farm's Motion to Dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) is before the Court. R. 38, Mot. Dismiss.

In this lawsuit, Plaintiffs allege that through a uniform set of firm-wide policies and practices, State Farm systematically discriminates against its African American Agents, resulting in lower pay, differential treatment, and higher rates of attrition for African American Agents. State Farm's motion presents questions about the level of pleading required to survive a motion to dismiss with respect to the intent and causation elements of a Section 1981 racial discrimination claim. While a close call, for the reasons that follow, the Court finds that Plaintiffs have done enough at this stage and denies State Farm's motion to dismiss.

## Background

### I.  Facts[3]

#### A. Parties

State Farm Mutual Automobile Insurance Company[4] is a leading auto and home insurer in the United States. FAC ¶ 1. State Farm offers insurance and

---

[2]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

[3]The Court accepts as true all of the well-pleaded facts in the FAC and draws all reasonable inferences in favor of Plaintiffs. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

[4]State Farm Mutual Automobile Insurance Company is the parent company of State Farm Life Insurance Company, State Farm Fire and Casualty Company, State Farm General Insurance Company, and State Farm Bank, F.S.B. FAC ¶ 7.

financial products to customers through its network of agents across the United States. *Id.* ¶ 2.

Plaintiffs are African American individuals who have worked as State Farm Agents and State Farm Term Independent Contract Agents (TICA Agents). Plaintiff Alton Williams (Williams) worked as a State Farm Agent in Chicago's north side from 1999 until he was terminated on December 31, 2017. FAC ¶¶ 8, 51, 52. Plaintiff Brandon Herndon (Herndon) worked as a State Farm Agent in the Houston area from 2010 until he was terminated in March 2017. *Id.* ¶¶ 9, 59. Plaintiff Markus Tolson (Tolson) worked as a State Farm Agent, also in the Houston area, from October 2009 until he was terminated in approximately August 2016. *Id.* ¶¶ 10, 21. Plaintiff Jeffrey Flowers (Flowers) worked as a State Farm Agent in Michigan from December 2002 until approximately December 2019. *Id.* ¶¶ 11, 79. Plaintiff Brooke Cluse (Cluse) became a TICA Agent in 2011, signed an Agent Agreement in 2013, and is currently working as a State Farm Agent in Houston. *Id.* ¶¶ 88–90.

Plaintiff Vvonaka Richardson (Richardson) worked as a State Farm TICA Agent in Alabama from June 2019 until she was terminated in approximately July 2020. FAC ¶ 13. Plaintiff Vera Dixon (Dixon) worked as a State Farm TICA Agent in Virginia from June 2019 until she was terminated in approximately July 2020. *Id.* ¶¶ 14.

**B. State Farm's Policies and Practices**

**1. TICA Program**

State Farm recruits African American individuals to join State Farm as agents through its TICA program with the promise of lucrative business opportunities and careers. FAC ¶ 25. State Farm then requires TICA agents to invest substantial sums of their own money in rent, offices, marketing, sales leads, and hiring a team. *Id.* TICA Agents must complete a 17-week State Farm training course before they may open an agency and begin selling insurance. *Id.* ¶ 26.

**2. Territory Assignments and "Race Matching"**

State Farm disproportionately assigns non-African American Agents to territories and agency locations in more affluent areas, while relegating African American agents to areas with significantly less wealth. FAC ¶ 31. State Farm also engages in "race matching," by assigning African American Agents to areas with higher African American and minority populations. *Id.* As a result, State Farm gives non-African American Agents a head start in their careers.

When an agent retires or leaves State Farm, State Farm reassigns the agent's customers and existing insurance policies to other agents. FAC ¶ 35. Agents who receive these assignments gain the value of the policies and any financial products the customers may have and the ongoing commissions and opportunities to grow the customers' accounts or to gain new customers through leads and referrals. *Id.* Due to State Farm's policies and practices, African American agents are largely excluded from being assigned lucrative insurance policies. *Id.*

### 3. Discriminatory Compensation Policies and Practices

State Farm provides substantial compensation to its Agents pursuant to a uniform, nationwide compensation policy and practice called the "Scorecard Bonus." FAC ¶ 40. Yet State Farm intentionally selects and relies on factors that disadvantage African Americans to calculate the Scorecard Bonus paid to agents. *Id.* State Farm uses commissions-based and cumulative-advantage systems to evaluate and compensate its agents. *Id.* ¶ 41. However, because State Farm steers African American Agents to less affluent territories or assigns them to territories in which the clientele matches the agents' race, African American Agents are at a disadvantage because many of their clientele cannot afford to purchase financial service products and purchase fewer or less expensive insurance products. *Id.* ¶ 42. Furthermore, State Farm targets African American Agents for compliance issues, thereby denying those agents the opportunity to offer financial products to their clients. *Id.* As a result, African American Agents are substantially less likely than non-African American Agents to meet the requirements of the Score Card Bonus policy. *Id.* ¶ 43.

### 4. Heightened Scrutiny

State Farm also subjects African American agents to heightened scrutiny, holds them to higher compliance standards and, imposes greater discipline, including termination for alleged violations of State Farm policies. FAC ¶ 45. For instance, State Farm disproportionately denies or rescinds the right of African American agents to offer financial products. *Id.* ¶ 46. This restriction, in turn, limits an Agent's

compensation, ability to attract and maintain customers, and makes an agent ineligible to open a second agency location or receive policy assignments. *Id*. Non-African American Agents' policy violations, by contrast, are routinely ignored or result in lesser discipline, thereby allowing those agents to offer financial products. *Id*.

### 5. Termination Review Plan

State Farm employs a centralized practice called the "Termination Review Plan." FAC ¶ 47. An agent who has been informed that State Farm intends to terminate the agent's agreement may request a termination review from State Farm's CEO. *Id*. A State Farm review team makes findings and/or recommendations to the CEO, who makes the final decision whether to terminate the Agent. *Id*. ¶ 48.

## C. Plaintiffs' Experiences with State Farm

### 1. Alton Williams

When Williams applied to open up a State Farm agency on Chicago's north side, there were two available options: one in the "prosperous" Lakeview neighborhood and the other in a more racially diverse, "working class" neighborhood further west. FAC ¶ 52. Williams requested the Lakeview location, but State Farm assigned a white agent to the more lucrative Lakeview location and gave Williams the less lucrative location further west. *Id*. Williams was forced to stay in his territory and was never offered a more lucrative agency or location for the rest of his time as a State Farm agent. *Id*.

The FAC alleges that despite excelling as an agent, because of his race, Williams was denied business opportunities and valuable business resources and support, including but not limited to policy assignments and the right to open an additional agency office. FAC ¶ 53. State Farm additionally targeted Williams for heightened, unwarranted scrutiny and ultimately terminated his employment because of his race. Around September 2017, State Farm audited Williams' business. *Id.* ¶ 54. State Farm identified a small number of auto policies that had incorrect vehicle purchase dates listed on the applications. *Id.* State Farm charged Williams with "rate manipulation" and terminated his employment, even though any inaccuracies were the result of customer or clerical error, not intentional manipulation. *Id.* Significantly, the inaccuracies had no material impact on the price of the supposedly manipulated policies. *Id.* In contrast to Williams' treatment, Non-African American agents who were accused of more severe "rate manipulation" were subjected to far less or no discipline by State Farm. *Id.* Williams participated in the Termination Review Plan, and CEO Michael Tipsord decided to terminate Williams' relationship with State Farm. *Id.* ¶ 55.

On several occasions prior to his termination, Williams reported to his superiors at State Farm that he was being treated differently than his non-African American colleagues. FAC ¶ 56. For instance, Williams explained to State Farm management that there was a racial disparity in the level of compliance auditing and discipline to which State Farm subjects its African American agents as compared to non-African American agents. *Id.* Instead of investigating or otherwise addressing

Williams' concerns, State Farm subjected Williams to increased scrutiny, ongoing discrimination and harassment, and ultimately termination. *Id.*

### 2. Brandon Herndon

Herndon sought to open an agency in the "affluent" Sugar Land area of Houston, where he and his wife lived. FAC ¶ 59. But State Farm required Herndon to locate his agency in southwest Houston, a "less affluent" community with a large African American population. *Id.* ¶ 59. When Herndon raised his placement with State Farm, State Farm told Herndon he would "fit right in" and "understand the demographic," or words to that effect. *Id.* Shortly after Herndon opened his agency, State Farm placed two non-African American agents in Sugar Land and gave a white agent a large existing book of business. *Id.* ¶ 60. Herndon, by contrast, had to build his book of business from scratch. *Id.* ¶ 61. Herndon's agency, moreover, required significantly more overhead to operate than it would have in Sugar Land or another more affluent area. *Id.* And unlike in the more affluent Houston communities, the potential clients in Herndon's territory often had little disposable income, which led to Herndon selling fewer and less lucrative auto and home policies. *Id.* Herndon repeatedly requested to be assigned to a more lucrative market or open an additional agency in another territory. *Id.* ¶ 62. State Farm rejected these requests, telling Herndon that to be successful in his territory, he needed to hire a "black guy and a Hispanic guy" to be successful. *Id.*

Herndon nevertheless excelled as an agent, building a book of business of $1.8 million, consisting of mostly auto insurance policies. FAC ¶ 63. State Farm did

not reward Herndon's successes in the same manner it did for non-African American agents. *Id.* ¶ 64. As an example, State Farm denied Herndon the opportunity to open a new agency or territory. *Id.* State Farm also denied Herndon lucrative policy assignments and other business opportunities, resources, and support. *Id.* Herndon received policy assignments when an agent in southwest Houston retired worth about ten thousand dollars per year, whereas several of Herndon's non-African American agent colleagues received policies worth hundreds of thousand dollars in a single year. *Id.* ¶ 65.

For instance, when a 40-year agent with a considerable book of business located near Herndon announced his plan to retire, the retiring agent informed Herndon that he wanted Herndon to inherit his book of business. *Id.* ¶ 66. State Farm, however, refused to approve Herndon inheriting his book of business or getting any accounts from the retiring agent's book of business. *Id.* Herndon told his manager that he believed that State Farm refused because of Herndon's race. *Id.* The manager did not deny or investigate the issue and warned Herndon to not "go there." *Id.* The FAC alleges that State Farm retaliated against Herndon by denying him any policy assignments for the remainder of his time at State Farm, subjecting him to increased scrutiny, and ultimately terminating him. *Id.*

State Farm terminated Herndon after he sold some auto insurance policies to ride-share drivers, which a State Farm underwriter told him he was authorized to do. FAC ¶ 68. State Farm later informed Herndon that the underwriter had been mistaken, and that ride-share policies were not approved in Texas. *Id.* Herndon

immediately contacted his customers and told them that their ride-share driver policies would be terminated, but State Farm still refused to renew his contract and terminated his agent agreement. *Id.* A few days later, State Farm announced that it would be offering ride-share drive policies in Texas. *Id.*

### 3. Markus Tolson

Tolson initially selected the River Oaks neighborhood in Houston for his agency. FAC ¶ 73. State Farm needed to find a new agent to take over an existing agency in River Oaks that had a considerable book of business. *Id.* Rather than assigning the agency to Tolson, State Farm gave the location to a non-African American agent and placed Tolson back in the pool of agents waiting for a location assignment. *Id.* State Farm eventually assigned Tolson the less lucrative Greater Heights territory, where he was required to start an agency from scratch. *Id.* Tolson was forced to stay in his territory and was never offered a more lucrative agency or location for the remainder of his time with State Farm. *Id.*

Nonetheless, Tolson was successful. FAC ¶ 74. Yet, State Farm allegedly denied Tolson policy assignments while his non-African American colleagues received policy assignments worth hundreds of thousands of dollars. *Id.* Tolson often notified State Farm management that non-African American agents in his region were receiving substantially more policy distributions. *Id.* State Farm never investigated or addressed Tolson's concerns. *Id.*

In light of Tolson's success, especially in the sale of financial products, Tolson grew concerned that State Farm would target him and subject him to increased

scrutiny because of his race. FAC ¶ 75. Tolson communicated this fear to his manager and required his employees to complete more compliance training than State Farm required. *Id.* Yet Tolson faced heightened scrutiny and differential discipline. *Id.* ¶ 76. State Farm terminated Tolson after one of his employees allegedly violated a State Farm policy, of which Tolson was unaware; Tolson fired the sales representative as soon as he learned about the situation. *Id.* ¶ 76. State Farm did not similarly target, discipline, or terminate non-African American agents who engaged in serious violations of State Farm policies. *Id.* Tolson participated in the Termination Review Plan and was terminated; the final decision was made by CEO Michael Tipsord. *Id.* ¶ 77.

### 4. Jeffrey Flowers

Flowers applied to open his agency in Michigan, where there were two available locations, one in the "prosperous" town of Canton and the other in the predominately African American "working-class" town of Pontiac. FAC ¶ 79. Flowers expressed an interest in Canton, but State Farm steered him to Pontiac and assigned a white agent to the more lucrative Canton location. *Id.* Flowers was forced to remain in Pontiac for the rest of his State Farm tenure. *Id.* Pontiac is nearly 50 percent African American, has a median household income of approximately $33,000, and a poverty rate of 32 percent. *Id.* ¶ 80. In such an area, optional products like life insurance and bank products were beyond the reach of the prospective client and the majority of Pontiac residents were renters rather than homeowners. *Id.* As a result,

11

Flowers had to rely almost exclusively on selling auto insurance to build his book of business. *Id.*

While Flowers nevertheless excelled as an agent, State Farm denied him business opportunities, not limited to policy assignments throughout his tenure. FAC ¶ 81. In or around 2007, Flowers relocated his family to Tennessee and split his time between Michigan and Tennessee. *Id.* ¶ 82. Although Flowers continued to perform at a high level as a State Farm agent, State Farm began subjecting Flowers to heightened scrutiny in 2017. *Id.* ¶ 83.

In approximately 2019, State Farm claimed it audited Flowers' book of business and that his office lacked proper oversight because of his living arrangement. FAC ¶ 84. State Farm specifically complained that some of Flowers' clients had higher liability coverage before they joined State Farm. *Id.* Flowers explained that most of his clients were lower income with fewer assets, such as a home, that would require higher liability coverage. *Id.* Flowers further explained that many of his clients had been sold more expensive insurance products by their prior insurers than they needed before they became clients of Flowers and State Farm. *Id.* State Farm told Flowers that if a customer had a higher liability coverage before coming to State Farm, Flowers should sell a policy with similar liability coverage, regardless of whether it was appropriate for the client's needs. *Id.* State Farm's heightened scrutiny stood in contrast to State Farm's treatment of non-African American agents who had similar living arrangements. *Id.* ¶ 85. A white agent with an agency in Michigan lived in New Jersey and traveled to Michigan only one week

12

a month, less than the time Flowers spent in his Michigan office. *Id*. Despite that, the white agent was not audited or subjected to increased scrutiny. *Id*.

Following the audit, State Farm continued to subject Flowers to heightened scrutiny. FAC ¶ 86. Among other things, State Farm required Flowers to submit a monthly report detailing any new policies he wrote and what liability coverage the client had prior to State Farm. *Id*. State Farm management further told Flowers that it would claim rate manipulation if Flowers continued to write policies with lower liability coverage than the client had prior to State Farm, regardless of the customer's needs. *Id*. Having seen other successful African American agents being targeted and terminated by State Farm, Flowers left State Farm in 2019. *Id*.

### 5. Brooke Cluse

Before becoming a TICA agent in 2011, Cluse worked for several years as a claims representative and public affairs specialist at State Farm in Texas and Louisiana. FAC ¶ 88. However, when Cluse was ready to start working as a TICA agent, State Farm denied Cluse the opportunity to open an agency in her home state of Louisiana, and instead gave the agency to non-African American agents. *Id*. ¶ 89. Cluse was then forced to relocate and open an agency in Houston, Texas. *Id*. State Farm directed her to the location of a former African American agent who had been terminated for being unable to build a successful business in the territory. *Id*. After Cluse opened the agency, she discovered that the book of business was substantially less than the amount State Farm had represented as the book of business. *Id*. Cluse,

13

nevertheless, became a successful agent. *Id.* ¶ 91. State Farm, however, denied her policy assignments and other business opportunities. *Id.*

After experiencing and observing State Farm's differential treatment of African American agents, Cluse sought help and reform, and complained about State Farm's discriminatory practices. FAC ¶ 92. Cluse specifically complained to her Sales Leader and Vice President of Agency about the policy assignments given to white agents but denied African American agents, as well as the targeting of African American agents for audits and compliance violations while white agents engaging in similar or more egregious violations are not subjected to the same level of scrutiny or punishment. *Id.* State Farm did not take corrective action in response to Cluse's complaints. *Id.* ¶ 93.

Instead, Cluse faced heightened scrutiny. FAC ¶ 93. In or around October 2019, Cluse received a complaint from a customer about an individual on Cluse's team. *Id.* Cluse immediately investigated the incident, terminated the employee, and reported the incident to State Farm. *Id.* State Farm responded by launching an audit of Cluse's entire book of business. *Id.* In or around March 2020, State Farm found an instance of "rate manipulation" by an employee three years earlier. *Id.* State Farm, as a sanction, rescinded Cluse's bank certification. *Id.* As a result, Cluse can no longer offer bank products, which can be lucrative and help attract and retain clients. *Id.* During Cluse's tenure, white agents who engaged in similar or worse infractions were not similarly targeted or punished by State Farm. *Id.* Cluse continued to raise her

14

concerns about the racial disparities between African American and white agents to both CEO Michael Tipsord and a Senior Vice President, to no avail. *Id.* ¶ 94.

### 6. Vvonaka Richardson

Richardson was assigned to open her agency in Mobile, Alabama. FAC ¶ 98. At that time, two senior State Farm agents had recently died, and State Farm needed to find new agents to take over their large books of business. *Id.* State Farm promised Richardson a substantial portion of those books of business but assigned the majority of the business to a white TICA agent instead. *Id.*

Like many agents, Richardson lost several team members as a result of the Covid-19 pandemic. FAC ¶ 101. In April, 2020, State Farm told Richardson that "she had 60 days to get a new team in place or she would not be given a full Agent contract." *Id.* At great expense to herself, Richardson hired and trained a new team and submitted a new action plan to State Farm. *Id.* State Farm refused to alter her production requirements. *Id.* Richardson asked State Farm and its CEO for an extension of her TICA contract in light of the pandemic, but State Farm denied her request. *Id.* ¶ 102. State Farm gave white TICA agents who did not meet production goals extensions and full Agent contracts. *Id.*

Richardson complained of race discrimination and disparate treatment to State Farm management, including CEO Michael Tipsord and the newly appointed Chief Diversity Officer, Victor Terry. FAC ¶ 103. Richardson received no response to her complaints. *Id.*

15

### 7.  Vera Dixon

Dixon became a TICA agent in June 2019, after a successful career in information technology. FAC ¶ 105. After working to obtain State Farm insurance for her church, a white male State Farm Sales Leader in Chesapeake, Virginia encouraged Dixon to pursue a career as a State Farm agent. *Id.* ¶ 106.

Dixon was initially offered an existing agency in Smithfield, Virginia with a considerable book of business." FAC ¶ 107. State Farm, however, gave the Smithfield agency and its book of business to three white males, at least two of whom were TICA Agents. *Id*. With Smithfield unavailable, Dixon then applied to two agencies, one in Norfolk and the other in Chesapeake. *Id.* ¶ 108. The former had an existing book of business, whereas the latter did not. *Id*. State Farm assigned the Norfolk agency to a white male TICA Agent. *Id*. Dixon was assigned the Chesapeake agency. *Id*. Dixon's sales leader promised to give her an existing book of business later, but never made good on that promise. *Id*. While State Farm assured Dixon during her application process that she could sell insurance policies in North Carolina, where she had a strong network, once hired, State Farm refused to allow Dixon to develop customers or sell policies outside of Virginia. *Id.* ¶ 110. State Farm, however, allowed at least five non-African American agents in Dixon's Virginia region to sell and do business in North Carolina. *Id.*

When the COVID-19 pandemic hit, Dixon was forced to continue to invest her own assets into her agency and defer paying herself a salary. FAC ¶ 111. Dixon

sought assistance from State Farm but only received advice to spend more money on purchasing leads and hiring staff. *Id.*

Dixon complained of race discrimination and retaliation on several occasions. FAC ¶ 112. For instance, in early 2020, Dixon complained of race discrimination to State Farm management. *Id.* Dixon was refused a meeting and subsequently told she would not receive her full agent contract. *Id.* Her sales leader stated: "I don't want to have to work with you in a year from now." *Id.* Dixon complained about this animus to State Farm management, to no avail. *Id.* Ultimately, State Farm did not extend Dixon a full Agent contract. *Id.*

## II. Agent Agreements

Before turning to the substance of State Farm's motion to dismiss, the Court briefly addresses whether the Court can consider the agent agreements attached to State Farm's motion to dismiss. *See* Memo. Dismiss Exhs. A–G.

Generally, a court may not consider extrinsic evidence when reviewing a motion to dismiss without converting it to a motion for summary judgment. *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020) (citing *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018)). However, a court "may consider documents attached to a defendant's motion to dismiss, where those documents are 'referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011) (quoting V*enture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). Furthermore, as observed by State Farm, where an exhibit

"incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (citations omitted).

But here, the agency agreements are not central to Plaintiffs' claims. Plaintiffs' allegations largely involve claims that State Farm assigned African American agents to less lucrative markets, subjected them to unwarranted and heightened scrutiny and discipline, and failed to renew or grant them Agent Agreements, when compared to their white counterparts. *See, e.g.*, FAC ¶¶ 21–50. While the agreements are "foundational" in the sense that this is a Section 1981 case, *see* R. 46, Reply at 3 n.2, Plaintiffs do not rely on the terms or language of the agreements in stating their claims. It is thus not the case that Plaintiffs are attempting to "surviv[e] a motion to dismiss by artful pleading or by failing to attach relevant documents." *188 LLC v. Trinity Indust., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (district court did not err in reviewing form in breach of contract case where form was purportedly on the reverse side of the parties' contract and district court "needed to view Form 4 to understand the nature of the dispute between the parties").

It is likewise not the case that the agreements unambiguously contradict the FAC's allegations. For instance, State Farm cites to the agreement exhibits in support of its argument that Plaintiffs Tolson, Herndon, Williams, and Flowers "admit" that their relationships with State Farm ended "after State Farm uncovered violations of Company policy and procedures resulting in a breach of its trust-based relationship with them[.]" Memo. Dismiss at 5–6. But boilerplate agreement

language about Plaintiffs' contractual obligations to "follow State Farm procedures," or be "responsible for the recruitment, selection, compensation, management, and control of [] staff," does not irrefutably disprove that Plaintiffs were discriminated against. *Id.*

At summary judgment, State Farm can use the agreements and other evidence in the record to try to disprove Plaintiffs' discrimination claims. For now, State Farm has not persuaded the Court that the agreements fit into the narrow exception permitting the Court to consider extraneous documents on a Rule 12(b)(6) motion. *See Hardiman v. Lipnic*, 455 F. Supp. 3d 693, 701 (N.D. Ill. 2020) (internal quotation marks and citations omitted) ("The exception permitting the Court to consider documents on a Rule 12(b) motion is a 'narrow' one, intended for cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment."). The Court therefore declines to consider the agent agreements in connection with this motion to dismiss.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on

its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## Analysis

Section 1981 provides that, "all persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981; *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020). Plaintiffs assert two Section 1981 claims against State Farm in the FAC: racial discrimination (Count I) and retaliation (Count II).

To state a racial discrimination claim under Section 1981, Plaintiffs must allege: (1) that they are members of a racial minority; (2) that State Farm had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, the making and enforcing of a contract). *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir. 1996). In addition, as discussed further below, under *Comcast Corp.*, 140 S. Ct. at 10190, a Section 1981 racial discrimination plaintiff must plead that "but for race, [the plaintiff] would not have suffered the loss of a legally protected right."

20

As a result, while "[t]he legal analysis for discrimination claims under Title VII and § 1981 is largely identical," *Lewis v. Indiana Wesleyan Univ.,* 36 F.4th 755 (7th Cir. 2022) (citing *McCurry v. Kenco Logistics Servs., LLC,* 942 F.3d 783, 788 (7th Cir. 2019)); *see also Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 773 (N.D. Ill. 2020) ("[C]ourts analyze Section 1981 claims using the same standards as Title VII."), a Section 1981 plaintiff must plead "but for" causation, whereas a Title VII plaintiff can plead causation in one of two ways: (1) by alleging that a protected trait was a "motivating factor" in a defendant's challenged employment practice; or (2) by the more traditional but-for causation standard. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1740 (2020).

Even so, this is not summary judgment, and satisfying Rule 8 and the accompanying standards articulated by the Supreme Court in *Twombly* and *Iqbal* does not require a plaintiff to plead a prima facie case of employment discrimination. *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022).

State Farm advances four arguments for dismissal of the FAC. First, State Farm argues that Plaintiffs fail to plausibly allege that State Farm intentionally discriminates against African American agents. Memo. Dismiss at 8. Second, State Farm contends Plaintiffs have not plausibly alleged "but for" causation as required to state a viable Section 1981 racial discrimination claim. *Id*. at 12. Third, State Farm argues Plaintiffs have failed to plausibly allege that they were retaliated against as a result of protected activity. *Id*. at 16. Fourth, State Farm asserts that the four-year

statute of limitations for Section 1981 claims bars much of Plaintiffs' claims. *Id.* at 19. The Court addresses each in turn.

## I. Intent to Discriminate

Section 1981 can only be violated by purposeful discrimination. *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982). Still, the allegations supporting the intent element can be pled quite generally. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (describing the "minimal pleading standard for simple claims of race or sex discrimination"); *see also Cole v. Bd. of Trs. of N. Ill. Univ.*, 38 F. Supp. 3d 925, 931 (N.D. Ill. 2014) (citations omitted) (explaining that racial animus "need not be set out with plausible factual allegations[;] instead a plaintiff can rely on conclusory allegations [of] racial animus").

State Farm argues that Plaintiffs fail to plausibly allege that State Farm intentionally discriminated against African American Agents. Memo. Dismiss. at 8. Instead, asserts State Farm, Plaintiffs rely on conclusory allegations which are insufficient to plead intent (citing *Twombly* and *Iqbal*). The Court disagrees.

While the FAC does contain some conclusions, which the Court need not accept as true, it also contains factual allegations that support a reasonable inference of intent to discriminate.[5] Specifically, Plaintiffs allege that State Farm engaged in company-wide discriminatory policies, such as "race matching" African American agents to less lucrative territories with higher African American and minority

---

[5]Because the FAC contains more than just generalized allegations with statistical evidence on disparate impact, State Farm's arguments attacking statistical evidence, *see* Memo. Dismiss at 10, miss the mark.

22

populations and refusing to reassign African American agents outside of their originally "race matched" territories. *See, e.g.*, FAC ¶¶ 29, 30, 31, 52. According to the FAC, African American agents were required to build their books of business from scratch, whereas non-African American agents were given substantial books of business. *See, e.g.*, *id.* ¶¶ 73, 98, 107–108. Plaintiffs further allege that State Farm systematically subjects African American agents to heightened scrutiny, higher compliance standards, and greater discipline, including termination. *See, e.g.*, *id.* ¶¶ 45–60, 66, 76. Although State Farm is correct that Plaintiffs have alleged that notwithstanding the fact that they were placed in more economically challenged territories, they became successful agents, *see* Memo. Dismiss at 11; FAC ¶¶ 8, 10, 53, 74, Plaintiffs additionally allege that State Farm denied them the opportunity to open second agencies while affording that opportunity to non-African American agents. *See, e.g.*, FAC ¶ 46, 67. Thus, the FAC contains plausible allegations on the issue of intent.

All in all, Plaintiffs have alleged that they were discriminated against because of their race. At this Rule 12(b)(6) juncture, the FAC's general pleadings suffice. *See Freeman v. Metro. Water Reclamation Dist.*, 927 F.3d 961, 965 (7th Cir. 2019) (citations omitted) ("Rather, to proceed against the District under § 1983 or Title VII, Freeman needed only to allege—as he did here—that the District fired him because of his race."); *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781 (7th Cir. 2007) (citations omitted) (plaintiff alleging racial discrimination can allege employers' intent "quite generally" and still proceed beyond pleadings); *Bennett v.*

23

*Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("'I was turned down for a job because of my race' is all a complaint has to say."). Whether Plaintiffs will be able to show that State Farm actually had the intent to discriminate is a question for another day.

State Farm reasons that Plaintiffs' complaint is "fundamentally implausible," because State Farm does better when all of its agents, irrespective of race, do better. Memo. Dismiss at 8. The Court finds this argument unconvincing. By State Farm's logic, no salesperson could ever state a pattern or practice claim for racial discrimination because the company employing the salesperson has a general incentive to make more money. While, as a general matter, it is not *logical* for a company to act in a way that reduces the company's profits, that does not make a salesperson's racial discrimination allegations categorically *implausible*.

State Farm further insists that Plaintiffs fail to plead intent with the "required level of factual specificity," as required by *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 887 (7th Cir. 2012). Memo. Dismiss at 8. Yet *McReynolds* is distinguishable from this case and does not change the general pleading requirements for intent. In *McReynolds*, the Seventh Circuit affirmed a district court's dismissal of the plaintiffs' Section 1981 and Title VII claims due to the challenged retention program qualifying as a production-based compensation system under Section 703(h) of Title VII, (codified at 42 U.S.C. § 2000e–2(h)). 694 F.3d at 877. The Seventh Circuit held that dismissal of the Section 1981 and Title VII claims was proper because "Section 703(h) [] creates an exception to the general rule that 'a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but

24

that nonetheless discriminate in effect against a particular group.'" *Id.* at 880 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 349 (1977)). Thus, the *McReynolds* court's holdings and analysis regarding the required pleadings for intent in a Section 1981 racial discrimination claim pertain to cases with a Section 703(h) exemption. *See, e.g.*, *id.* at 885, 887.

Here, State Farm does not argue that a Section 703(h) exemption applies, so *McReynolds* presents the wrong measuring stick for the FAC. *See Allen-Noll v. Madison Area Tech. Coll.*, 2018 WL 6834477, at *6 (W.D. Wis. Dec. 28, 2018) ("*McReynolds* is distinguishable because it involved a bona fide production-based compensation system under 42 U.S.C. § 2000e–2(h), for which it is necessary to plead a specific intent to discriminate.").

That said, one issue from *McReynolds*, unrelated to the Section 703(h) exemption, remains. As State Farm points out, in *McReynolds*, the Seventh Circuit found that the plaintiffs' intent allegations in that case were problematic, at least in part, because in "a complex discrimination claim . . . under *Iqbal* and *Twombly*, the required level of specificity rises with the complexity of the claim." Memo. Dismiss at 10 (citing 694 F.3d at 887). While that unremarkable proposition of law is certainly true (for any complaint), the Seventh Circuit has held that "the degree of specificity required is not easily quantified," and that the plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks and citation omitted). Here, the Court finds that Plaintiffs' allegations present a story

sufficiently cohesive to unlock the doors to discovery. A brief discussion on State Farm's supplemental authority, *Byrd v. McDonald's USA, LLC*, 2021 WL 2329369 (N.D. Ill. June 8, 2021), illustrates why. *See* R. 54.

In *Byrd*, African American franchisees of McDonald's brought a putative class action against McDonalds under Section 1981. 2021 WL 2329369, at *1. Plaintiffs alleged that McDonald's' growth strategy was predatory in nature, and that McDonald's targeted African American consumers, markets, and territories by steering African American franchisees to African American neighborhoods with high overhead costs. *Id.* McDonald's moved to dismiss the complaint, arguing that the complaint failed to allege any specific facts that could support a plausible inference that McDonald's intended to discriminate against Black-franchise owners. *Id.* at *3. The court agreed. It found that, regardless of whether the case was classified as "simple" or "complex," the minimum allegations necessary to satisfy Rule 8 for discrimination cases are the three W's: who, what, and when. *Id.* at *4 (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)). The plaintiffs' complaint, concluded the court, failed to satisfy this standard. *Id.* at *4.

But here, the Court finds that the Plaintiffs have sufficiently explained the who, what, and when in a way that presents a story that holds together. The FAC identifies CEO Michael Tipsord, Plaintiffs' managers, Cluse's Sales Leader and Vice President of Agency, and others at State Farm as the actors, or the "who" of Plaintiffs' discrimination claims. *See, e.g.*, FAC ¶¶ 75, 77 85, 92. Plaintiffs allege the "what," *i.e.*, that State Farm engages in a firm-wide pattern and practice of race

26

discrimination and discriminatory policies and practices,[6] and that pursuant to those policies and practices, Plaintiffs were assigned to less lucrative territories, began their careers from scratch or with a significantly smaller book of business, were denied valuable policies and resources, were subjected to differential discipline, and were paid lower wages because of their race. *See, e.g.*, *id.* ¶¶ 4, 52, 59, 61, 73, 53, 64–66, 54–56, 95, 104. Plaintiffs also allege that these acts took place throughout their tenures as State Farm agents, which provides the "when." *See, e.g.*, *id.* ¶¶ 74, 79, 81. The FAC therefore satisfies the "three w's." *See Swanson*, 614 F.3d at 405 ("Swanson's complaint identifies the type of discrimination that she thinks occurs (racial), by whom (Citibank, through Skertich, the manager, and the outside appraisers it used), and when (in connection with her effort in early 2009 to obtain a home-equity loan). This is all that she needed to put in the complaint.").

In another attempt to raise the pleading standard for the intent element of a Section 1981 racial discrimination claim, State Farm contends that Plaintiffs fail to plausibly allege facts that would support an inference of intentional discrimination

---

[6]State Farm avers that a "pattern or practice" approach cannot be used to establish Plaintiffs' Section 1981 claim of company-wide discrimination because only the EEOC can bring a "pattern or practice" claim under Section 707 of Title VII, 42 U.S.C. § 2000e-6(a). Reply at 13 (citations omitted). The Court cannot make heads or tails of this argument. While it is certainly true that only the EEOC can bring a Section 707 pattern or practice claim, not every pattern or practice claim is a Section 707 claim. *See, e.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709 (7th Cir. 2012) (private individual on behalf of herself and a putative class alleging that the defendant carried out a nationwide pattern or practice of sex discrimination in contravention of Title VII); *Daniels v. Fed. Rsrv. Bank of Chicago*, 194 F.R.D. 609, 612 (N.D. Ill. 2000) (current and former employees of bank alleging bank has pervasive pattern and practice of discriminating against African Americans under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e). Indeed, even State Farm's supplemental case, *Byrd*, is a Section 1981 case alleging a pattern or practice claim. *See* 2021 WL 2329369, at *5. None of the foregoing pattern or practice cases was dismissed because private individuals, rather than the EEOC, filed suit.

under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Memo. Dismiss at 11. But as the Supreme Court and the Seventh Circuit have made clear, *McDonnell Douglas* is an evidentiary standard for summary judgment, not a hurdle plaintiffs must clear on a Rule 12(b)(6) motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002) ("This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013) (citations omitted) ("[T]he Supreme Court has made clear that the pleading standards in Title VII cases are different from the evidentiary burden a plaintiff must subsequently meet when using the method of indirect proof under *McDonnell Douglas*.").

Contrary to State Farm's suggestion, Memo. Dismiss at 11, the test set forth in *McDonnell Douglas* continues to be a summary judgment standard—not a Rule 12(b)(6) standard—even after the Supreme Court's decision in *Comcast*.[7] As the Supreme Court in *Comcast* explained, "McDonnell Douglas sought only to supply a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination." 140 S. Ct. at 1019 (citations omitted). While the Supreme Court did state that *McDonnell Douglas* could not provide a shield for a complaint to survive a motion to dismiss when it fails to allege an essential element of a Section 1981 claim, *see id.* at 1019, the Supreme Court in no way held that

---

[7]The Court discusses this case further below in connection with State Farm's causation arguments.

defendants could use *McDonnell Douglas* as a sword in a motion to dismiss (as State Farm attempts to here). Plaintiffs have not failed to allege an essential element of their Section 1981 claim here, so State Farm's argument that the Court should dismiss the FAC on *McDonnell Douglas* grounds, in light of *Comcast*, falls flat.

Along similar lines, State Farm suggests that the FAC is deficient because Plaintiffs fail to adequately plead facts identifying similarly situated non-African American agents who were not subjected to the same adverse actions. Memo. Dismiss at 12. However, such comparator evidence, like the *McDonnell Douglas* requirements, are not required at the pleading stage. As the Seventh Circuit recently held, a discrimination plaintiff "certainly does not need to identify . . . a similarly situated employee who managed to avoid termination" in order to survive a motion to dismiss. *Kaminski*, 23 F.4th at 777 (citation omitted). *See also Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 830 (7th Cir. 2014) (explaining that, although plaintiffs at summary judgment may need to point to similarly situated comparators, plaintiffs need not identify comparators in pleadings and often need discovery to identify them); *Hickman v. Fam. Dollar, Inc.*, 2021 WL 4401498, at *4 (N.D. Ill. Sept. 27, 2021) (citations omitted) (comparator allegations for Section 1981 claim not required to survive motion to dismiss). In any event, the FAC does allege that similarly situated non-African American agents received better territories, better policy assignments, and less severe discipline. *See, e.g.*, FAC ¶¶ 52, 53 59–60, 65–66, 73, 79, 89, 93, 98,

29

107–108.[8] State Farm's comparator argument consequently does not support dismissal of the FAC.

At this stage, Plaintiffs have done enough to plead intent, so the Court turns to State Farm's causation arguments.

## II. Causation

State Farm argues that the Court should dismiss the complaint because Plaintiffs do not plausibly allege "but for" causation as required to state a viable Section 1981 claim. Memo. Dismiss at 12. A plaintiff, asserts State Farm, "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Id.* (citing *Comcast,* 140 S. Ct. at 1019; *Piccioli v. Plumbers Welfare Fund Loc. 130, U.A.,* 2020 WL 6063065, at *6 (N.D. Ill. Oct. 14, 2020)). State Farm submits that Plaintiffs cannot state a Section 1981 claim by simply alleging that race played a role in State Farm's conduct. *Id.* at 13. Rather, Plaintiffs "must plausibly allege facts that establish that their race was the actual cause of the injury for which they seek redress." *Id.* Plaintiffs, according to State Farm, fail to do so.

---

[8]State Farm further directs the Court to *Thurmon v. Mount Carmel High Sch.*, 191 F. Supp. 3d 894 (N.D. Ill. 2016) and *Payne v. Abbott Lab'ys*, 999 F. Supp. 1145 (N.D. Ill. 1998), *see* Memo. Dismiss at 12, but neither case is like this one. In *Thurmon*, the court held that the plaintiff failed to show the defendant's intent where the complaint did not "reference racial discrimination when recounting the factual allegations except to state tautologically at the end of the facts section that 'the treatment of Plaintiffs was based on their race in that non-black students received substantially better treatment.'" 191 F. Supp. 3d at 897. Here, the FAC does more than tautologically state that Plaintiffs' treatment was based on race. *See, e.g.*, FAC ¶ 59 (allegation of Herndon being "race matched" to southwest Houston and being told he would "fit right in" and "understand the demographic"). *Payne* is inapposite because there the complaint appeared to rely exclusively on a glass ceiling study, showing that over 90% of the defendant's high-level officials, managers, professionals, sales workers, and higher-grade employees were white to plead intent. 999 F. Supp. at 1147, 1153.

In *Comcast*, the Supreme Court declared that a plaintiff asserting a Section 1981 claim "must initially plead and ultimately prove that, *but for* race, it would not have suffered the loss of a legally protected right." 140 S. Ct. at 1019 (emphasis added). There, plaintiff, Entertainment Studio Network (ESN), an African American owned television-network operator, and the National Association of African American-Owned Media, brought a section 1981 action against Comcast after Comcast refused to carry ESN's channels, alleging that Comcast "systematically disfavored '100% African American-owned media companies.'" *Id.* at 1013. Comcast insisted that its refusal was based on lack of programing demand, among other reasons. *Id.* After three rounds of pleadings, motions, and dismissals, the district court ultimately dismissed the plaintiffs' complaint, finding that the plaintiffs failed to plausibly show that, but for racial animus, Comcast would have contracted with the plaintiffs. *Id.* The Ninth Circuit reversed the district court, holding that a section 1981 plaintiff "doesn't have to point to facts plausibly showing that racial animus was a 'but for' cause of the defendant's conduct." *Id.* Rather, the Ninth Circuit held that a plaintiff "must only plead facts plausibly showing that race played 'some role' in the defendant's decisionmaking process." *Id.*

In a unanimous decision, the Supreme Court reversed the Ninth Circuit. As an initial matter, the Court observed that it is "textbook tort law" that a plaintiff must prove but-for causation. *Comcast*, 140 S. Ct. at 1014 (citation omitted). Under this standard, explained the Court, "a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred." *Id.* In

rejecting plaintiffs' argument that Section 1981 departs from the general rule of "but for causation," the Court looked to the statute's text, history, and Supreme Court precedent, and found that Section 1981 follows the general rule. *Id.* at 1015. In doing so, the Court rejected the plaintiffs' suggestion that the Court apply the "motivating factor" causation test found in Title VII cases. *Id.* at 1016–18.

In *Piccioli*, the other in-circuit (albeit unpublished) case cited by State Farm, *see* Memo. Dismiss at 12–13, the plaintiff sued his health and welfare plan sponsor for vicarious racial discrimination under Section 1981, asserting that the defendant denied covering his treatments for spinal pain because his doctor was Indian. 2020 WL 6063065, at *1. The *Piccioli* court found that, in light of *Comcast*, "a plaintiff cannot survive a motion to dismiss upon a showing that racial discrimination was one factor among many in a defendant's decision. Racial discrimination must be the determining factor." *Id.* The court accordingly dismissed the plaintiff's complaint because it found that the plaintiff failed to show that racial discrimination was "a but-for cause" of the defendant's denial of Ketamine treatments. *Id.* at *6. The court reasoned that because the amended complaint "effectively conceded that the [defendant] interfered with his coverage of Ketamine infusions from any provider, without regard to their identity or race," the plaintiff "pleaded himself out of court." *Id.*

Plaintiffs respond that, contrary to State Farm's suggestion, *Comcast* did not "radically alter the landscape of § 1981 litigation[.]" R. 45, Resp. at 15. Rather, following *Comcast*, a plaintiff need only plead that the "employer instituted a

(specified) adverse employment action against the plaintiff on the basis of her [race]." *Id*. Plaintiffs further assert that in *Bostock*, the Supreme Court found that an adverse action can have multiple but for causes. *Id*. (citing 140 S. Ct. at 1739).

In *Bostock*, the Supreme Court held that discrimination on the basis of sexual orientation or transgender status constitutes discrimination because of an individual's sex and therefore violates Title VII. 140 S. Ct. 1731. In reaching its conclusion, the Supreme Court found that Title VII's "because of" test incorporates the traditional but-for causation standard. *Id*. at 1739 (citation omitted). According to the Court, that form of causation is "established whenever a particular outcome would not have happened 'but for' the purported cause." *Id*. (citation omitted). The but-for test, reasoned the Supreme Court, "directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id*. The Supreme Court nevertheless acknowledged that but-for causation is a "sweeping standard," because "[o]ften, events have multiple but-for causes." *Id*. The Supreme Court provided the example of a car accident, in which the defendant ran a red light and the plaintiff failed to signal his turn at the intersection: "we might call each a but-for cause of the collision." *Id*. (citation omitted). Critically, the Supreme Court concluded, "[w]hen it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's [protected trait] was one but-for cause of that decision, that is enough to trigger the law." *Id*. (citations omitted).

The parties' positions on *Comcast* and *Bostock* present an interesting and difficult question—whether *Bostock*'s multiple but-for causes analysis can apply in the Section 1981 context. Unfortunately, neither party offers a satisfactory answer. Plaintiffs downplay *Comcast* and invite the Court to apply *Bostock*'s but-for causation analysis in the Title VII context to their Section 1981 claim. Resp. at 15. Whereas State Farm, by way of a footnote, merely concludes that *Bostock* is exclusively a Title VII case with no application to a Section 1981 claim. Reply at 8 n.5. The Court, however, need not untangle the *Comcast*/*Bostock* knot here because the Court finds that, even under *Comcast*, Plaintiffs have alleged the requisite but-for causation.

This is because throughout the FAC, Plaintiffs allege that, *because of their race*, they were, among other things, "race matched" to less lucrative territories, denied advancement opportunities, disciplined more harshly, and even terminated.[9] *See, e.g.*, FAC ¶¶ 53, 54, 59, 66, 75. The FAC thus passes muster under the *Comcast* decision alone because the Supreme Court in *Comcast* recognized that Section 1981, like Section 1982, requires a plaintiff pleading causation to allege that the defendant's challenged conduct was "because of race." 140 S. Ct. at 1016–17. The Court thereby recognized that but-for causation can be satisfied by pleading that a defendant's challenged conduct was "because of" race. *Id.* Here, Plaintiffs have done just that. Plaintiffs allege that they would not have been subject to these purportedly

---

[9]In its reply brief, State Farm appears to concede that a Section 1981 complaint should survive a motion to dismiss where the plaintiffs plausibly allege that adverse actions occurred "because of their race." *See* Reply at 9 ("[P]ost-Comcast, courts dismiss § 1981 claims where a plaintiff fails to plausibly allege that they were discriminated against because of their race.").

adverse events had they been white. Plaintiffs' allegations, moreover, are plausible because they support their "because of their race" allegations with specifics and do not merely tack "because of race" onto their allegations. *See, e.g.*, FAC ¶¶ 54, 59, 66, 75–76. Applying *Comcast's* definition of but-for causation, the Court finds Plaintiffs have satisfied the pleading requirements for causation.

State Farm's arguments to the contrary misfire. For instance, State Farm argues that Plaintiffs fail to plead causation for Plaintiffs Flowers, Herndon, Tolson, and Williams because "each admits that their contractual relationship with State Farm ended after they were found to have violated State Farm policies and procedures – the Complaint states that Plaintiff Williams engaged in rate manipulation, Plaintiff Herndon sold policies that were not approved for sale by the Company in Texas, an employee of Plaintiff Tolson violated a Company policy, and Plaintiff Flowers failed to adequately supervise his agency." Memo. Dismiss at 14 (citing FAC ¶¶ 54, 68, 76).

As an initial matter, State Farm at least partially misreads the FAC. For example, the FAC does not allege that Williams engaged in rate manipulation. Instead, the FAC alleges that State Farm "targeted Williams for *heightened, unwarranted* scrutiny," and "*unfairly* and *inaccurately* charged Williams with 'rate manipulation'[.]" FAC ¶ 54 (emphases added). With respect to Tolson, the FAC alleges that "State Farm terminated Tolson after one of his employees *allegedly* violated a State Farm policy, even though Tolson was *unaware* of the *alleged violation* and fired the sales representative as soon as he learned about the situation." *Id.* ¶ 76.

That, too, is not the same as pleading that Tolson's employee definitively violated a State Farm policy.

However, even if the FAC did allege that Plaintiffs' relationships with State Farm ended after Plaintiffs violated State Farm policies, that still would not defeat the FAC. *After* does not mean the same thing as *because of*. Plaintiffs include allegations of the instances of misconduct to support their claims that they were subjected to higher scrutiny and discipline because of their race. That does not mean that they are pleading their relationships ended because of the misconduct. So long as Plaintiffs have alleged that State Farm took adverse actions against them because of their race, Plaintiffs have sufficiently pled causation. *See Comcast*, 140 S. Ct. at 1016.[10]

Turning to State Farm's contention that the Agent Plaintiffs (Plaintiffs Cluse, Flowers, Herndon, Tolson, and Williams) have not plausibly alleged that "but for" their race they would not have been subjected to audit and compliance evaluations, *see* Memo. Dismiss at 15, the Court is unpersuaded for similar reasons. State Farm insists that there are no facts alleged supporting Plaintiffs' audit and compliance evaluation pleadings, *id.*, but the Court disagrees. Plaintiffs allege that because of their race, they were subjected to heightened scrutiny by way of compliance evaluations and audits, and that such scrutiny resulted in decreased opportunities, lower compensation, and other negative outcomes. FAC ¶¶ 44–45, 54, 68,76, 85, 93.

---

[10]State Farm's citation to unpublished and largely out-of-circuit authority for the proposition that a complaint should be dismissed when the complaint alleges facts providing "independent non-discriminatory reasons" for taking an adverse action, *see* Memo. Dismiss at 14, is unpersuasive.

The FAC further provides specific examples of the alleged heightened scrutiny, such as Flowers being audited, scrutinized, and disciplined for traveling between Michigan and Tennessee while a white agent who lived in New Jersey and traveled to Michigan only one week a month was not audited or subjected to increased scrutiny. *See id.* ¶¶ 84–85. State Farm highlights Plaintiffs' successes and insists that the Plaintiffs' allegations do not satisfy the *McDonnell Douglas* burden shifting framework. Memo. Dismiss at 15. But again, this is not summary judgment; whether Plaintiffs can satisfy *McDonnell Douglas* is a question for another day. For now, the Court must accept the FAC's well pled allegations as true. When the Court does so, it is clear that Plaintiffs have alleged causation and State Farm's audit and compliance evaluation argument fails.

The Court is even less swayed by State Farm's arguments with respect to the TICA Plaintiffs (Plaintiffs Dixon and Richardson). *See* Memo. Dismiss at 15–16. To begin, State Farm argues that because the TICA agreement boilerplate language does not obligate State Farm to offer an additional agreement to a TICA agent, Plaintiffs cannot plead that race was the but-for cause of their failure to obtain additional agent agreements. *Id.* This argument is dead on arrival because, as discussed above, the TICA agreements are not central to Plaintiffs' claims, so the Court cannot consider them on the motion to dismiss. Even if the TICA agreements were fair play, boilerplate language giving a company the right to not renew a contract does not mean that the company could not discriminate on the basis of race by offering white agents additional contracts while denying additional contracts to non-white agents.

State Farm additionally asserts that Plaintiffs "admit[ted] that they failed to meet their business plan production goals used to evaluate their performance." *Id.* at 16 (citing FAC ¶¶ 101, 111). That is not what the FAC says. State Farm's TICA Plaintiffs causation arguments, like its intent and other causation arguments, fail to persuade the Court that Plaintiffs' intentional discrimination claim should be dismissed. The Court therefore denies State Farm's motion to dismiss on Count I. *See Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021) (movant has burden to establish entitlement to relief in a motion to dismiss for failure to state a claim).

### III.    Retaliation

In Count II, Plaintiffs Herndon, Tolson, Cluse, Richardson, and Dixon assert retaliation in violation of 42 U.S.C. § 1981. FAC ¶ 127. To state a claim for Section 1981 retaliation, the Plaintiffs must plead: (1) a statutorily protected activity; (2) a materially adverse action taken by State Farm; and (3) a causal connection between the two. *Herrera v. DiMeo Bros.,* 529 F. Supp. 3d 819, 831 (N.D. Ill. 2021). State Farm argues that Plaintiffs fail to plausibly allege the second and third elements. Memo. Dismiss. at 16. The Court discusses each element in turn.

### A.    Materially Adverse Action

Section 1981 "forbids *any* retaliatory actions that are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination[.]'" *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016) (emphasis in original) (quoting *Burlington Northern and Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006)). Thus an "adverse employment action" is simply an "action that would

dissuade a reasonable worker from participating in protected activity." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 (7th Cir. 2015) (citation omitted).

State Farm argues that subjecting Plaintiffs Cluse, Herndon, and Tolson[11] to "increased scrutiny" fails to state a claim for retaliation because "increased scrutiny" is not a materially adverse action under the law. Memo. Dismiss at 16–17. In addition, State Farm contends that a conclusory allegation that Plaintiffs were subjected to "heightened scrutiny" without *details* to establish that it was, in fact, "increased," "unwarranted," or somehow different from the oversight of non-African American Agents is insufficient to establish that such actions were adverse or retaliatory. *Id.* at 17 (citing *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 886 (7th Cir. 2012)).[12]

State Farm's arguments are not convincing because the FAC alleges specific examples of heightened scrutiny, and because Plaintiffs Herndon, Tolson, and Cluse allege other adverse actions in addition to heightened scrutiny. For example, Plaintiffs Herndon and Tolson allege that after complaining of race discrimination, State Farm subjected them to audits and then terminated them. *See* FAC ¶¶ 66, 68–

---

[11] State Farm has additionally made retaliation arguments about Williams and Flowers. *See* Memo. Dismiss at 16–17. But Williams and Flowers do not bring retaliation claims, so the Court does not address whether Williams and Flowers suffered an adverse employment action. *See* FAC ¶¶ 127–130.

[12] State Farm's *Keeton* argument is additionally problematic because *Keeton* is a summary judgment case applying the *McDonnell Douglas* standard. 667 F.3d at 884. As discussed above, *see supra* Section I, *McDonnell Douglas* is not a proper basis to dismiss a complaint under Rule 12(b)(6).

69; 74, 76–78. With respect to Plaintiff Cluse, the FAC alleges that after Cluse complained of race discrimination, State Farm audited her and banned her from offering bank products, which resulted in a significant loss of compensation. *Id.* ¶¶ 92–93. By pleading that they were terminated and/or caused to lose substantial amounts of pay in retaliation for complaining of race discrimination, Plaintiffs Herndon, Tolson, and Cluse have adequately pled that they suffered a materially adverse action. As alleged, their termination and loss of pay would dissuade a reasonable worker from making or supporting a charge of discrimination against State Farm in the future. *See Burlington Northern*, 548 U.S. at 68–69.

State Farm goes on to attack Plaintiffs' claims that their Agent Agreements were terminated in retaliation because, "[e]ach admits that their contracts ended after it was determined that they had violated Company policy." Memo. Dismiss at 17. As previously discussed, the Court disagrees that each Plaintiff admits they violated State Farm policies. Rather, the Court finds that Plaintiffs Herndon and Tolson pled that after making protected complaints of race discrimination, State Farm retaliated against them by terminating them. *See* FAC ¶¶ 66, 68–69; 74, 76–78. State Farm maintains that, absent facts to show that the Agent Agreements of non-African American Agents would not have been terminated under the same circumstances, Plaintiffs cannot plausibly establish that theirs were in retaliation for complaining of racial discrimination. Memo. Dismiss at 17 (citing *Rao v. Gondi*, 2017 WL 2445131, *21 (N.D. Ill. June 5, 2017); *Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 674 (7th Cir. 2011)). But State Farm again puts the

40

cart before the horse. This is not summary judgment, so Plaintiffs do not need to prove now that their contracts were terminated because of their complaints of race discrimination, which proof could include comparator evidence of non-African American agents. Instead, Plaintiffs need only plead that they were subject to a materially adverse action in retaliation for engaging in a protected activity. Plaintiffs have done so here.[13]

### B. Protected Activity and Adverse Action Nexus

Next, State Farm contends that Plaintiffs fail to allege a nexus between the protected activity and the alleged adverse action. Memo. Dismiss. at 17–18.

A Section 1981 retaliation plaintiff "need not present proof of a causal link" between a protected activity and adverse employment action to survive a motion to dismiss. *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (internal quotation marks and citations omitted); *see also Luevano*, 722 F.3d at 1029. That said, Plaintiffs "must allege sufficient facts from which the Court can infer that the alleged retaliatory conduct" was caused by the protected conduct. *Straub v. Jewel Food Stores, Inc.*, 2018 WL 4512060, *5 (N.D. Ill. Sept. 20, 2018). And, "a retaliation claim can indeed be so bare-bones that a lengthy time period between the protected

---

[13]In addition, the TICA Plaintiffs, Richardson and Dixon, allege that they were retaliated against through a denial of a full Agent Agreement upon the expiration of their TICA Agreements. FAC ¶¶ 103, 112. State Farm states in a conclusory manner that "these allegations, even if taken as true for purposes of this motion, and assuming arguendo to constitute protected activity, are insufficient to establish retaliation." Memo. Dismiss at 16 (emphasis added). However, State Farm does not explain how the denial of a full agent agreement does not constitute an adverse employment action, so any argument to that effect is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]").

activity and the alleged retaliation will make any causal connection between the two implausible. If the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed." *CSX Transp.*, 758 F.3d at 828 (citation omitted).

State Farm asserts that Plaintiffs fail to identify the specific individuals they complained to, as well as the individuals they believe were responsible for engaging in subsequent retaliatory conduct. Memo. Dismiss at 18. Essentially, State Farm argues that Plaintiffs offer no facts about the "when" and "how" of their retaliation claims. *Id.* While the Court finds that the FAC does contain some allegations about the people involved in their retaliation claims—i.e., whom Plaintiffs complained to and who made the ultimate decision, *see, e.g.*, FAC ¶¶ 66, 92, 94, the FAC does lack detail for the Court to assess the time period between the protected activity and materially adverse action. As an example, with respect to Dixon, the FAC alleges that Dixon complained of race discrimination and retaliation on several occasions, including in early 2020. *Id.* ¶ 112. However, the FAC does not provide a bookend for when State Farm declined to extend Dixon a full agent contract; instead, the FAC simply states: "Ultimately, State Farm refused to extend to Dixon a full Agent contract." *Id.*

That said, as Plaintiffs observe, pleading a retaliation claim in the Seventh Circuit is an "undemanding standard." *See* Resp. at 23 (citing *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015)). In viewing the allegations in the light

most favorable to Plaintiffs, as the Court must, the Court cannot say that Plaintiffs can prove no set of facts consistent with their allegations of a nexus between their complaints of racial discrimination and the adverse employment actions. *See, e.g., Harris v. City of Chicago*, 1998 WL 59873, at *17 (N.D. Ill. Feb. 9, 1998). The Court further finds support in the holding in *Green v. Scurto Cement Const.*, Ltd., 820 F. Supp. 2d 854, 858 (N.D. Ill. 2011), a case cited by Plaintiffs. *See* Resp. at 23.

In *Green*, the defendant asserted, akin to State Farm, that a plaintiff must plead how he was retaliated against, "who specifically retaliated against him, or a temporal nexus between the charge filing and alleged retaliation." 820 F. Supp. 2d at 858. The court in *Green* denied the motion to dismiss holding that requiring the who, when, and how questions at the pleadings stage would be like requiring a retaliation plaintiff to meet the heightened fraud pleading standards under Rule 9(b) of the Federal Rules of Civil Procedure, when retaliation need only be pled under the notice pleading standard found in Fed. R. Civ. P. 8. *Id.* Here, like in *Green*, Plaintiffs have met the Rule 8 pleading standard by giving enough details about the retaliation to present a story that holds together. *Id.*

One more retaliation argument by State Farm bears discussion, albeit brief. State Farm contends that the TICA Agents fail to plead a retaliatory causal link because the agents admit that TICA Agents are not guaranteed an Agent Agreements upon expiration of their TICA contract. Memo. Dismiss at 18–19. This argument is doomed because it depends on the agreements State Farm attached to its motion to dismiss, which the Court declines to review at this time.

43

In short, State Farm has failed to show that Plaintiffs' retaliation claims should be dismissed, so State Farm's motion with respect to Count II is denied.

## IV. Statute of Limitations

Lastly, State Farm argues that some of Plaintiffs' claims are time-barred. As the parties agree, Section 1981 claims for discriminatory conduct during the term of a contract have a four-year limitations period. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). *See* Memo. Dismiss at 19; Resp. at 24. Because the complaint was filed on February 14, 2020, State Farm argues that all alleged acts of discrimination that arose prior to February 14, 2016 are untimely and must be dismissed. Memo. Dismiss at 19. In support of its limitations argument, State Farm classifies Plaintiffs' claims into two categories for dismissal pursuant to the statute of limitations: (a) agency and territory assignments; and (b) claims of other discriminatory acts. *Id.* The Court addresses each in turn.

### A. Agency and Territory Assignments

State Farm reasons that because Plaintiffs became State Farm Agents prior to 2016, their claims relating to agency territory and policy assignment are time-barred. Memo. Dismiss at 20. State Farm contends that each Plaintiff "admits that the assignment of their territory and alleged refusal to provide them with an initial book of business took place when they became a State Farm Agent, which occurred in 1999 for Williams, 2002 for Flowers, 2009 for Tolson, 2010 for Hendon, and 2011 for Cluse, all well outside the four-year limitations period." *Id.* As such, reasons State Farm, any claim based on discriminatory "location" assignments or initial policy

44

assignments are time-barred and subject to dismissal. *Id.* (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). The Court disagrees.

True, as State Farm argues, a plaintiff can plead herself out of court on a statute of limitation basis if the face of the complaint reveals that the claim is time-barred.[14] *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010). However, dismissal based on an affirmative defense is permissible only if the complaint "admits all the ingredients of an impenetrable defense." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (citation omitted). In viewing the allegations of the FAC in the light most favorable to the Plaintiffs, as it must, the Court cannot say that Plaintiffs have pled themselves out of court as it pertains to the agency territory and policy assignments. For example, although Plaintiffs Williams, Herndon, Tolson, Flowers, and Cluse began their careers with State Farm more than four years prior to the filing of this action, they all allegedly experienced discriminatory policy assignments, compensation, and discipline that are indisputably within the limitations period. Furthermore, Plaintiffs allege that they were denied favorable territories throughout their State Farm tenure and received lower pay throughout their tenure as a result. *See* FAC ¶¶ 52, 64, 73, 79, 89, 98, 108. The Court thus declines to dismiss claims relating to agency and territory assignments at this juncture based on State Farm's affirmative defense.

---

[14]This appears to have occurred in State Farm's supplemental case, *Byrd*, so the Court finds the case inapposite. *See* 2021 WL 2329369, at *5.

### B. Claims of Other Discriminatory Acts

State Farm next argues that Plaintiffs' claims regarding discrimination during their time as State Farm Agents in the denial of policy assignments or other business resources are also subject to dismissal on the statute of limitations grounds. Memo. Dismiss. at 20. State Farm notes that while Plaintiffs "identify the dates that they became State Farm Agents, the [FAC] is silent with respect to the dates on which they were each allegedly denied the 'business opportunities and valuable business resources and support, including but not limited to policy assignments,' that they believe they were wrongfully denied." *Id.* (citing FAC ¶¶ 53, 60, 62, 64-67, 72, 74, 81, 89, 91, 92). Such vagueness, submits State Farm, does not save an untimely complaint. *Id.* (citing *Rivas v. Levy*, 2015 WL 718271, at *7 (N.D. Ill. Feb. 18, 2015)). Plaintiffs counter that nothing on the face of the FAC indicates that their claims are time-barred, therefore, the motion to dismiss should be denied. Resp. at 24. The Court agrees.

As with the agency and territory assignment argument, it cannot be said that from the face of the FAC, Plaintiffs have pled themselves out of court. *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014). True, the FAC fails to identify the specific dates upon which Plaintiffs were denied business opportunities and resources that were provided to non-African American Agents, but Plaintiffs are not required to plead around the statute of limitations. *See United States v. Northern Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004). Here, Plaintiffs sufficiently allege that they were denied business opportunities throughout their

46

tenure, and the FAC provides years relating to Plaintiffs' relationships with State Farm showing that at least part of those tenures fell within the statute of limitations. As such, the Court finds, in viewing the allegations of the complaint in the light most favorable to Plaintiffs, that they have not pled themselves out of court. Therefore, the motion to dismiss the FAC on the basis of the statute of limitations is denied.

### Conclusion

For the foregoing reasons, State Farm's motion to dismiss is denied. State Farm shall answer the FAC by July 25, 2022.

Dated: July 1, 2022

Franklin U. Valderrama
United States District Judge