**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALTON WILLIAMS, BRANDON HERNDON, MARKUS TOLSON, JEFFREY FLOWERS, BROOKE CLUSE, VVONAKA RICHARDSON, and VERA DIXON, on behalf of themselves and all others similarly situated<br><br>    Plaintiffs,<br><br>  v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., STATE FARM LIFE INSURANCE CO., STATE FARM FIRE AND CASUALTY CO., STATE FARM GENERAL INSURANCE CO., and STATE FARM BANK, F.S.B.,<br><br>    Defendants. | Case No. 20-cv-01121<br><br>Honorable Franklin U. Valderrama<br><br>Honorable Sunil R. Harjani |

**DEFENDANTS' ANSWER AND DEFENSES
TO PLAINTIFFS' AMENDED CLASS COMPLAINT**

Defendants State Farm Mutual Automobile Insurance Co. ("State Farm Mutual"), State Farm Life Insurance Co. ("State Farm Life"), State Farm Fire and Casualty Co. ("State Farm Fire"), State Farm General Insurance Co. ("State Farm General"), and State Farm Bank, F.S.B. ("State Farm Bank") (collectively, "State Farm Defendants"), by and through their counsel of record, hereby submit their answer and defenses to Plaintiffs' Amended Class Complaint.

This Answer restates the allegations in the Complaint (including footnotes) solely for the convenience of the Court and the parties. Unless specifically stated otherwise, State Farm Defendants' answer to any footnote is included within the answer to the Complaint paragraph that contained the footnote. This Answer does not restate the headings in the Complaint, as they are not substantive allegations to which an answer is required; to the extent that those items are

intended as substantive allegations, State Farm Defendants deny them. Any allegation not expressly admitted is denied. Any allegation that is partially admitted or admitted with qualification is admitted only as stated herein and is otherwise denied.

### STATE FARM DEFENDANTS' ANSWER

1. State Farm is "the leading auto and home insurer in the United States" and is currently ranked number 36 on the Fortune 500 list of largest companies in the United States. According to its Annual Report, in 2018, State Farm generated premium revenue of over $43.4 billion and net income of approximately $6.4 billion.

**ANSWER:** State Farm Defendants admit that State Farm Mutual's 2021 Annual Report states that "State Farm is the leading Auto and Home insurer in the United States." Answering further, State Farm Defendants admit that Fortune Magazine maintains a list of the largest companies in the United States, and that in 2022, State Farm was ranked number 42 on the Fortune list. Answering further, State Farm Defendants admit that State Farm Mutual's 2018 Annual Report states that its Premium Earned for 2018 was $43,426,000,000 and that its net income was $6,350,000,000. State Farm Defendants deny the remaining allegations as stated in Paragraph 1.

2. State Farm offers insurance and financial products to customers through its workforce of over 19,000 Agents across the United States. State Farm provides widely divergent compensation and opportunities to the Agents who service its customers, depending on their race. African Americans are underrepresented as State Farm Agents and paid substantially less than their counterparts who are not African American. These racial disparities result from State Farm's systemic, intentional race discrimination and company-wide discriminatory practices.

**ANSWER:** State Farm Defendants admit that they market insurance and financial services products in the United States through business relationships with more than 19,000 State Farm independent contractor Agents. State Farm Defendants deny the remaining allegations as stated in Paragraph 2.

3. State Farm maintains a racially biased corporate culture replete with harmful stereotypes regarding its African American employees and customers that infects its policies and decision-making, including its racial steering and race-matching of

Agents, territories, and clients. Plaintiffs, and the class they seek to represent in this lawsuit, challenge State Farm's company-wide policies and practices that result in higher rates of discipline and lower pay for African Americans.

**ANSWER:** State Farm Defendants deny that they maintain a racially biased corporate culture or stereotype with respect to their African American employees, customers or independent contractor Agents. State Farm Defendants further deny that they engage in discriminatory conduct with respect to their African American employees, customers or independent contractor Agents. State Farm Defendants further deny that Plaintiffs have sustained any damages or injuries as a result of any alleged wrongdoing by State Farm Defendants, and deny that Plaintiffs are entitled to any recovery from this action. State Farm Defendants deny the remaining allegations as stated in Paragraph 3.

4.     Plaintiffs file this lawsuit to hold State Farm accountable for its unlawful treatment of African American Agents and to achieve meaningful reform. This lawsuit is brought by Plaintiffs on behalf of themselves and other African American State Farm Agents subjected to and harmed by the Firm's company-wide pattern or practice of race discrimination and discriminatory policies and practices. This action seeks class-wide injunctive relief to end State Farm's entrenched race discrimination and make-whole relief for class members.

**ANSWER:** State Farm Defendants deny that they engage in discriminatory conduct with respect to African American independent contractor Agents or that they have a company-wide pattern or practice of race discrimination and discriminatory policies and practices. State Farm Defendants admit that Plaintiffs have filed this suit seeking the claimed relief on behalf of themselves and a putative class, but deny that Plaintiffs have sustained any damages or injuries as a result of any alleged wrongdoing by State Farm Defendants, and deny that Plaintiffs or any putative class members are entitled to any recovery from this action. State Farm deny the remaining allegations as stated in Paragraph 4.

5.     Plaintiffs' claims arise under 42 U.S.C. § 1981, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

**ANSWER:** State Farm Defendants admit that the Court has jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiffs' claims brought pursuant to 42 U.S.C. § 1981. State Farm Defendants deny that Plaintiffs have sustained any damages or injuries as a result of any alleged wrongdoing by State Farm Defendants and deny that Plaintiffs are entitled to any recovery from this action.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). State Farm conducts business throughout this District, and Plaintiff Williams worked for and was harmed by State Farm in this District. The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

**ANSWER:** State Farm Defendants admit that venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because they conduct business throughout this judicial district and the Williams Agency (owned and operated by Plaintiff Williams) was located within this judicial district. State Farm Defendants deny Plaintiffs have sustained any damages or injuries as a result of any alleged wrongdoing by State Farm Defendants, and deny that Plaintiffs are entitled to any recovery from this action. State Farm Defendants deny the remaining allegations as stated in Paragraph 6.

7.      State Farm Mutual Automobile Insurance Company is the parent company of State Farm Life Insurance Company, State Farm Fire and Casualty Company, State Farm General Insurance Company, and State Farm Bank, F.S.B., (collectively "State Farm," "the Firm," or "Defendants"). All of these entities are Illinois corporations with their principal place of business in Bloomington, Illinois.

**ANSWER:** State Farm Defendants admit that State Farm Mutual is a mutual insurance company organized under the laws of the State of Illinois, that State Farm Life, State Farm Fire, and State Farm General are wholly owned subsidiaries of State Farm Mutual, and that the principal place of business of all three of these entities is Bloomington, Illinois. State Farm Defendants deny the remaining allegations as stated in Paragraph 7.

8.      Plaintiff Alton Williams is African American and worked for State Farm as an Agent from 1999 until he was unlawfully terminated on December 31, 2017.

Williams competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his dedication to his job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm subjected Williams to race discrimination throughout his employment.

**ANSWER:** State Farm Defendants admit that Williams was a State Farm independent contractor Agent from June 1, 1999 until May 31, 2000, that he was President of the Williams Insurance Agency, Inc. (the "Williams Agency"), and that the Williams Agency was a State Farm independent contractor Agent from June 1, 2000, until the Williams Agency's then-current Agent's Agreement was terminated effective December 31, 2017. State Farm Defendants deny that while he was an independent contractor State Farm Agent or President of the Williams Agency Williams was an employee of or employed by any State Farm company during his tenure as an independent contractor Agent. Upon information and belief, State Farm Defendants admit that Plaintiff Williams is African American. State Farm Defendants deny the remaining allegations as stated in Paragraph 8.

9.      Plaintiff Brandon Herndon is African American and worked for State Farm as an Agent from 2010 until he was unlawfully terminated in March 2017. Throughout his employment, Herndon competently discharged all duties assigned to him and enjoyed an excellent reputation regarding the high quality of his work and his conscientious devotion to his job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm subjected Herndon to race discrimination and retaliation for challenging the Firm's discriminatory practices.

**ANSWER:** State Farm Defendants admit that Herndon was a State Farm independent contractor TICA Agent from June 1, 2010 to May 31, 2015, and became a State Farm independent contractor Agent on June 1, 2015, until his Agent's Agreement was terminated effective March 17, 2017. State Farm Defendants deny that Herndon was an employee of or employed by any State Farm company during his tenure as an independent contractor Agent. Upon information and belief, State Farm Defendants admit that Plaintiff Herndon is African American. State Farm Defendants deny the remaining allegations as stated in Paragraph 9.

10. Plaintiff Markus Tolson is African American and worked for State Farm as an Agent from October 2009 until he was unlawfully terminated in approximately August 2016. Throughout his employment, Tolson competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his devotion to his job. Pursuant to its discriminatory policies and practices, however, State Farm subjected Tolson to race discrimination and retaliation for challenging the Firm's discriminatory practices.

**ANSWER:** State Farm Defendants admit that Tolson was a State Farm independent contractor TICA Agent from October 1, 2009 to September 30, 2014, and a State Farm independent contractor Agent from October 1, 2014 until his Agent's Agreement was terminated effective August 5, 2016. State Farm Defendants deny that Tolson was an employee of or employed by any State Farm company during his tenure as an independent contractor Agent. Upon information and belief, State Farm Defendants admit that Plaintiff Tolson is African American. State Farm Defendants deny the remaining allegations as stated in Paragraph 10.

11. Plaintiff Jeffrey Flowers is African American and worked for State Farm as an Agent from December 2002 until he was constructively discharged in approximately December 2019. Throughout his employment, Flowers competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his devotion to his job. Pursuant to its discriminatory policies and practices, however, State Farm subjected Flowers to race discrimination throughout his employment.

**ANSWER:** State Farm Defendants admit that Flowers was appointed as a State Farm Trainee Agent as of December 1, 2002. Answering further, State Farm Defendants admit that Flowers was appointed as a State Farm independent contractor Agent as of December 1, 2005, until he voluntarily terminated his Agent's Agreement effective December 9, 2019. State Farm Defendants deny that Flowers was an employee of or employed by any State Farm company during his tenure as an independent contractor Agent. Upon information and belief, State Farm Defendants admit that Plaintiff Flowers is African American. State Farm Defendants deny the remaining allegations as stated in Paragraph 11.

12.     Plaintiff Brooke Cluse is African American and has worked for State Farm as an Agent since approximately 2011. Cluse has competently discharged all duties assigned to her and enjoys an excellent reputation with regard to the high quality of her work and her dedication to her job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm has subjected Cluse to race discrimination throughout her employment and to retaliation for challenging the Firm's discriminatory practices.

**ANSWER:** State Farm Defendants admit that Cluse became a State Farm independent contractor TICA Agent on June 1, 2011, and was appointed as a State Farm independent contractor Agent on September 11, 2013, and that appointment is currently in effect. State Farm Defendants deny that Cluse has been or is currently an employee of or employed by any State Farm company during her tenure as an independent contractor Agent. Upon information and belief, State Farm Defendants admit that Plaintiff Cluse is African American. State Farm Defendants deny the remaining allegations as stated in Paragraph 12.

13.     Plaintiff Vvonaka Richardson is African American and worked for State Farm as a Term Independent Contractor Agent from June 2019 until she was unlawfully terminated in approximately July 2020. Throughout her employment, Richardson competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her devotion to her job. Pursuant to its discriminatory policies and practices, however, State Farm subjected Richardson to race discrimination and retaliation for challenging the Firm's discriminatory practices.

**ANSWER:** State Farm Defendants admit that Richardson was appointed as a State Farm independent contractor TICA Agent effective June 1, 2019, and that her TICA Agent's Agreement ended upon the conclusion of its term on June 30, 2020. State Farm Defendants deny that Richardson was an employee of or employed by any State Farm company during her tenure as an independent contractor TICA Agent. Upon information and belief, State Farm Defendants admit that Plaintiff Richardson is African American. State Farm Defendants deny the remaining allegations as stated in Paragraph 13.

14.     Plaintiff Vera Dixon is African American and worked for State Farm as a Term Independent Contractor Agent from June 2019 until she was unlawfully terminated

in approximately July 2020. Throughout her employment, Dixon competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her devotion to her job. Pursuant to its discriminatory policies and practices, however, State Farm subjected Dixon to race discrimination and retaliation for challenging discriminatory practices.

**ANSWER:** State Farm Defendants admit that Dixon was appointed as a State Farm independent contractor TICA Agent effective June 1, 2019, and that her TICA Agent's Agreement ended upon the conclusion of its term on June 30, 2020. State Farm Defendants deny that Dixon was an employee or employed by any State Farm company during her tenure as an independent contractor TICA Agent. Upon information and belief, State Farm Defendants admit that Plaintiff Dixon is African American. State Farm Defendants deny the remaining allegations as stated in Paragraph 14.

15.    State Farm maintains a corporate culture replete with harmful racial stereotypes and biased views about the skills, abilities, and potential of African American employees, including Agents, and customers. The Firm's racial bias is exemplified by its racial steering, racial redlining and other discriminatory practices against employees and customers of color, as illustrated in a number of recent lawsuits.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 15.

16.    State Farm has faced at least two class actions brought by employees challenging the Firm's entrenched discrimination,[1] and at least two other African American Agents are currently suing State Farm and make similar allegations of race discrimination as those raised in this Complaint, including that State Farm subjects African American Agents to heightened scrutiny and differential discipline. See *Florvius v. State Farm*, No. 12-cv-2912 (N.D. Ga. July 28, 2020), ECF No. 8 (alleging State Farm subjected her to increased scrutiny and termination for purported infractions while failing to audit or punish white Agents for similar or more egregious violations of State Farm policies); *Bazil v. State Farm*, No. 20-cv-2914 (N.D. Ga. July 26, 2020), ECF No. 9 (same).

---

[1]    State Farm Settles Discrimination Lawsuit, AP (Nov. 21, 1990), https://apnews.com/1660be099229e8bcd1d5bf6897f1f38d; Philip Hager, State Farm to Pay Women $157 Million for Job Bias: Total Damages Against Insurance Firm May Exceed $200 Million. Award Is Record for Civil Rights Case, L.A. TIMES (Apr. 29, 1992), https://www.latimes.com/archives/la-xpm-1992-04-29-mn-886-story.html.

**ANSWER:** State Farm Defendants admit that an action captioned *Bazil v. State Farm Mutual Automobile Insurance Co.* was initiated in the United States District Court for the Northern District of Georgia in 2020, and that on February 17, 2021, that Court granted Defendant's motion to dismiss, and dismissed the action with prejudice. State Farm Defendants further admit that an action captioned *Florvius v. State Farm Mutual Automobile Insurance Co.* was initiated in the United States District Court for the Northern District of Georgia in 2020, and that on January 4, 2021, that Court granted Defendant's motion to dismiss, and dismissed the action with prejudice. State Farm Defendants further deny that they engage in discriminatory conduct with respect to their African American employees, customers or independent contractor Agents. State Farm Defendants deny the remaining allegations as stated in Paragraph 16.

17.     State Farm's long history of racial discrimination also extends to its customers of color, as illustrated by a pending class action charging discrimination against African American policy holders. See *Connectors Realty Group Corp. v. State Farm*, No. 19-cv-0743 (N.D. Ill. Feb. 5, 2019), ECF No. 24, 38 (denying motion to dismiss class claim of discrimination brought by African American policy holders, and including allegation that State Farm refused to process insurance claim for African American customer because "we have a lot of fraud in your area," referring to the "South Side of Chicago and you all's neighborhoods").

**ANSWER:** State Farm Defendants admit that an action captioned *Connectors Realty Group Corp. v. State Farm* is currently pending in the United States District Court for the Northern District of Illinois. State Farm Defendants deny the remaining allegations as stated in Paragraph 17.

18.     State Farm maintains a racially hostile culture and environment in which there is no accountability for racist conduct and statements. For example, a prominent white Agent in the midwest engaged in a racist rant on a public social media platform, claiming an African American man wanted "to rely on the government" and told him to "Go get another my[sic] babies mama" and "go back to Africa." Despite complaints, the agent remains at State Farm.

**ANSWER:** State Farm Defendants deny the allegations as stated in the first sentence of Paragraph 18. State Farm Defendants admit that an independent contractor Agent based in Kansas

9

City, Kansas made racially offensive statements on a public social media platform, and that this individual's Agent's Agreement was terminated effective June 10, 2020. State Farm Defendants deny the remaining allegations as stated in Paragraph 18.

19.    State Farm lacks any meaningful avenue for African American Agents to complain or seek redress for disparities in opportunities and resources. State Farm is ineffective at resolving complaints of discrimination, which are typically ignored or result in the complaining employee being targeted for retaliation. Most African Americans recognize the futility of lodging internal complaints of race discrimination. Those brave enough to come forward suffer retaliation.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 19.

20.    Following the killing of George Floyd and subsequent racial justice movement, State Farm, like other large corporations, issued a statement that "our society still suffers from far too many cases of distrust, hatred and racism." State Farm, however, has failed to address the claims of racism within its own ranks. Nevertheless, the widespread nature of racial discrimination at State Farm has been voiced by the State Farm workforce. Agents and employees of color created a petition to State Farm describing past and present racial inequality and demanding racial equity in the State Farm workplace. The petition asked Black State Farm agents and employees to sign if they knew of State Farm personnel who had been let go unfairly, had to go scratch (agents forced to start without a book of business) or been given a smaller book of business, experienced or seen racism at work, received less resources, or were afraid to speak up in fear of backlash, among other discriminatory practices. To date, nearly 1,600 State Farm employees of color have signed the petition to demand change and racial equality at the Firm.[2]

**ANSWER:** State Farm Defendants admit that on June 5, 2020, the companies issued a statement that stated:

> The deaths of George Floyd, Ahmaud Arbery and countless others are unnecessary tragedies we are outraged and saddened by. These times are a stark reminder that our society still suffers from far too many cases of distrust, hatred and racism. This is not the world we should accept as a society. We must push ourselves to influence change and create compassion. State Farm has long been committed to helping build safer, stronger communities. We embrace the responsibility to work with others to make the world around us better.

___
[2] State Farm: Employees & Agents of Color Demand Racial Equality & Equity in the Workplace, MoveOn, https://sign.moveon.org/petitions/state-farm-employees-agents-of-color-demand-racial-equality-equity-in-the-workplace.

Answering further, State Farm Defendants admit that a petition titled "State Farm: Employees and Agents of Color Demand Racial Equality & Equity in the Workplace" can be found on the internet. State Farm Defendants deny the remaining allegations as stated in Paragraph 20.

21.     State Farm maintains strict, centralized control over its operations and Agents from its company headquarters in Bloomington, Illinois, where an almost exclusively white team of senior executives issues mandatory company policies and practices that apply to all Agents in the State Farm workforce. State Farm requires each of its Agents to sign nearly identical Agent Agreements that govern their employment relationship and dictate the conditions under which the Agents operate and may offer State Farm's insurance and financial products to customers.

**ANSWER:**  State Farm Defendants admit that independent contractor Agents execute an applicable State Farm Agent's Agreement and that such agreements set forth the objectives, obligations, and responsibilities essential to the relationship between the independent contractor agent and the contracting State Farm entities.  State Farm Defendants explicitly deny that State Farm independent contractor Agents are employed by or employees of any State Farm entity.  State Farm Defendants deny the remaining allegations as stated in Paragraph 21.

22.     State Farm is engaged in a firm-wide pattern and practice of discrimination against African American Agents in their terms and conditions of employment. State Farm issues, implements, and oversees uniform, company-wide policies and practices that discriminate against African American Agents and advantage non-African American Agents at the expense of African American Agents. Because of the Firm's stereotypical views and discriminatory employment practices, African Americans are under-represented among State Farm Agents by statistically significant margins as compared to the national average.

**ANSWER:**  State Farm Defendants explicitly deny that State Farm independent contractor Agents are employed by or employees of any State Farm entity, and deny the remaining allegations as stated in Paragraph 22.

23.     Among other things, State Farm maintains discriminatory training practices and its discriminatory policies and practices provide African Americans less lucrative agencies and territories; deny them valuable business opportunities (including Agent contracts) and resources; subject them to heightened scrutiny and differential discipline; and result in lower pay than Agents who are not African American.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 23.

24. State Farm employs discriminatory policies and practices in its TICA program, including its policies and practices regarding performance evaluation, training, and the assignment of policies, business opportunities, and other resources and support, as well as the awarding of full Agent contracts to Agents in training, or TICA Agents.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 24.

25. State Farm recruits African Americans to join the Firm as Agents through its TICA program, often luring them away from stable and well-paying jobs, with the promise of lucrative business opportunities and careers. State Farm requires these TICA Agents to invest substantial sums of their own money in rent, offices, marketing, sales leads, and hiring a team. State Farm, however, denies African American TICA Agents the same business opportunities, support, training, and resources provided to non-African American TICA Agents, subjects African Americans to more stringent performance standards, and denies African American Agents permanent agency contracts on the basis of their race.

**ANSWER:** State Farm Defendants admit that they recruit individuals of all races, including African Americans, to become State Farm independent contractor Agents. State Farm Defendants further admit that the Agent's Agreement provides that expenses associated with the independent contractor agent's business, including rent and compensation of their staff, are the obligation of the independent contractor Agent. State Farm Defendants deny the remaining allegations as stated in Paragraph 25.

26. TICA Agents must complete a 17-week State Farm training course before they open an agency and begin selling insurance. State Farm provides largely sales training. Rather than train prospective Agents in how to successfully run an agency, State Farm selects who will succeed by assigning non-African American Agents lucrative locations to open their agency and assigns them established books of business and policies. African American TICA Agents are in turn steered to less lucrative agency locations and are not given books of business or given substantially smaller policies or books of business than their non-African American peers.

**ANSWER:** State Farm Defendants admit that as of June 1, 2019, prospective State Farm independent contractor TICA Agents first completed a training process that lasted approximately 17 weeks, that such training was designed to offer guidance and assistance to prospective TICA

Agents in how to successfully run their business, and that upon completion of that training process, they may have been offered a TICA Agent's Agreement. State Farm Defendants deny the remaining allegations as stated in Paragraph 26.

27. At the conclusion of 13-months, State Farm decides whether to extend a full Agent contract to the TICA Agent or terminate the Agent.

**ANSWER:** State Farm Defendants admit that as of June 1, 2019, the TICA Agent's Agreement lasted for a period of 13-months, and at the end of that period, State Farm Mutual may have offered the TICA Agent a subsequent State Farm Agent's Agreement on behalf of the State Farm entities that were parties to the agreement. State Farm Defendants deny the remaining allegations as stated in Paragraph 27.

28. State Farm's TICA training program uses and applies criteria intentionally designed to discriminate against African Americans, both in the training program itself, and in the opportunities steered toward non-African American TICA Agents and ultimately, by who gets selected for full Agent contract.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 28.

29. State Farm employs company-wide policies and practices for assigning territories and agency locations that discriminate against African American Agents and TICA Agents. Pursuant to these policies and practices, State Farm assigns the most lucrative territories and agency locations to Agents who are not African American while assigning African American Agents less lucrative and more problematic agencies and territories on the basis of their race.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 29.

30. State Farm disproportionately gives non-African American Agents a head start in their careers by allowing them to take over existing agencies with substantial books of business from Agents who have moved or who no longer work for the Firm. By contrast, State Farm generally requires African American Agents to start new agencies with substantially less lucrative books of business or from "scratch" and without existing insurance policies or financial products.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 30.

31. In addition, State Farm disproportionately assigns non-African American Agents to territories and agency locations in areas with more affluent populations, while relegating African American Agents to areas with considerably less wealth. The

Firm also engages in "race matching," by assigning African American Agents to areas with higher African American and minority populations.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 31.

32. State Farm's policy and practice of disproportionately assigning non-African American Agents to territories and agency locations in more affluent areas affords them greater opportunities to generate income, in part, because wealthy customers have more need for and ability to purchase insurance and financial products than customers with lower incomes and less wealth. More affluent customers are also more likely to pay their bills on time, freeing the Agents who serve them from the need to hire employees and use resources to engage in collection efforts for overdue premiums, and allowing the Agents to devote more resources to sales.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 32.

33. State Farm also disproportionately authorizes non-African American Agents to expand their agencies to additional locations, while denying those income-generating opportunities to African American Agents, even very successful African American Agents.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 33.

34. State Farm's company-wide policies and practices for assigning insurance policies and financial products give the most lucrative business opportunities to Agents and TICA Agents who are not African American, and assign African American Agents less lucrative business opportunities.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 34.

35. When an Agent retires or leaves the Firm, State Farm reassigns the Agent's customers and existing insurance policies to other Agents. Agents who receive these assignments gain not only the value of these policies and any financial products the customers may have, but also ongoing commissions and the opportunity to grow the customers' accounts or to gain new customers through leads and referrals. Thus, the discriminatory distribution of policies has a substantial impact on the number, value, and quality of policies and accounts that Agents manage, and on their compensation. Pursuant to State Farm's discriminatory policies and practices, African Americans are largely excluded from being assigned lucrative insurance policies, even when they achieve high-performance distinctions.

**ANSWER:** State Farm Defendants admit that upon termination of the Agent's Agreement, the customers and existing State Farm policies assigned to the terminating independent contractor Agent are reassigned to other independent contractor Agents, and that the receiving

14

independent contractor Agent receives servicing compensation from those policies as provided in the Schedule of Payments incorporated into the applicable State Farm Agent's Agreement. State Farm Defendants deny that the reassignment of customers or existing insurance policies is discriminatory or based upon anything other than legitimate business factors. State Farm Defendants deny the remaining allegations as stated in Paragraph 35.

36.     When State Farm does assign insurance policies to African American Agents, they are generally fewer in number, more problematic, and less lucrative than those that State Farm assigns to non-African American Agents.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 36.

37.     Moreover, because of State Farm's discriminatory policies and practices regarding assignment of territories and agency locations, it is more difficult for African American Agents to retain policy assignments they receive.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 37.

38.     Similarly, in addition to denying African American Agents business opportunities, State Farm provides Agents who are not African American with valuable resources and support, which are denied to African American Agents.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 38.

39.     State Farm employs intentionally discriminatory compensation policies and practices that provide widely divergent compensation to Agents depending on their race.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 39.

40.     Among other discriminatory compensation practices, State Farm provides substantial compensation to its Agents pursuant to a uniform, nationwide compensation policy and practice called the "Scorecard Bonus." State Farm intentionally selects and relies on factors that disadvantage African Americans to calculate eligibility for and the amount of the Scorecard Bonus paid to Agents.

**ANSWER:** State Farm Defendants admit that there is a program called Agent's Business Development Scorecard, but deny that it is discriminatory or based upon anything other than legitimate business factors. State Farm Defendants deny the remaining allegations as stated in Paragraph 40.

15

41.     Because State Farm uses commission-based and cumulative-advantage systems to evaluate and compensate its Agents, a level playing field and fair distribution of resources and business opportunities are essential. However, State Farm's discriminatory policies and practices deny African American Agents opportunities, resources, and substantial compensation.

**ANSWER:**  State Farm Defendants deny the allegations as stated in Paragraph 41.

42.     For example, State Farm steers African American Agents toward less affluent territories and/or assigns them to territories in which the clientele match the Agents' race. African American Agents are therefore disadvantaged because many of the clients in their territories cannot afford to purchase financial service products and purchase fewer or less expensive insurance products. Further, the Firm intentionally distributes more, and more lucrative, policies and financial products to non-African American Agents, and denies similarly situated African American Agents such distributions. Moreover, State Farm targets African American Agents for compliance issues, denying African American Agents the opportunity to offer financial products to their clients.

**ANSWER:**  State Farm Defendants deny the allegations as stated in Paragraph 42.

43.     Because of these and other company-wide policies and practices, African American Agents are substantially less likely than non-African American Agents to meet the requirements of the Score Card Bonus policy. State Farm employs these and other policies and practices to discriminate against African American Agents and to deny compensation to African American Agents.

**ANSWER:**  State Farm Defendants deny the allegations as stated in Paragraph 43.

44.     State Farm's company-wide policies and practices regarding performance, compliance, discipline, and termination discriminate against African American Agents. These discriminatory policies and practices are designed to target African American Agents and force them to either resign or be terminated.

**ANSWER:**  State Farm Defendants deny the allegations as stated in Paragraph 44.

45.     Pursuant to its discriminatory policies and practices, State Farm subjects African American Agents to heightened scrutiny, holds them to higher compliance standards, and imposes greater discipline, including termination, on African American Agents for alleged violations of Firm policies than it does on similarly situated non-African American Agents. Through Firm-wide practices, including review and approval by a corporate review committee, State Farm disproportionately audits and disciplines African American Agents.

**ANSWER:**  State Farm Defendants deny the allegations as stated in Paragraph 45.

46.     Among other discriminatory practices, State Farm disproportionately denies or rescinds the right of African American Agents to offer financial products. The inability to offer financial products limits an Agent's compensation and ability to attract and maintain customers and makes an Agent ineligible to open a second agency location or receive policy assignments. Non-African American Agents' policy violations are routinely ignored or result in lesser discipline, and they are routinely assigned lucrative policy assignments and eligible to offer financial products, compounding their success and the racial disparity in earnings.

**ANSWER:**  State Farm Defendants deny the allegations as stated in Paragraph 46.

47.     State Farm employs a centralized practice called the "Termination Review Plan." Agents who have been informed that the Firm intends to terminate their Agent Agreement may request a termination review from State Farm's Chief Executive Officer ("CEO") pursuant to policies and practices approved by State Farm's Board of Directors.

**ANSWER:** State Farm Defendants admit that State Farm Agent's Agreements are terminable at will by either party, and that when the Agent's Agreement is terminated by State Farm, an independent contractor Agent may have the right to request a review of the termination decision in accordance with the then in-effect termination review procedures approved by the Board of Directors of the Companies. State Farm Defendants deny the remaining allegations as stated in Paragraph 47.

48.     A State Farm review team makes findings and/or recommendation for the CEO who makes the final decision of whether to terminate the Agent.

**ANSWER:**  State Farm Defendants admit that at the time that the Agent's Agreements of the Williams Agency, Tolson, and Herndon were terminated, the decision to terminate an Agent's Agreement was made by the independent contractor's Market Area leadership; and if a termination review was requested by the Agent, a Termination Review Committee would be assembled and would make findings of fact and recommendations as to whether to reverse the decision of the Market Area leadership; that the Termination Review Committee would submit its findings of fact and recommendation to the Office of the Chairman of State Farm Mutual; and that the Office of the Chairman would consider the findings, and recommendations, if any, and decide whether to

reverse the termination decision made by Market Area leadership. State Farm Defendants deny the remaining allegations as stated in Paragraph 48.

49. State Farm's centralized system for terminating Agents is poisoned by racial bias and intentional discrimination, and results in significant racial disparities between Agents who State Farm elects to terminate and those it decides to continue to employ.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 49.

50. Moreover, when State Farm terminates African American Agents, their policies are disproportionately divided among non-African American Agents, further compounding the racial inequities within the Firm.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 50.

51. In 1992, State Farm hired Plaintiff Alton Williams, who had just graduated from college and was eager to make his mark and become a successful Agent. Williams had interned for State Farm while in college and worked his way up to claim representative, and finally to Agent.

**ANSWER:** State Farm Defendants admit that Alton Williams became an employee of State Farm Mutual in 1992 and that his employment terminated in 2000. Answering further, State Farm Defendants admit that Williams became an independent contractor Agent in 2000, and in 2005, in his capacity as President of the Williams Agency, signed an independent contractor Agent's Agreement on behalf of the Williams Agency. State Farm lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 51.

52. After qualifying to become an Agent, Williams applied to open his agency on Chicago's north side. There were two available locations, one in the prosperous Lakeview neighborhood and another in a more racially diverse, working class neighborhood further west. Williams requested the Lakeview location; however, pursuant to its discriminatory assignment practices, State Farm assigned a white Agent to the more lucrative Lakeview location and gave Williams the less lucrative location further west. Williams was forced to remain in his territory and State Farm did not offer him a more lucrative agency or location for the remainder of his employment.

**ANSWER:** State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation regarding what Williams requested and/or was told when he opened the Williams Agency 22 years ago, and therefore deny them. State Farm Defendants deny the remaining allegations as stated in Paragraph 52.

53. Despite State Farm denying him the more lucrative agency location, Williams excelled as an Agent. At one time, Williams ranked number 7 in the country in production among State Farm Agents. He achieved President's Club and earned the President's Club Trophy award, among other achievements and accolades. Consistent with its treatment of other African American Agents, State Farm denied Williams business opportunities and valuable business resources and support, including but not limited to policy assignments and the right to open an additional agency office, throughout his tenure because of his race.

**ANSWER:** State Farm Defendants admit that the Williams Agency was financially successful. State Farm Defendants admit that at one point the Williams Agency may have ranked as high as number 7 in the country in certain State Farm product lines, and that Williams earned President's Club recognition and the President's Club Trophy award as well as other accolades while an independent contractor Agent. State Farm Defendants deny the remaining allegations as stated in Paragraph 53.

54. Consistent with its discriminatory review and discipline practices, State Farm targeted Williams for heightened, unwarranted scrutiny and ultimately terminated his employment because of his race. Around September 2017, State Farm audited Williams's business. During the course of the audit, State Farm identified a small number of auto policies that had incorrect vehicle purchase dates listed on the applications. State Farm unfairly and inaccurately charged Williams with "rate manipulation" and terminated his employment. Any inaccuracies were the result of customer or clerical error, not intentional manipulation, as they had no material impact on the price of the supposedly manipulated policies. Williams is aware of non-African American agents who were accused of more severe "rate manipulation" and were subjected to far less or no discipline.

**ANSWER:** State Farm Defendants deny the allegations as stated in the first sentence of Paragraph 54, and specifically deny that Williams was "targeted," that he was an employee of or employed by State Farm while an independent contractor Agent, and that his Agent's Agreement

was terminated because of his race. State Farm Defendants admit that the Williams Agency was audited in 2017, and that the audit revealed that Williams and employees of the Williams Agency were submitting inaccurate data in support of auto insurance applications, which improperly manipulated the price of auto insurance quoted to applicants. State Farm further admits that the Williams Agency Agent Agreement was terminated based on the results of this audit investigation and a history of other prior improper business practices. State Farm Defendants specifically deny that the audit was racially motivated or discriminatory. State Farm Defendants deny the remaining allegations as stated in Paragraph 54.

> 55.     Williams participated in the discriminatory Termination Review Plan, and CEO Michael Tipsord decided to terminate Williams's employment. State Farm did not discipline, let alone terminate, non-African American Agents with similar or greater compliance issues.

**ANSWER:** State Farm Defendants admit that the Williams Agency State Farm Agent's Agreement was terminated by leadership within State Farm's North Central Market Area, that Williams sought a review of the decision by a Termination Review Committee, which declined to recommend reversal of that decision, and that State Farm Mutual Chairman Michael Tipsord also declined to reverse that decision. State Farm Defendants specifically deny that Williams was an "employee" or that his "employment" was terminated as an independent contractor Agent. State Farm Defendants deny the remaining allegations as stated in Paragraph 55.

> 56.     On several occasions, Williams reported to his superiors at State Farm that he was being treated differently than his non-African American colleagues. For example, Williams explained to State Farm management the racial disparity in the level of compliance auditing and discipline to which State Farm subjects its African American Agents as compared to its non-African American Agents. Rather than investigate or otherwise address his concerns, State Farm targeted Williams for increased scrutiny, ongoing discrimination and harassment, and, ultimately, termination.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 56.

57. As a result of State Farm's unlawful conduct and discriminatory policies and practices, Williams has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 57.

58. Plaintiff Brandon Herndon joined State Farm as an Agent in June 2010, after a successful career in pharmaceutical sales. Despite Herndon being an experienced and successful sales leader, pursuant to its firm-wide discriminatory practices, State Farm denied Herndon business opportunities, support, and resources it regularly provided to non-African American Agents at State Farm.

**ANSWER:** State Farm Defendants admit that in June 2010, Herndon signed the first of several State Farm independent contractor TICA Agreements. State Farm Defendants lack knowledge or information sufficient to a form a belief as to the truth of the allegations concerning Herndon's career prior to becoming a State Farm Agent, and therefore deny them. State Farm Defendants deny the remaining allegations as stated in Paragraph 58.

59. Herndon sought to open an agency in the Houston area, specifically in the affluent Sugar Land area where he and his wife lived. However, pursuant to its discriminatory assignment practices, State Farm required Herndon to instead locate his agency in southwest Houston, a less affluent community with a large African American population. State Farm placed Herndon in this territory because of his race. When Herndon expressed concern about his placement, State Farm told Herndon he would "fit right in" and "understand the demographic," or words to that effect. State Farm believed that Herndon "belonged" in a territory where many of the potential customers would be African American.

**ANSWER:** State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of allegations as to the agency location that Herndon "sought" or any concerns expressed by Tolson to unidentified persons 12 years ago regarding agency location, and therefore deny them. State Farm Defendants deny the remaining allegations as stated in Paragraph 59.

60. Shortly after Herndon opened his agency in southwest Houston, State Farm placed two non-African American Agents in Sugar Land, and State Farm gave a white Agent a sizeable existing book of business.

21

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 60.

61.    Because State Farm did not give Herndon an existing agency, he had to build his book of business from scratch. Moreover, because his community was predominantly working-class and lacked wealth, Herndon's agency required significantly more overhead to operate than it would have in Sugar Land and other more affluent areas. Unlike the more affluent communities in and around Houston, the potential clients in Herndon's territory often had little disposable income, which made it difficult to sell life insurance policies or financial products and limited Herndon to selling fewer, less lucrative auto and home policies.

**ANSWER:** State Farm Defendants admit that the agency location sought by Herndon and for which he was selected was a new market opportunity and did not include an existing book of business or assignment of policies. State Farm Defendants deny the remaining allegations as stated in Paragraph 61.

62.    State Farm rejected Herndon's repeated requests to be assigned a more lucrative market or open an additional agency in another territory. State Farm made clear that its decisions were based on its race-matching of Agents with potential customers. State Farm told Herndon that he needed to hire a "black guy and a Hispanic guy" to be successful.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 62.

63.    Despite these challenges, Herndon excelled as an Agent. In his first six months, Herndon was in the top 10 nationally for new Agent business, and within 18 months, he had built a $1.8 million book of business consisting of mostly auto insurance policies.

**ANSWER:** State Farm Defendants admit that Herndon was financially successful as an agent, and that in 2013, 2014, 2015 and 2016, Herndon's book of business of Auto and Fire written premium exceeded $3 million. State Farm Defendants deny the remaining allegations as stated in Paragraph 63.

64.    State Farm did not reward Herndon's successes in the same manner it did for his non-African American colleagues. Throughout Herndon's employment, State Farm denied Herndon a new agency or territory, as well as lucrative policy assignments and other business opportunities, resources, and support.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 64.

65.     One of the only instances in which Herndon received any policy assignments was when an Agent in southwest Houston retired and Herndon received a small number of his policies, worth about ten thousand dollars per year. Meanwhile, several of Herndon's non-African American Agent colleagues received policies worth hundreds of thousands of dollars in a single year.

**ANSWER:** State Farm Defendants admit that Herndon received policy assignments while an independent contractor Agent. State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of allegations concerning the number or value of such policy assignments received by him as compared to other unidentified State Farm Agents, and therefore deny them. State Farm Defendants deny the remaining allegations as stated in Paragraph 65.

66.     Indeed, when a 40-year agent with a considerable book of business located near Herndon announced his plan to retire, the retiring agent told Herndon that he wanted Herndon to inherit his book of business. It is common practice for retiring agents at State Farm to select an agent to inherit their book of business. State Farm refused to approve Herndon taking over the retiring agent's book of business. Indeed, State Farm refused to assign Herndon any accounts from his business. Herndon informed his manager of his belief that State Farm denied him policies and the book of business from the retiring agent because of his race. His manager did not deny this or investigate the issue, but just issued a warning to Herndon not to "go there" or words to that effect. After this complaint, State Farm retaliated against Herndon by denying him any policy assignments for the remainder of his time at the Firm, subjecting him to increased scrutiny, and ultimately terminating him.

**ANSWER:** State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of allegations concerning what an unidentified retiring agent may have "told" Herndon at some unspecified point in time, and therefore deny them. State Farm Defendants specifically deny that it is "common practice" for retiring Agents to select an Agent to "inherit" their assigned book of business and deny that Agents have any authority to decide how policies are assigned following their retirement. State Farm Defendants deny the remaining allegations as stated in Paragraph 66.

23

67.     In addition, State Farm awarded several of Herndon's non-African American colleagues' permission to open second or even third agencies, lucrative business opportunities State Farm denied Herndon.

**ANSWER:** State Farm Defendants generally admit that some independent contractor Agents have been authorized to open additional offices, but lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegation that Herndon's unidentified colleagues were so authorized, and therefore deny them. State Farm Defendants deny the remaining allegations as stated in Paragraph 67.

68.     Pursuant to State Farm's discriminatory policies and practices and in retaliation for making a protected complaint of race discrimination, State Farm subjected Herndon to heightened, unwarranted, and discriminatory scrutiny and discipline. State Farm terminated Herndon after he sold some auto insurance policies to ride-share drivers. Herndon had sold the policies because a State Farm underwriter told him he was authorized do so. State Farm later informed Herndon that the underwriter had been mistaken, and that ride-share driver policies were not approved in Texas. Herndon immediately contacted his customers and informed them that their ride-share driver policies would be terminated. Nonetheless, State Farm refused to renew his contract and terminated his Agent Agreement. A few days later, State Farm announced it would immediately begin offering ride-share driver polices in Texas, plainly demonstrating the reason for Herndon's termination was pretextual.

**ANSWER:** State Farm Defendants admit that Herndon's Agent's Agreement was terminated after he, among other things, engaged in unethical and deceptive business practices by submitting applications for auto insurance for private passenger vehicles that Herndon knew were being used for livery and/or ride sharing purposes and stating that such vehicles were being used for "personal use," and preparing and submitting to the City of Houston false certificates of insurance representing that State Farm had issued policies covering livery usage of the vehicles when in fact the policies covered personal use only. State Farm Defendants deny the remaining allegations as stated in Paragraph 68.

69.     State Farm did not similarly target, discipline, or terminate Agents who are not African American, even those who engaged in serious violations of State Farm policies.

**ANSWER:** State Farm Defendants deny that they "target" any independent contractor Agents, and deny the remaining allegations as stated in paragraph 69.

70. As a result of State Farm's discriminatory practices and unlawful conduct, Herndon has suffered substantial damages. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

**ANSWER:** State Farm Defendants deny the allegations as stated in paragraph 70.

71. Plaintiff Markus Tolson became a State Farm Agent in October 2009, after he worked for several years as a licensed sales representative for another State Farm Agent in Houston.

**ANSWER:** State Farm Defendants admit that Tolson executed a State Farm independent contractor TICA Agreement in October 2009, that prior to that time he worked for another State Farm independent contractor Agent in Houston and that from July 13, 2006 to July 14, 2009, Tolson held a licensed staff agreement as a team member of that independent contractor Agent. State Farm Defendants deny the remaining allegations of Paragraph 71.

72. Despite Tolson's significant experience with State Farm and in the sale of insurance products, State Farm denied Tolson business opportunities and resources regularly provided to non-African American Agents.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 72.

73. Tolson initially selected the River Oaks neighborhood in Houston for his agency location. At that time, State Farm needed to find a new Agent to take over an existing agency in River Oaks that had a considerable book of business. Consistent with its discriminatory policies and practices, however, State Farm instead gave the location to a non-African American Agent and placed Tolson back into a pool of Agents waiting for a location assignment. State Farm eventually assigned Tolson the less lucrative Greater Heights territory, where he was required to start an agency from scratch with no established book of business. Tolson was forced to remain in his territory, and State Farm did not offer him a more lucrative agency or location for the remainder of his employment.

**ANSWER:** State Farm Defendants admit that Tolson accepted an opportunity to become an independent contractor Agent in or around Greater Heights, Texas. State Farm Defendants

25

deny that Tolson was "required" to accept the opportunity offered to him or "forced" to remain in this location. State Farm Defendants deny the remaining allegations as stated in Paragraph 73.

74.    Despite being assigned to a less lucrative territory without an existing book of business, Tolson worked hard to achieve success at State Farm. He earned President's Club and Chairman's Circle distinctions. Nevertheless, pursuant to its discriminatory practices, State Farm denied Tolson policy assignments and compensation. For example, Tolson received only a handful of policy assignments throughout his tenure at State Farm, while his non-African American colleagues received policy assignments worth hundreds of thousands of dollars, which generated substantial revenues, referrals, and additional business and compensation. Tolson often pointed out to State Farm management that non-African American agents in his region were receiving far more policy distributions than he was. State Farm never investigated or addressed Tolson's concerns and State Farm continued its policy of assigning non-African American agents the lion-share of policy assignments.

**ANSWER:** State Farm Defendants admit that during the term of his State Farm Agent's Agreement, Tolson achieved President's Club and Chairman's Circle designations and received policy assignments. State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of allegations regarding Tolson's efforts to "achieve success" or the value or number of policy assignments he received as compared to assignments received by unidentified "colleagues," and therefore deny them. State Farm Defendants deny the remaining allegations as stated in Paragraph 74.

75.    Despite State Farm's discriminatory policies and practices, Tolson continued to excel, especially in the sale of financial products. As Tolson sold more financial products, he grew concerned that State Farm, consistent with its policy and practice, would target him and subject him to increased scrutiny because of his race. Tolson expressed this fear to his manager that State Farm would single him out for increased scrutiny and discipline because he was a high-achieving African American Agent. To be diligent and attempt to protect himself, Tolson required his employees complete more compliance training than State Farm required.

**ANSWER:** State Farm Defendants admit that Tolson achieved financial success in the marketing of State Farm financial services products. State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of allegations concerning Tolson's

"concerns" or the training he required of his employees, and therefore deny them. State Farm Defendants deny the validity of any concern by Tolson that he would be subject to increased scrutiny because of his race and deny that they "target" any independent contractor Agents. State Farm Defendants deny the remaining allegations as stated in Paragraph 75.

76.    However, consistent with State Farm's discriminatory practices, and in retaliation for complaining of racial discrimination, Tolson faced heightened scrutiny and unwarranted and differential discipline. State Farm terminated Tolson after one of his employees allegedly violated a State Farm policy, even though Tolson was unaware of the alleged violation and fired the sales representative as soon as he learned about the situation. State Farm did not similarly target, discipline, or terminate non-African American Agents, even those who engaged in serious violations of State Farm policies.

**ANSWER:** State Farm Defendants admit that Tolson's State Farm Agency Agreement was terminated due to a pattern of behavior that demonstrated his failure to provide proper oversight of his team members' activities inside and outside of his office, his repeated failure to comply with State Farm Bank guidelines and internal State Farm procedures, and his demonstrated concealment of his improper business practices. State Farm Defendants deny that they "target" any independent contractor Agents, and deny the remaining allegations as stated in Paragraph 76.

77.    Tolson participated in the discriminatory State Farm Termination Review Plan, and CEO Michael Tipsord made the final decision to terminate him because of his race.

**ANSWER:** State Farm Defendants admit that Tolson sought review by a Termination Review Committee of the decision by his Market Area leadership to terminate his Agent's Agreement, that the Termination Review Committee declined to recommend reversal of the decision, and that Chairman Tipsord also declined to reverse that decision. State Farm Defendants deny the remaining allegations as stated in Paragraph 77.

78.    As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Tolson has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 78.

79. With nearly a decade of experience in the insurance industry, Flowers was recruited by State Farm to become an Agent in or around 2002. Flowers applied to open his agency in Michigan, where there were two available locations, one in the prosperous town of Canton and another in the predominantly African American, working-class town of Pontiac. Flowers expressed interest in Canton, but State Farm instead steered Flowers to Pontiac pursuant to its racial steering practices. State Farm assigned a white Agent to the more lucrative Canton location. Flowers was forced to remain in this less lucrative territory for the remainder of his State Farm tenure.

**ANSWER:** State Farm Defendants admit that Flowers became a State Farm Agent Trainee in the state of Michigan effective as of December 1, 2002, and that he was appointed as an independent contractor Agent effective December 1, 2005. State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation regarding what Flowers requested and/or was told when he became an independent contractor Agent Trainee twenty years ago, and therefore denies them. State Farm Defendants specifically deny that Flowers was "forced" to remain in the Pontiac location, and deny the remaining allegations as stated in Paragraph 79.

80. According to publicly available census data, the population of Pontiac, Michigan is nearly 50 percent African American, and it has a median household income of approximately $33,000 and a poverty rate of 32 percent. In such a depressed area, "optional" products such as life insurance and bank products were beyond the reach of the average prospective client. Further, a majority of Pontiac residents were renters rather than homeowners, meaning there is significantly less need for home insurance. Accordingly, Flowers was forced to rely almost exclusively on a single product, auto insurance, to build his book of business.

**ANSWER:** State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of allegations as stated in Paragraph 80, and therefore deny them.

81. Despite State Farm denying him a more lucrative agency location, Flowers excelled as an Agent. He achieved President's Club and qualified for the Firm's life insurance trip, among other achievements and accolades. However, consistent with its treatment of other African American Agents, State Farm denied Flowers business opportunities and valuable business resources and support, including but not limited to policy assignments, throughout his tenure because of his race.

**ANSWER:** State Farm Defendants admit that Flowers earned the Auto President's Club distinction in 2008, 2011, and 2012. State Farm Defendants deny the remaining allegations as stated in Paragraph 81.

82.     In or around 2007, Flowers relocated his family to Tennessee and Flowers split his time between Pontiac, Michigan and Tennessee. Flowers obtained State Farm's permission for this arrangement and continued to perform strongly, including earning the President's Club distinction award three times.

**ANSWER:** State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the relocation of Flowers and his family as stated in Paragraph 82. State Farm Defendants admit that Flowers earned the Auto President's Club distinction in 2008, 2011, and 2012. State Farm Defendants deny the remaining allegations as stated in Paragraph 82.

83.     Although Flowers continued to perform at a high level as a State Farm Agent, in approximately 2017, State Farm began subjecting Flowers to heightened, unwarranted scrutiny, consistent with its discriminatory review and discipline practices.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 83.

84.     In approximately 2019, State Farm claimed it audited his book of business and claimed his office lacked proper oversight because of his living arrangement. Specifically, State Farm complained that some of Flowers's clients had higher liability coverage before they joined State Farm. Flowers explained that most of his clients were lower income with fewer assets, such as a home, that would require higher liability coverage. He explained that many of his clients had been sold more expensive insurance products by their prior insurers than they needed before they became clients of Flowers and State Farm. Flowers told State Farm that he did not believe it was ethical to sell higher liability coverage to lower income customers who did not require it, simply to make more money. State Farm told Flowers that if a customer had a higher liability coverage before coming to State Farm, Flowers should sell a policy with similar liability coverage, regardless whether it was appropriate for the client's needs.

**ANSWER:** State Farm Defendants deny that Flowers' office was audited in 2019 or that Flowers was told that he lacked proper oversight of his business. Answering further, State Farm Defendants admit that Flowers was informed that there were questions about the accuracy of

information submitted to State Farm by Flowers and his staff.  State Farm Defendants specifically

deny the sixth sentence as stated in Paragraph 84 and that State Farm instructed Flowers to market

policies with liability coverage in excess of a client's needs.  State Farm Defendants deny the

remaining allegations as stated in Paragraph 84.

85.    State Farm's treatment of Flowers was plainly discriminatory. The Firm's heightened scrutiny and complaints that Flowers was traveling between Michigan and Tennessee stood in stark contrast to their treatment of non-African American Agents who had similar living arrangements and who were not subjected to any criticism or heightened scrutiny. Indeed, a white Agent with an agency in Michigan lived in New Jersey and traveled to Michigan only one week a month, far less time in the office than Flowers, but was not audited or subjected to increased scrutiny. State Farm management demanded an in-person meeting with Flowers to discuss the audit and living arrangement because, as the State Farm manager told Flowers, management "wanted him to sweat," or words to that effect.

**ANSWER:**   State Farm Defendants deny the allegations as stated in Paragraph 85.

86.    Following the audit, State Farm continued to harass Flowers and subject him and his business to unwarranted and unfair scrutiny. Among other things, State Farm required Flowers to submit a monthly report detailing any new policies he wrote and what liability coverage the client had before joining State Farm. Management told Flowers that it would claim rate manipulation if Flowers continued to write policies with lower liability coverage than the client had prior to State Farm, regardless of the customer's needs. Having seen State Farm target and terminate a litany of successful African American Agents, Flowers had no choice but to leave the Firm and was constructively discharged in December 2019.

**ANSWER:** State Farm Defendants admit that Flowers voluntarily terminated his State

Farm Agent's Agreement in December 2019.  Answering further, State Farm Defendants state,

upon information and belief, that Flowers terminated his State Farm Agent's Agreement in order

to accept an offer of an agent opportunity in Tennessee from GEICO Insurance.  State Farm

Defendants specifically deny that they "target" any independent contractor Agents, and deny the

remaining allegations as stated in Paragraph 86.

87.    As a result of State Farm's unlawful conduct and discriminatory policies and practices, Flowers has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 87.

88.     Plaintiff Brooke Cluse became a State Farm TICA Agent in September 2011. Cluse was well-equipped to succeed as a State Farm Agent, having worked for several years as a claims representative and public affairs specialist at State Farm in Texas and Louisiana. Despite Cluse's significant experience with State Farm, State Farm has denied Cluse business opportunities, support, and resources regularly provided to non-African American Agents.

**ANSWER:** State Farm Defendants admit that prior to her appointment as an independent

contractor TICA Agent, Cluse was a State Farm employee working in public affairs and as a claims

representative. State Farm Defendants further admit that Cluse was appointed as a TICA Agent

in the South Texas region effective as of September 1, 2011. State Farm Defendants deny the

remaining allegations as stated in Paragraph 88.

89.     State Farm denied Cluse the opportunity to open an agency in her home state of Louisiana, having opted to give the few available agency locations to non-African American Agents. As a result, Cluse was forced to relocate and open her agency in Houston, Texas. Although Cluse applied for three open agency locations in Houston, State Farm steered her to the location of a former African American Agent who had been terminated for being unable to build a successful business in the territory. Consistent with its racial steering and race-matching practices, State Farm steered Cluse to this territory even though it had been unable to sustain the prior African American Agent. State Farm represented that the agency had a $2 million book of business. However, after Cluse opened her agency, she discovered the book of business was substantially less than the amount State Farm promised. Cluse has been forced to remain in this territory, and State Farm has not since offered her a more lucrative agency or location.

**ANSWER:** State Farm Defendants admit that Cluse was appointed as a TICA Agent in

the South Texas region effective as of September 1, 2011, and that at the time, her home address

was listed as Baton Rouge, Louisiana. State Farm Defendants further admit that Cluse was

appointed as an independent contractor Agent for an agent opportunity located in Houston, Texas,

effective as of September 1, 2012. State Farm Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegation regarding what Cluse was told by

unidentified persons when she opened her office, and therefore deny them. State Farm Defendants

deny the remaining allegations as stated in Paragraph 89.

90.     At State Farm's direction, Cluse invested a substantial amount of her own money
        to establish her agency, purchase sales leads, and hire staff. Cluse is still in debt
        from the considerable expenses associated with opening a new agency with State
        Farm without the sizeable book of business promised by State Farm when she
        accepted the assignment. Nevertheless, Cluse worked hard and received her full
        Agent contract in or around 2013.

**ANSWER:** State Farm Defendants deny that any investment of money by Cluse was "at

State Farm's direction," deny that State Farm Defendants promised Cluse a "sizeable book of

business," and lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations as stated in the first and second sentences in Paragraph 90. State Farm

Defendants admit that all independent contractor Agents are responsible for making their own

decisions relating to investing money and hiring staff to establish their respective businesses, and

further admit that Cluse executed another TICA Agent's Agreement on or about September 1,

2012 and a State Farm Agent's Agreement on or about September 1, 2013. State Farm Defendants

deny the remaining allegations as stated in Paragraph 90.

91.     Despite State Farm denying her a more lucrative agency location and existing book
        of business, Cluse has succeeded as an Agent. Nevertheless, pursuant to its
        discriminatory practices, State Farm has denied Cluse policy assignments and other
        business opportunities. For example, when Agents left State Farm, Cluse received
        only a handful of policy assignments throughout her tenure at State Farm, while her
        non-African American colleagues received policy assignments worth hundreds of
        thousands of dollars, which have generated substantial revenues, referrals, and
        additional business and compensation.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 91.

92.     After experiencing and watching State Farm's differential treatment of African
        American Agents, Cluse sought help and reform by lodging complaints about the
        Firm's discriminatory practices. For example, Cluse complained to her Sales
        Leader and Vice President of Agency about the discriminatory policy assignments
        given to white Agents but denied to her and other African American Agents; she
        also raised the unfair targeting of African American Agents in audits and for alleged

compliance violations while white Agents who engage is similar or more egregious violations are not subjected to the same level of scrutiny or punishment.

**ANSWER:** State Farm Defendants deny that they "target" any independent contractor Agents, and deny the remaining allegations as stated in Paragraph 92.

93.     State Farm took no corrective action in response to Cluse's complaints and instead targeted Cluse for retaliation. Consistent with State Farm's hostile, retaliatory culture and discriminatory practices, following her complaints, Cluse herself faced heightened scrutiny and unwarranted and differential discipline. In or around October 2019, Cluse received a complaint from a customer about an individual on her team. Cluse immediately investigated the complaint, terminated the employee, and reported the incident to State Farm. Rather than credit Cluse for being proactive, State Farm launched an unwarranted audit of Cluse's entire book of business. In or around March 2020, State Farm alleged it had found one instance of "rate manipulation" by an employee three years prior. State Farm then sanctioned Cluse by rescinding her bank certification. As a result, Cluse can no longer offer bank products, which can be lucrative and help attract and retain clients. In Cluse's long tenure at State Farm, white agents who engaged in similar or worse "infractions" have not been similarly targeted or punished by State Farm.

**ANSWER:** State Farm Defendants admit that in or about May 2019, Cluse was informed that an anonymous complaint had been received via State Farm's hotline regarding one of Cluse's team members, and that after investigation, Cluse terminated that team member's employment with her office. Answering further, State Farm Defendants admit that in or about March 2020, Cluse's office was audited, which revealed instances of improper auto quoting practices and that as a result of these findings, in April 2020, Cluse's authority to offer banking products was revoked for a one-year period. State Farm Defendants deny the remaining allegations as stated in Paragraph 93.

94.     Cluse has continued to try to help the Firm address its discriminatory practices, to no avail and to her detriment. After State Farm CEO Michael Tipsord issued a statement about State Farm's commitment to diversity following the social justice movement spurred by the killing of George Floyd, Cluse alerted him by email of "the disparities between African American and White Agents, especially here in Texas and in Louisiana" and the systematic lack of opportunities and support for African American Agents at State Farm. She asked for accountability for these inequities. Mr. Tipsord did not respond to her email, but a Senior Vice President acknowledged to Cluse that State Farm has been slow to meet the calls for diversity

and that the Agents who receive the bulk of the resources and policy assignment are not African American. However, the Senior Vice President offered no remedy to Cluse's complaints other than to acknowledge their existence. Cluse's call for accountability has not been answered, and she is not aware of any investigation or corrective action taken by the Firm into her complaints or those lodged by many other African American Agents and employees at State Farm.

**ANSWER:** State Farm Defendants admit that on June 5, 2020, the companies issued a

statement that stated:

> The deaths of George Floyd, Ahmaud Arbery and countless others are unnecessary tragedies we are outraged and saddened by. These times are a stark reminder that our society still suffers from far too many cases of distrust, hatred and racism. This is not the world we should accept as a society. We must push ourselves to influence change and create compassion. State Farm has long been committed to helping build safer, stronger communities. We embrace the responsibility to work with others to make the world around us better.

Answering further, State Farm Defendants admit that Plaintiff Cluse sent State Farm an email in

response to the above statement, and that thereafter, a State Farm Senior Vice President had a

conversation with Plaintiff Cluse. State Farm Defendants deny that the allegations of Paragraph

94 fairly characterize or describe the conversations and interactions between Cluse and State Farm,

and deny the remaining allegations as stated in Paragraph 94.

95. As a result of State Farm's unlawful conduct and discriminatory policies and practices, Cluse has suffered, and continues to suffer, substantial harm. She has lost wages and other benefits, suffered emotional distress, and her career and reputation have been irreparably damaged.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 95.

96. Plaintiff Vvonaka Richardson became a State Farm TICA Agent in June 2019, after she worked for several years as a licensed sales representative for another State Farm Agent in Tuscaloosa, Alabama.

**ANSWER:** State Farm Defendants admit that Richardson entered into a TICA Agent's

Agreement, Form TICA 16, on or about June 1, 2019, and that such agreement ended upon the

conclusion of its terms on June 30, 2020. Answering further, State Farm Defendants admit that

34

prior to becoming an independent contractor TICA Agent, Richardson worked as an employee for a State Farm independent contractor Agent in Tuscaloosa, Alabama. State Farm Defendants deny the remaining allegations as stated in Paragraph 96.

97. Despite Richardson's significant experience with State Farm and in the sale of insurance products, State Farm denied Richardson business opportunities, support, and resources regularly provided to non-African American Agents, and denied her a full Agent contract.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 97.

98. Richardson was assigned to open her agency in Mobile, Alabama. At that time, two senior State Farm Agents had recently died, and State Farm needed to find new Agents to take over their considerable books of business. State Farm promised Richardson a substantial portion of the two books of business. Consistent with its discriminatory policy assignment practices, however, State Farm instead denied Richardson the amount of policies it promised and instead assigned the majority of the policies and books of business to a white TICA Agent.

**ANSWER:** State Farm Defendants admit that the location of Richardson's agent office during the pendency of her TICA Agent's Agreement was in Mobile, Alabama. Answering further, State Farm Defendants state that during Richardson's tenure as a TICA Agent, the books of business of two recently deceased independent contractor Agents were allocated to new agents in the market area, including Richardson, but specifically deny that Richardson received less than the other new Agents, and state on information and belief that when the final distribution of the existing books of business was made between Richardson and two other new Agents in Mobile, Alabama, Richardson received a greater share of the existing business than either of the other new Agents (one of whom is white). State Farm Defendants deny the remaining allegations as stated in Paragraph 98.

99. At State Farm's direction, Richardson made her business plan (and expense budget) based on the value of the promised policies. Despite denying her the amount of policies it promised, State Farm refused to allow her to adjust these production goals and instead evaluated her performance based on these inflated numbers.

**ANSWER:** State Farm Defendants admit that Richardson made a business plan and expense budget, but deny that the contents of such plan and budget were directed by State Farm. State Farm Defendants deny the remaining allegations as stated in Paragraph 99.

100. Despite being assigned significantly less in assets than State Farm promised, Richardson worked hard to achieve success at State Farm. Indeed, two senior African American Agents assured Richardson that she was performing well as a TICA Agent.

**ANSWER:** State Farm Defendants deny that Richardson was promised any policies or assets by State Farm. State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations as stated in Paragraph 100, and therefore deny them.

101. Like many State Farm Agents, Richardson lost several team members as a result of the Covid-19 pandemic. In or around April 2020, State Farm told Richardson that she had 60 days to get a new team in place or she would not be given a full Agent contract. Richardson hired and trained a new team, at great expense to herself, and in the middle of a pandemic, and submitted a new action plan to State Farm. However, State Farm refused to alter her production requirements or support her in any way despite the economic turmoil and uncertainty during Covid. Consistent with the Firm's discriminatory practices, Richardson understands that State Farm provided support and granted exceptions during the pandemic to TICA Agents who were not African American, including by extending their TICA contracts.

**ANSWER:** State Farm Defendants admit that Richardson lost team members and had difficulty retaining team members, but deny that such difficulty arose solely as a result of the COVID-19 pandemic. State Farm Defendants admit that Richardson asserted that she was attempting to hire and train new staff, but lack knowledge or information sufficient to form a belief as to what efforts she actually undertook to hire or train staff. State Farm Defendants admit that Richardson submitted an adjusted Business Plan, but deny that State Farm entities set production goals for agents. State Farm Defendants deny the remaining allegations as stated in Paragraph 101.

102.    Richardson asked State Farm management and its CEO for an extension of her TICA contract in light of the pandemic. State Farm denied her request and denied her a full Agent contract in the summer of 2020. Richardson understands that State Farm gave white TICA Agents who did not meet production goals extensions and full Agent contracts. Indeed, a majority of the TICA Agents denied contracts in Richardson's TICA class were African American, despite being a substantial minority in the class.

**ANSWER:** State Farm Defendants admit that after Richardson was informed that she would not receive a subsequent State Farm Agent's Agreement upon expiration of her TICA Agent's Agreement she asked for reconsideration of the decision in light of the COVID-19 pandemic.  Answering further, State Farm Defendants admit that State Farm determined that no basis existed to reconsider the decision not to offer Richardson a subsequent independent contractor Agent's Agreement, because among other reasons, Richardson's difficulties in hiring and retaining employees and otherwise managing her Agent's office pre-dated the pandemic and was not related solely to the pandemic.  State Farm Defendants deny that State Farm entities set production goals for independent contractor Agents, and deny the remaining allegations as stated in Paragraph 102.

103.    Richardson complained of race discrimination and disparate treatment to State Farm management, including CEO Michael Tipsord and the newly appointed Chief Diversity Officer Victor Terry, to no avail. Richardson did not even receive a response to her serious allegations of race discrimination. Like other African Americans who dared to complain, State Farm retaliated against Richardson, including by refusing to assist her efforts to build a successful agency at State Farm and refusing to extend her a full Agent contract.

**ANSWER:** State Farm Defendants admit that after Richardson was informed that she would not receive a subsequent State Farm Agent's Agreement upon expiration of her TICA Agent's Agreement, she made several allegations of discrimination.  State Farm Defendants deny the remaining allegations as stated in Paragraph 103.

104.    As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Richardson

has suffered substantial harm. She has lost wages and other benefits, suffered emotional distress, and her career and reputation have been irreparably damaged.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 104.

105. Plaintiff Vera Dixon became a State Farm TICA Agent in June 2019, after a successful career in information technology. However, pursuant to its firm-wide discriminatory practices, State Farm denied Dixon business opportunities, support, and resources it regularly provided to non-African American Agents at State Farm, and denied her a full Agent contract.

**ANSWER:** State Farm Defendants admit that Dixon entered into a TICA Agent's Agreement, Form TICA 16, on or about June 1, 2019, and that such agreement expired upon the conclusion of its term on June 30, 2020. State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations as to Dixon's prior career. State Farm Defendants deny the remaining allegations as stated in Paragraph 105.

106. After working with State Farm to obtain insurance for her church, Dixon met with a State Farm Sales Leader (a white male) in Chesapeake, Virginia, who encouraged her to pursue a career as a State Farm Agent. The Sales Leader provided Dixon with target revenues for her business plan, which he claimed were based on performance in the territory. Dixon relied on his experience as to what was achievable in the market but later learned that the numbers he provided were significantly higher than those of most experienced Agents in the region achieved. The unrealistic target numbers in Dixon's business plan, however, were the ones she was held accountable to in evaluating whether she qualified for a full Agent contract.

**ANSWER:** State Farm Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations as to Dixon's efforts to obtain State Farm insurance for her church. State Farm Defendants deny the remaining allegations as stated in Paragraph 106.

107. Dixon was initially offered an existing agency in Smithfield, Virginia with a considerable book of business. State Farm instead gave the Smithfield agency and its book of business to three white males, at least two of whom were TICA Agents.

**ANSWER:** State Farm Defendants admit that prior to Dixon becoming eligible for a TICA Agent's Agreement, an independent contractor Agent whose office was located in Smithfield, Virginia died, and that policies serviced by that Agent needed to be reassigned for

servicing to other Agents as a result. State Farm Defendants deny the remaining allegations as stated in Paragraph 107.

108. With Smithfield unavailable, Dixon applied to two agencies: Norfolk and Chesapeake. The Norfolk agency had an existing book of business whereas the Chesapeake agency had no policies or book of business and needed to be built from "scratch." State Farm assigned Dixon to Chesapeake, and gave Norfolk to a white male TICA Agent, who she understands later got his full Agent contract as a result of the favorable territory assignment. Accordingly, Dixon was required to start an agency from scratch in Chesapeake. Dixon's Sales Leader informed her that he would give her an existing book of business later, but Dixon never received a single policy distribution during her tenure.

**ANSWER:** State Farm Defendants admit that Dixon applied for and was appointed to a new market opportunity in Chesapeake, Virginia, and that as a new market opportunity, there was no existing book of business for assignment. Answering further, State Farm Defendants state that as a TICA Agent who accepted a new market opportunity Dixon was eligible for and received Premium Builder Payments, which provided additional earning potential to help new market TICA Agents manage expenses while building a book of business. State Farm Defendants deny the remaining allegations as stated in Paragraph 108.

109. State Farm instructed Dixon to open her agency and sign a three-year lease on the expensive Cedar Road, claiming the location was showing the most growth. Dixon later learned that another Agent had recently closed her agency due to a lack of business.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 109.

110. During the application and interview process, Dixon informed State Farm that part of her business plan was to sell policies in North Carolina, where she lived a majority of her life and where she had a strong network. State Farm assured Dixon she could sell insurance policies in North Carolina as long as she paid a small fee to obtain the appropriate North Carolina licenses. However, after Dixon was given her TICA contract, State Farm refused to allow Dixon to develop customers or sell policies outside of Virginia. State Farm allowed at least five non-African American Agents in Dixon's Virginia region to sell and do business in North Carolina.

**ANSWER:** State Farm Defendants admit that on or about May 1, 2020, Dixon entered into a Memorandum of Agreement that was made part of her existing independent contractor TICA

Agent's Agreement and which provided that she was appointed as an Agent in the State of North

Carolina. State Farm Defendants deny the remaining allegations as stated in Paragraph 110.

111.    Despite being denied a book of business or any policies, Dixon worked hard to
        achieve success at State Farm. However, just as Dixon was staffing and training her
        team, the Covid-19 pandemic hit, which led to staffing shortages and made
        prospecting for new clients far more difficult. Without an existing book of business
        to generate revenues, Dixon was forced to continue to invest her own assets into
        the agency and defer paying herself a salary. Dixon sought assistance and guidance
        from State Farm but received only advice to spend more money on purchasing leads
        and hiring staff.

**ANSWER:** State Farm Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations as to whether Dixon worked hard or as to what Dixon

personally experienced regarding staffing shortages and difficulties in prospecting as a result of

COVID-19, and therefore deny these allegations. State Farm Defendants admit that Dixon, like

all independent contractor agents, was responsible for running and managing her own business,

but lack knowledge or information sufficient to form a belief as to how Dixon personally managed

her own business or what "assistance and guidance" she sought from unnamed individuals, and

therefore deny these allegations. State Farm Defendants deny the remaining allegations as stated

in Paragraph 111.

112.    Dixon complained of race discrimination and retaliation on several occasions. For
        example, in early 2020, Dixon raised issues of race discrimination to State Farm
        management. Dixon asked if she could speak with an attorney before meeting with
        human resources. State Farm refused Dixon's request and told her that her case was
        closed. Later, Dixon requested a meeting with her Sales Leader to discuss her
        discriminatory treatment, but he refused to meet with her as well. After Dixon
        complained of discrimination, but before she was told that she would not receive
        her full Agent contract, Dixon's Sales Leader admitted: "I don't want to have to
        work with you in a year from now." Dixon complained to State Farm management
        regarding her Sales Leader's acknowledged animus, to no avail. Ultimately, State
        Farm refused to extend to Dixon a full Agent contract.

**ANSWER:** State Farm Defendants admit that Dixon complained of race discrimination

but denies the substance of those complaints. State Farm Defendants admit that Sales Leader Tim

Westerman advised Dixon during multiple checkpoint assessments during the term of her TICA Agent's Agreement that if her business operations did not improve substantially, he could not recommend that Dixon be offered a subsequent State Farm Agent's Agreement upon the expiration of her TICA Agent's Agreement. Answering further, State Farm Defendants state that Dixon first complained of discrimination after being advised that she would not receive a subsequent State Farm Agent's Agreement. State Farm Defendants deny that the allegations of Paragraph 112 fairly characterize or describe the conversations and interactions between Dixon and her State Farm Sales Leader. State Farm Defendants deny the remaining allegations as stated in Paragraph 112.

113. As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Dixon has suffered substantial harm. She has lost wages and other benefits, suffered emotional distress, and her career and reputation have been irreparably damaged.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 113.

114. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who work or worked for State Farm as Agents or Term Independent Contractor Agents. The proposed class meets all requirements for class certification under Federal Rule of Civil Procedure 23.

**ANSWER:** State Farm Defendants admit that Plaintiffs purport to bring this action as a putative class action pursuant to Rule 23. State Farm Defendants deny that this action can be maintained on behalf of a Rule 23(b)(2), Rule 23(b)(3), or Rule 23(c)(4) class of current or former State Farm Agents or Term Independent Contractor Agents and denies the allegations as stated in Paragraph 114.

115. The class of African American employees and former employees is so numerous and geographically disbursed that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1).

**ANSWER:** State Farm Defendants deny that Plaintiffs satisfy Rule 23(a)(1), deny that this action can be maintained on behalf of a Rule 23(b)(2), Rule 23(b)(3), or Rule 23(c)(4) class of current or former State Farm Agents or Term Independent Contractor Agents, that State Farm

independent contractor Agents and TICA Agents are employees, and deny the allegations as stated in Paragraph 115.

116. There are numerous questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. FED. R. CIV. P. 23(a)(2).

**ANSWER:** State Farm Defendants deny that Plaintiffs satisfy Rule 23(a)(2), deny that this action can be maintained on behalf of a Rule 23(b)(2), Rule 23(b)(3), or Rule 23(c)(4) class of current or former State Farm Agents or Term Independent Contractor Agents, and deny the allegations as stated in Paragraph 116.

117. The claims alleged by Plaintiffs are typical of the claims of the class members. FED. R. CIV. P. 23(a)(3).

**ANSWER:** State Farm Defendants deny that Plaintiffs satisfy Rule 23(a)(3), deny that this action can be maintained on behalf of a Rule 23(b)(2), Rule 23(b)(3), or Rule 23(c)(4) class of current or former State Farm Agents or Term Independent Contractor Agents, and deny the allegations as stated in Paragraph 117.

118. Plaintiffs will fairly and adequately represent and protect the interests of the class, and they have retained competent and experienced counsel to represent the class. FED. R. CIV. P. 23(a)(4).

**ANSWER:** State Farm Defendants deny that Plaintiffs satisfy Rule 23(a)(4), deny that this action can be maintained on behalf of a Rule 23(b)(2), Rule 23(b)(3), or Rule 23(c)(4) class of current or former State Farm Agents or Term Independent Contractor Agents, and deny the allegations as stated in Paragraph 118.

119. The proposed class meets the requirements for certification under Rule 23(b)(2) and Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3).

**ANSWER:** State Farm Defendants deny that Plaintiffs satisfy Rule 23(b)(2) and 23(b)(3), deny that this action can be maintained on behalf of a Rule 23(b)(2), Rule 23(b)(3), or Rule 23(c)(4) class of current or former State Farm Agents or Term Independent Contractor Agents, and deny the allegations as stated in Paragraph 119.

120.   The issues of determining liability and equitable and injunctive relief, among other issues, are appropriate for certification under Rule 23(c)(4), as are other common issues.

**ANSWER:** State Farm Defendants deny that Plaintiffs satisfy Rule 23(c)(4), deny that this action can be maintained on behalf of a Rule 23(b)(2), Rule 23(b)(3), or Rule 23(c)(4) class of current or former State Farm Agents or Term Independent Contractor Agents, and deny the allegations as stated in Paragraph 120.

121.   Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of 1 of this Complaint.

**ANSWER:** State Farm Defendants hereby incorporate by reference its responses to paragraphs 1 through 120 as though fully set forth herein.

122.   42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, and conditions of the contractual relationship.

**ANSWER:** Paragraph 122 is a statement of law to which no answer is required.

123.   State Farm maintains a nationwide set of uniform, discriminatory employment policies and practices and engaged in a pattern or practice of systemic race discrimination against African Americans that constitutes illegal intentional racial discrimination in violation of U.S.C. § 1981.

**ANSWER:** State Farm Defendants deny that State Farm independent contractor Agents and TICA Agents are employees subject to any State Farm employment policies or practices, and deny the remaining allegations as stated in Paragraph 123.

43

124.     Through the conduct alleged herein, State Farm denied Plaintiffs and other African American Agents opportunities and resources valuable to their careers because of their race. State Farm also discriminated against Plaintiffs and all other similarly situated African American Agents in compliance auditing, discipline, termination, compensation, performance evaluation, promotions, and in other terms and conditions of their employment.

**ANSWER:** State Farm Defendants deny that State Farm independent contractor Agents and TICA Agents are employees, and deny the remaining allegations as stated in Paragraph 124.

125.     Plaintiffs and all those similarly situated were subjected to and harmed by State Farm's systemic and individual discrimination.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 125.

126.     On behalf of themselves and the class they seek to represent, Plaintiffs request the relief set forth below.

**ANSWER:** State Farm Defendants deny that Plaintiffs have sustained any damages or injuries as a result of any wrongdoing by State Farm, and deny that Plaintiffs are entitled to any recovery from this action.

127.     Plaintiffs Herndon, Tolson, Cluse, Richardson, and Dixon, individually, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

**ANSWER:** State Farm Defendants deny hereby incorporate by reference its responses to paragraphs 1 through 126 as though fully set forth herein.

128.     Plaintiffs engaged in protected activity by complaining of their unlawful treatment.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 128.

129.     Plaintiffs suffered retaliation and harm because of their protected activity, in violation of 42 U.S.C. § 1981.

**ANSWER:** State Farm Defendants deny the allegations as stated in Paragraph 129.

130.     On behalf of themselves, individually, Plaintiffs Herndon, Tolson, Cluse, Richardson, and Dixon request the relief set forth below.

**ANSWER:** State Farm Defendants deny that Plaintiffs have sustained any damages or injuries as a result of any wrongdoing by State Farm, and deny that Plaintiffs are entitled to any recovery from this action.

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and the class they seek to represent and against Defendants as follows:

a.    Certify this case as a class action;

b.    Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.    Declare the State Farm acts, conduct, policies and practices alleged herein are unlawful and violate the federal statutes identified in the Counts alleged against them set forth above;

d.    Declare that State Farm engages in a pattern and practice of racial discrimination against African Americans;

e.    Order that State Farm stop discriminating and retaliating against African Americans;

f.    Order Plaintiffs and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise make Plaintiffs whole;

g.    Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of State Farm's unlawful conduct;

h.    Award Plaintiffs and all other all others similarly situated compensatory and punitive damages;

i.    Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs, and disbursements, as provided by law;

j.    Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs;

k.    Declare that State Farm's actions and conduct constitute unlawful retaliation as to Plaintiffs Herndon, Tolson, Cluse, Richardson, and Dixon, individually, pursuant to 42 U.S.C. § 1981; and

l.    Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

**ANSWER:** State Farm Defendants deny that Plaintiffs have sustained any damages or injuries as a result of any wrongdoing by any State Farm Defendant, and deny that Plaintiffs are entitled to the certification of any class, or any of the relief, recovery or orders from this action Plaintiffs request above.

### STATE FARM DEFENDANTS' ADDITIONAL DEFENSES

State Farm Defendants assert the following defenses, without assuming the burden of proof as to any such defenses or any portions thereof that would otherwise rest with Plaintiffs. State Farm Defendants repeat and incorporate their answers and denials to the allegations of the Complaint as though fully set forth herein. State Farm Defendants expressly reserve the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

### FIRST DEFENSE

1. State Farm Defendants market insurance and other financial services products through business relationships with more than 19,000 independent contractor Agents. The relationship between State Farm Defendants and these Agents is governed by the applicable State Farm Agent's Agreement. State Farm Defendants perform their obligations and responsibilities as set forth in the Agent's Agreement in good faith and without regard to race, gender, or any other protected status.

2. State Farm's Code of Conduct provides that the company "will not practice, tolerate nor condone discrimination, including harassment, based upon a person's status, such as, but not limited to: age, race, color, religion, sex, national origin, sexual orientation, gender identity, disability, genetic information, veteran status or another basis prohibited by law." Complaints of discrimination or harassment can be reported through numerous channels, including the Compliance & Ethics Hotline.

3.     Plaintiffs' claims fail because any actions taken by any State Farm Defendants with respect to them were consistent with State Farm's Code of Conduct, non-discrimination and diversity and inclusion policies, and taken in good faith, for legitimate, non-discriminatory and non-pretextual reasons.

## SECOND DEFENSE

4.     Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

## THIRD DEFENSE

5.     Any claim for punitive damages is barred because State Farm Defendants exercised reasonable care to prevent and promptly correct any discriminatory conduct, and Plaintiffs unreasonably failed to take advantage of preventative or corrective opportunities provided by State Farm Defendants and failed to report any discriminatory conduct of which they may have been aware.

## FOURTH DEFENSE

6.     The Agent's Agreement is terminable at-will, and the Agent's Agreements for Plaintiffs Williams, Herndon and Tolson were terminated based on a legitimate non-discriminatory basis and therefore, such termination is not the result of any conduct by any State Farm Defendant that can support a claim for race discrimination under 42 U.S.C. § 1981.

## FIFTH DEFENSE

7.     Brook Cluse remains a State Farm independent contractor Agent and has not suffered any tangible harm or detriment that can support a claim for race discrimination under 42 U.S.C. 1981.

8.     Jeffrey Flowers voluntarily terminated his Agent's Agreement with State Farm to accept an agency opportunity with another insurance company and has not suffered any tangible

harm or detriment as the result of any conduct by any State Farm Defendant that can support a claim for race discrimination under 42 U.S.C. § 1981.

## SIXTH DEFENSE

9.      Plaintiffs did not suffer any damages attributable to the actions of any State Farm Defendants or any of their employees or agents.

## SEVENTH DEFENSE

10.     If Plaintiffs have suffered any injury, which the State Farm Defendants expressly deny, such injury is the result of Plaintiffs' own acts or omissions.

## EIGHTH DEFENSE

11.     If Plaintiffs have suffered any injury, which the State Farm Defendants expressly deny, Plaintiffs failed to take reasonable and diligent efforts to mitigate their damages.

12.     Alternatively, to the extent Plaintiffs have mitigated any lost income resulting from an alleged action or inaction of State Farm Defendants, any damages awarded to Plaintiffs must be reduced by the amount of this substitute income.

## NINTH DEFENSE

13.     Plaintiffs are not entitled to recover punitive damages in this action because at all times relevant herein, including prior to the allegations that form the basis of the Plaintiffs' claims, State Farm Defendants have taken good faith efforts to comply with federal and state anti-discrimination laws and to ensure that Plaintiffs were not discriminated and/or retaliated against based on any illegal or impermissible factor; and any acts or omissions alleged by Plaintiffs that give rise to this action were taken in good faith, without malice or intent to injure Plaintiff, and do not constitute a willful violation of law.

**TENTH DEFENSE**

14.     Plaintiffs are not entitled to punitive damages because such damages violate each State Farm Defendant's constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution to procedural and substantive due process and the constitutional right to be protected from excessive fines.

**ELEVENTH DEFENSE**

15.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**TWELFTH DEFENSE**

16.     Plaintiffs' claims are barred, in whole or in part, by waiver and/or estoppel.

**THIRTEENTH DEFENSE**

17.     The types of claims alleged by the Plaintiffs on behalf of themselves and the alleged class are matters in which individual questions predominate and, accordingly, are not appropriate for class treatment. The claims alleged by Plaintiffs are neither common to nor typical of those, if any, pertaining to the alleged class Plaintiffs purport to represent. Plaintiffs have not shown and cannot show that class treatment of the claims alleged herein is superior to other methods of adjudicating the controversy.

**FOURTEENTH DEFENSE**

18.     To the extent that any or all of the allegedly injured individuals on whose behalf Plaintiffs sue have brought claims in another forum, such allegedly injured individuals cannot recover multiple times for the same alleged injuries.

**FIFTEENTH DEFENSE**

19.     To the extent that any of Plaintiffs or any putative class member has filed for and failed to identify their claims in bankruptcy, such individual(s) lack standing and/or their claims must be judicially estopped/barred.

## SIXTEENTH DEFENSE

20.     Because liability and/or damages, if any, to Plaintiffs and each of the allegedly injured individuals on whose behalf Plaintiffs are suing may not be determined by a single jury or on a group-wide basis or representative basis, allowing this action to proceed on a class basis would violate State Farm Defendants' rights under the Seventh and Fourteenth Amendment to the United States Constitution.

Dated:  August 22, 2022                     Respectfully submitted,


                                             /s/ *Patricia Brown Holmes*
                                            Patricia Brown Holmes
                                            Joseph A. Cancila Jr.
                                            Sondra A. Hemeryck
                                            Amy C. Andrews
                                            RILEY SAFER HOLMES & CANCILA LLP
                                            70 W. Madison St., Suite 2900
                                            Chicago, IL  60602
                                            312-471-8700

                                            Michael A. Warner Jr.
                                            Erin Fowler
                                            FRANCZEK P.C.
                                            300 S. Wacker Drive, Suite 3400
                                            Chicago, IL  60606

                                            *Counsel for State Farm Mutual Automobile Ins.
                                            Co., State Farm Life Ins. Co., State Farm Fire
                                            & Casualty Co., State Farm General Ins. Co.,
                                            and State Farm Bank, F.S.B.*