**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALTON WILLIAMS, BRANDON HERNDON, MARKUS TOLSON, JEFFREY FLOWERS, BROOKE CLUSE, VVONAKA RICHARDSON, and VERA DIXON, on behalf of themselves and all others similarly situated, | Case No. 20-cv-01121 |
| | Hon. Franklin U. Valderrama |
| Plaintiffs, | Hon. Sunil R. Harjani |
| v. | Jury Trial Requested |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., STATE FARM LIFE INSURANCE CO., STATE FARM FIRE AND CASUALTY CO., STATE FARM GENERAL INSURANCE CO., and STATE FARM BANK, F.S.B., | |
| Defendants. | |

**SECOND AMENDED CLASS COMPLAINT**

Plaintiffs Alton Williams ("Williams"), Brandon Herndon ("Herndon"), Markus Tolson ("Tolson"), Jeffrey Flowers ("Flowers"), Brooke Cluse ("Cluse"), Vvonaka Richardson ("Richardson"), and Vera Dixon ("Dixon") (collectively "Plaintiffs"), through their counsel Stowell & Friedman, Ltd., Ben Crump Law, PLLC, and Leinenweber Baroni & Daffada, LLC, on behalf of themselves and all others similarly situated, file this Second Amended Complaint of race discrimination and retaliation against Defendants State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Co., State Farm General Insurance Co., and State Farm Bank, F.S.B., and in support state as follows:

## OVERVIEW

1.      State Farm is "the leading auto and home insurer in the United States" and is currently ranked number 36 on the Fortune 500 list of largest companies in the United States. According to its Annual Report, in 2018, State Farm generated premium revenue of over $43.4 billion and net income of approximately $6.4 billion.

2.      State Farm offers insurance and financial products to customers through its workforce of over 19,000 Agents across the United States.  State Farm provides widely divergent compensation and opportunities to the Agents who service its customers, depending on their race. African Americans are underrepresented as State Farm Agents and paid substantially less than their counterparts who are not African American.  These racial disparities result from State Farm's systemic, intentional race discrimination and company-wide discriminatory practices.

3.      State Farm maintains a racially biased corporate culture replete with harmful stereotypes regarding its African American employees and customers that infects its policies and decision-making, including its racial steering and race-matching of Agents, territories, and clients.  Plaintiffs, and the class they seek to represent in this lawsuit, challenge State Farm's company-wide policies and practices that result in higher rates of discipline and lower pay for African Americans.

4.      Plaintiffs file this lawsuit to hold State Farm accountable for its unlawful treatment of African American Agents and to achieve meaningful reform.  This lawsuit is brought by Plaintiffs on behalf of themselves and other African American State Farm Agents subjected to and harmed by the Firm's company-wide pattern or practice of race discrimination and discriminatory policies and practices.  This action seeks class-wide injunctive relief to end State Farm's entrenched race discrimination and make-whole relief for class members.

## JURISDICTION AND VENUE

5.     Plaintiffs' claims arise under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.*, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). State Farm conducts business throughout this District, and Plaintiff Williams worked for and was harmed by State Farm in this District. The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

## PARTIES

7.     State Farm Mutual Automobile Insurance Company is the parent company of State Farm Life Insurance Company, State Farm Fire and Casualty Company, State Farm General Insurance Company, and State Farm Bank, F.S.B., (collectively "State Farm," "the Firm," or "Defendants"). All of these entities are Illinois corporations with their principal place of business in Bloomington, Illinois.

8.     Plaintiff Alton Williams is African American and worked for State Farm as an Agent from 1999 until he was unlawfully terminated on December 31, 2017. Williams competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his dedication to his job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm subjected Williams to race discrimination throughout his employment.

9.     Plaintiff Brandon Herndon is African American and worked for State Farm as an Agent from 2010 until he was unlawfully terminated in March 2017.  Throughout his employment, Herndon competently discharged all duties assigned to him and enjoyed an excellent reputation regarding the high quality of his work and his conscientious devotion to his

job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm subjected Herndon to race discrimination and retaliation for challenging the Firm's discriminatory practices.

10.     Plaintiff Markus Tolson is African American and worked for State Farm as an Agent from October 2009 until he was unlawfully terminated in approximately August 2016. Throughout his employment, Tolson competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his devotion to his job.  Pursuant to its discriminatory policies and practices, however, State Farm subjected Tolson to race discrimination and retaliation for challenging the Firm's discriminatory practices.

11.     Plaintiff Jeffrey Flowers is African American and worked for State Farm as an Agent from December 2002 until he was constructively discharged in approximately December 2019. Throughout his employment, Flowers competently discharged all duties assigned to him and enjoyed an excellent reputation with regard to the high quality of his work and his devotion to his job.  Pursuant to its discriminatory policies and practices, however, State Farm subjected Flowers to race discrimination throughout his employment.

12.     Plaintiff Brooke Cluse is African American and has worked for State Farm as an Agent since approximately 2011. Cluse has competently discharged all duties assigned to her and enjoys an excellent reputation with regard to the high quality of her work and her dedication to her job. Nevertheless, pursuant to its discriminatory policies and practices, State Farm has subjected Cluse to race discrimination throughout her employment and to retaliation for challenging the Firm's discriminatory practices.

13.     Plaintiff Vvonaka Richardson is African American and worked for State Farm as a Term Independent Contractor Agent from June 2019 until she was unlawfully terminated in

approximately July 2020. Throughout her employment, Richardson competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her devotion to her job.  Pursuant to its discriminatory policies and practices, however, State Farm subjected Richardson to race and sex discrimination and retaliation for challenging the Firm's discriminatory practices.

14.     Plaintiff Vera Dixon is African American and worked for State Farm as a Term Independent Contractor Agent from June 2019 until she was unlawfully terminated in approximately July 2020. Throughout her employment, Dixon competently discharged all duties assigned to her and enjoyed an excellent reputation with regard to the high quality of her work and her devotion to her job.  Pursuant to its discriminatory policies and practices, however, State Farm subjected Dixon to race discrimination and retaliation for challenging discriminatory practices.

## FACTUAL ALLEGATIONS

15.     State Farm maintains a corporate culture replete with harmful racial stereotypes and biased views about the skills, abilities, and potential of African American employees, including Agents, and customers.  The Firm's racial bias is exemplified by its racial steering, racial redlining and other discriminatory practices against employees and customers of color, as illustrated in a number of recent lawsuits.

16.     State Farm has faced at least two class actions brought by employees challenging the Firm's entrenched discrimination,[1] and at least two other African American Agents are

---

[1] *State Farm Settles Discrimination Lawsuit*, AP (Nov. 21, 1990), https://apnews.com/1660be099229e8bcd1d5bf6897f1f38d; Philip Hager, *State Farm to Pay Women $157 Million for Job Bias : Total Damages Against Insurance Firm May Exceed $200 Million. Award Is Record for Civil Rights Case*, L.A. TIMES (Apr. 29, 1992), https://www.latimes.com/archives/la-xpm-1992-04-29-mn-886-story.html.

currently suing State Farm and make similar allegations of race discrimination as those raised in this Complaint, including that State Farm subjects African American Agents to heightened scrutiny and differential discipline. *See Florvius v. State Farm*, No. 12-cv-2912 (N.D. Ga. July 28, 2020), ECF No. 8 (alleging State Farm subjected her to increased scrutiny and termination for purported infractions while failing to audit or punish white Agents for similar or more egregious violations of State Farm policies); *Bazil v. State Farm*, No. 20-cv-2914 (N.D. Ga. July 26, 2020), ECF No. 9 (same).

17. State Farm's long history of racial discrimination also extends to its customers of color, as illustrated by a pending class action charging discrimination against African American policy holders. *See Connectors Realty Group Corp. v. State Farm*, No. 19-cv-0743 (N.D. Ill. Feb. 5, 2019), ECF No. 24, 38 (denying motion to dismiss class claim of discrimination brought by African American policy holders, and including allegation that State Farm refused to process insurance claim for African American customer because "we have a lot of fraud in your area," referring to the "South Side of Chicago and you all's neighborhoods").

18. State Farm maintains a racially hostile culture and environment in which there is no accountability for racist conduct and statements. For example, a prominent white Agent in the midwest engaged in a racist rant on a public social media platform, claiming an African American man wanted "to rely on the government" and told him to "Go get another my[sic] babies mama" and "go back to Africa." Despite complaints, the agent remains at State Farm.

19. State Farm lacks any meaningful avenue for African American Agents to complain or seek redress for disparities in opportunities and resources. State Farm is ineffective at resolving complaints of discrimination, which are typically ignored or result in the complaining employee being targeted for retaliation. Most African Americans recognize the

futility of lodging internal complaints of race discrimination. Those brave enough to come forward suffer retaliation.

20.     Following the killing of George Floyd and subsequent racial justice movement, State Farm, like other large corporations, issued a statement that "our society still suffers from far too many cases of distrust, hatred and racism." State Farm, however, has failed to address the claims of racism within its own ranks. Nevertheless, the widespread nature of racial discrimination at State Farm has been voiced by the State Farm workforce. Agents and employees of color created a petition to State Farm describing past and present racial inequality and demanding racial equity in the State Farm workplace. The petition asked Black State Farm agents and employees to sign if they knew of State Farm personnel who had been let go unfairly, had to go scratch (agents forced to start without a book of business) or been given a smaller book of business, experienced or seen racism at work, received less resources, or were afraid to speak up in fear of backlash, among other discriminatory practices. To date, nearly 1,600 State Farm employees of color have signed the petition to demand change and racial equality at the Firm.[2]

## I.     State Farm Is Engaged In Firm-Wide Systemic Discrimination Against African American Agents

21.     State Farm maintains strict, centralized control over its operations and Agents from its company headquarters in Bloomington, Illinois, where an almost exclusively white team of senior executives issues mandatory company policies and practices that apply to all Agents in the State Farm workforce. State Farm requires each of its Agents to sign nearly identical Agent Agreements that govern their employment relationship and dictate the conditions under which the Agents operate and may offer State Farm's insurance and financial products to customers.

---

[2] *State Farm: Employees & Agents of Color Demand Racial Equality & Equity in the Workplace*, MoveOn, https://sign.moveon.org/petitions/state-farm-employees-agents-of-color-demand-racial-equality-equity-in-the-workplace.

22. State Farm is engaged in a firm-wide pattern and practice of discrimination against African American Agents in their terms and conditions of employment. State Farm issues, implements, and oversees uniform, company-wide policies and practices that discriminate against African American Agents and advantage non-African American Agents at the expense of African American Agents. Because of the Firm's stereotypical views and discriminatory employment practices, African Americans are under-represented among State Farm Agents by statistically significant margins as compared to the national average.

23. Among other things, State Farm maintains discriminatory training practices and its discriminatory policies and practices provide African Americans less lucrative agencies and territories; deny them valuable business opportunities (including Agent contracts) and resources; subject them to heightened scrutiny and differential discipline; and result in lower pay than Agents who are not African American.

**Term Independent Contract Agent ("TICA Agent")**

24. State Farm employs discriminatory policies and practices in its TICA program, including its policies and practices regarding performance evaluation, training, and the assignment of policies, business opportunities, and other resources and support, as well as the awarding of full Agent contracts to Agents in training, or TICA Agents.

25. State Farm recruits African Americans to join the Firm as Agents through its TICA program, often luring them away from stable and well-paying jobs, with the promise of lucrative business opportunities and careers. State Farm requires these TICA Agents to invest substantial sums of their own money in rent, offices, marketing, sales leads, and hiring a team. State Farm, however, denies African American TICA Agents the same business opportunities, support, training, and resources provided to non-African American TICA Agents, subjects

African Americans to more stringent performance standards, and denies African American

Agents permanent agency contracts on the basis of their race.

26.     TICA Agents must complete a 17-week State Farm training course before they

open an agency and begin selling insurance, during which period State Farm considers them

employees. State Farm provides largely sales training. Rather than train prospective Agents in

how to successfully run an agency, State Farm selects who will succeed by assigning non-

African American Agents lucrative locations to open their agency and assigns them established

books of business and policies. African American TICA Agents are in turn steered to less

lucrative agency locations and are not given books of business or given substantially smaller

policies or books of business than their non-African American peers.

27.     At the conclusion of 13-months, State Farm decides whether to extend a full

Agent contract to the TICA Agent or terminate the Agent.

28.     State Farm's TICA training program uses and applies criteria intentionally

designed to discriminate against African Americans, both in the training program itself, and in

the opportunities steered toward non-African American TICA Agents and ultimately, by who

gets selected for full Agent contract.

29.     State Farm maintains extensive control over its TICA employees, including, for

example:

- State Farm insists that TICAs exclusively represent State Farm and a TICA cannot sell
  insurance for any other insurance company;

- TICAs do not own their books of business, and State Farm retains the TICA's book of
  business and redistributes it among other Agents if a TICA is terminated;

- State Farm maintains discretion over where a TICA opens his or her agency and the appearance of the physical building, including signage and branding;

- State Farm claims the right to change TICA compensation without prior notice or consent;

- TICAs must use State Farm computers and programs to maintain client records, and State Farm monitors and reviews TICA Agents' records without consent;

- State Farm sets performance standards and monitors TICA's performance regularly; and

- State Farm controls and approves all TICA advertising and requires TICAs to pay for marketing through State Farm or its approved third-party vendors.

**Territory and Agency Assignment**

30. State Farm employs company-wide policies and practices for assigning territories and agency locations that discriminate against African American Agents and TICA Agents. Pursuant to these policies and practices, State Farm assigns the most lucrative territories and agency locations to Agents who are not African American while assigning African American Agents less lucrative and more problematic agencies and territories on the basis of their race.

31. State Farm disproportionately gives non-African American Agents a head start in their careers by allowing them to take over existing agencies with substantial books of business from Agents who have moved or who no longer work for the Firm. By contrast, State Farm generally requires African American Agents to start new agencies with substantially less lucrative books of business or from "scratch" and without existing insurance policies or financial products.

32. In addition, State Farm disproportionately assigns non-African American Agents to territories and agency locations in areas with more affluent populations, while relegating

African American Agents to areas with considerably less wealth. The Firm also engages in "race matching," by assigning African American Agents to areas with higher African American and minority populations.

33.     State Farm's policy and practice of disproportionately assigning non-African American Agents to territories and agency locations in more affluent areas affords them greater opportunities to generate income, in part, because wealthy customers have more need for and ability to purchase insurance and financial products than customers with lower incomes and less wealth. More affluent customers are also more likely to pay their bills on time, freeing the Agents who serve them from the need to hire employees and use resources to engage in collection efforts for overdue premiums, and allowing the Agents to devote more resources to sales.

34.     State Farm also disproportionately authorizes non-African American Agents to expand their agencies to additional locations, while denying those income-generating opportunities to African American Agents, even very successful African American Agents.

**Insurance Policy and Financial Product Assignments**

35.     State Farm's company-wide policies and practices for assigning insurance policies and financial products give the most lucrative business opportunities to Agents and TICA Agents who are not African American, and assign African American Agents less lucrative business opportunities.

36.     When an Agent retires or leaves the Firm, State Farm reassigns the Agent's customers and existing insurance policies to other Agents. Agents who receive these assignments gain not only the value of these policies and any financial products the customers may have, but also ongoing commissions and the opportunity to grow the customers' accounts or to gain new

customers through leads and referrals. Thus, the discriminatory distribution of policies has a substantial impact on the number, value, and quality of policies and accounts that Agents manage, and on their compensation. Pursuant to State Farm's discriminatory policies and practices, African Americans are largely excluded from being assigned lucrative insurance policies, even when they achieve high-performance distinctions.

37.     When State Farm does assign insurance policies to African American Agents, they are generally fewer in number, more problematic, and less lucrative than those that State Farm assigns to non-African American Agents.

38.     Moreover, because of State Farm's discriminatory policies and practices regarding assignment of territories and agency locations, it is more difficult for African American Agents to retain policy assignments they receive.

39.     Similarly, in addition to denying African American Agents business opportunities, State Farm provides Agents who are not African American with valuable resources and support, which are denied to African American Agents.

**Compensation and the Scorecard Bonus**

40.     State Farm employs intentionally discriminatory compensation policies and practices that provide widely divergent compensation to Agents depending on their race.

41.     Among other discriminatory compensation practices, State Farm provides substantial compensation to its Agents pursuant to a uniform, nationwide compensation policy and practice called the "Scorecard Bonus." State Farm intentionally selects and relies on factors that disadvantage African Americans to calculate eligibility for and the amount of the Scorecard Bonus paid to Agents.

42.     Because State Farm uses commission-based and cumulative-advantage systems to evaluate and compensate its Agents, a level playing field and fair distribution of resources and business opportunities are essential.  However, State Farm's discriminatory policies and practices deny African American Agents opportunities, resources, and substantial compensation.

43.     For example, State Farm steers African American Agents toward less affluent territories and/or assigns them to territories in which the clientele match the Agents' race. African American Agents are therefore disadvantaged because many of the clients in their territories cannot afford to purchase financial service products and purchase fewer or less expensive insurance products.  Further, the Firm intentionally distributes more, and more lucrative, policies and financial products to non-African American Agents, and denies similarly situated African American Agents such distributions. Moreover, State Farm targets African American Agents for compliance issues, denying African American Agents the opportunity to offer financial products to their clients.

44.     Because of these and other company-wide policies and practices, African American Agents are substantially less likely than non-African American Agents to meet the requirements of the Score Card Bonus policy. State Farm employs these and other policies and practices to discriminate against African American Agents and to deny compensation to African American Agents.

**Compliance Auditing, Discipline, and the Termination Review Plan**

45.     State Farm's company-wide policies and practices regarding performance, compliance, discipline, and termination discriminate against African American Agents.  These discriminatory policies and practices are designed to target African American Agents and force them to either resign or be terminated.

46. Pursuant to its discriminatory policies and practices, State Farm subjects African American Agents to heightened scrutiny, holds them to higher compliance standards, and imposes greater discipline, including termination, on African American Agents for alleged violations of Firm policies than it does on similarly situated non-African American Agents. Through Firm-wide practices, including review and approval by a corporate review committee, State Farm disproportionately audits and disciplines African American Agents.

47. Among other discriminatory practices, State Farm disproportionately denies or rescinds the right of African American Agents to offer financial products. The inability to offer financial products limits an Agent's compensation and ability to attract and maintain customers and makes an Agent ineligible to open a second agency location or receive policy assignments. Non-African American Agents' policy violations are routinely ignored or result in lesser discipline, and they are routinely assigned lucrative policy assignments and eligible to offer financial products, compounding their success and the racial disparity in earnings.

48. State Farm employs a centralized practice called the "Termination Review Plan." Agents who have been informed that the Firm intends to terminate their Agent Agreement may request a termination review from State Farm's Chief Executive Officer ("CEO") pursuant to policies and practices approved by State Farm's Board of Directors.

49. A State Farm review team makes findings and/or recommendation for the CEO who makes the final decision of whether to terminate the Agent.

50. State Farm's centralized system for terminating Agents is poisoned by racial bias and intentional discrimination, and results in significant racial disparities between Agents who State Farm elects to terminate and those it decides to continue to employ.

51. Moreover, when State Farm terminates African American Agents, their policies are disproportionately divided among non-African American Agents, further compounding the racial inequities within the Firm.

## II. Plaintiffs Were Subjected to and Injured By State Farm's Unlawful Conduct

Plaintiff Alton Williams

52. In 1992, State Farm hired Plaintiff Alton Williams, who had just graduated from college and was eager to make his mark and become a successful Agent. Williams had interned for State Farm while in college and worked his way up to claim representative, and finally to Agent.

53. After qualifying to become an Agent, Williams applied to open his agency on Chicago's north side. There were two available locations, one in the prosperous Lakeview neighborhood and another in a more racially diverse, working class neighborhood further west. Williams requested the Lakeview location; however, pursuant to its discriminatory assignment practices, State Farm assigned a white Agent to the more lucrative Lakeview location and gave Williams the less lucrative location further west. Williams was forced to remain in his territory and State Farm did not offer him a more lucrative agency or location for the remainder of his employment.

54. Despite State Farm denying him the more lucrative agency location, Williams excelled as an Agent. At one time, Williams ranked number 7 in the country in production among State Farm Agents. He achieved President's Club and earned the President's Club Trophy award, among other achievements and accolades. Consistent with its treatment of other African American Agents, State Farm denied Williams business opportunities and valuable

business resources and support, including but not limited to policy assignments and the right to open an additional agency office, throughout his tenure because of his race.

55.     Consistent with its discriminatory review and discipline practices, State Farm targeted Williams for heightened, unwarranted scrutiny and ultimately terminated his employment because of his race. Around September 2017, State Farm audited Williams's business. During the course of the audit, State Farm identified a small number of auto policies that had incorrect vehicle purchase dates listed on the applications. State Farm unfairly and inaccurately charged Williams with "rate manipulation" and terminated his employment. Any inaccuracies were the result of customer or clerical error, not intentional manipulation, as they had no material impact on the price of the supposedly manipulated policies. Williams is aware of non-African American agents who were accused of more severe "rate manipulation" and were subjected to far less or no discipline.

56.     Williams participated in the discriminatory Termination Review Plan, and CEO Michael Tipsord decided to terminate Williams's employment. State Farm did not discipline, let alone terminate, non-African American Agents with similar or greater compliance issues.

57.     On several occasions, Williams reported to his superiors at State Farm that he was being treated differently than his non-African American colleagues. For example, Williams explained to State Farm management the racial disparity in the level of compliance auditing and discipline to which State Farm subjects its African American Agents as compared to its non-African American Agents. Rather than investigate or otherwise address his concerns, State Farm targeted Williams for increased scrutiny, ongoing discrimination and harassment, and, ultimately, termination.

58.     As a result of State Farm's unlawful conduct and discriminatory policies and practices, Williams has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

Plaintiff Brandon Herndon

59.     Plaintiff Brandon Herndon joined State Farm as an Agent in June 2010, after a successful career in pharmaceutical sales. Despite Herndon being an experienced and successful sales leader, pursuant to its firm-wide discriminatory practices, State Farm denied Herndon business opportunities, support, and resources it regularly provided to non-African American Agents at State Farm.

60.     Herndon sought to open an agency in the Houston area, specifically in the affluent Sugar Land area where he and his wife lived. However, pursuant to its discriminatory assignment practices, State Farm required Herndon to instead locate his agency in southwest Houston, a less affluent community with a large African American population.  State Farm placed Herndon in this territory because of his race. When Herndon expressed concern about his placement, State Farm told Herndon he would "fit right in" and "understand the demographic," or words to that effect. State Farm believed that Herndon "belonged" in a territory where many of the potential customers would be African American.

61.     Shortly after Herndon opened his agency in southwest Houston, State Farm placed two non-African American Agents in Sugar Land, and State Farm gave a white Agent a sizeable existing book of business.

62.     Because State Farm did not give Herndon an existing agency, he had to build his book of business from scratch. Moreover, because his community was predominantly working-class and lacked wealth, Herndon's agency required significantly more overhead to operate than

17

it would have in Sugar Land and other more affluent areas. Unlike the more affluent communities in and around Houston, the potential clients in Herndon's territory often had little disposable income, which made it difficult to sell life insurance policies or financial products and limited Herndon to selling fewer, less lucrative auto and home policies.

63.     State Farm rejected Herndon's repeated requests to be assigned a more lucrative market or open an additional agency in another territory. State Farm made clear that its decisions were based on its race-matching of Agents with potential customers. State Farm told Herndon that he needed to hire a "black guy and a Hispanic guy" to be successful.

64.     Despite these challenges, Herndon excelled as an Agent. In his first six months, Herndon was in the top 10 nationally for new Agent business, and within 18 months, he had built a $1.8 million book of business consisting of mostly auto insurance policies.

65.     State Farm did not reward Herndon's successes in the same manner it did for his non-African American colleagues. Throughout Herndon's employment, State Farm denied Herndon a new agency or territory, as well as lucrative policy assignments and other business opportunities, resources, and support.

66.     One of the only instances in which Herndon received any policy assignments was when an Agent in southwest Houston retired and Herndon received a small number of his policies, worth about ten thousand dollars per year. Meanwhile, several of Herndon's non-African American Agent colleagues received policies worth hundreds of thousands of dollars in a single year.

67.     Indeed, when a 40-year agent with a considerable book of business located near Herndon announced his plan to retire, the retiring agent told Herndon that he wanted Herndon to inherit his book of business. It is common practice for retiring agents at State Farm to select an

agent to inherit their book of business. State Farm refused to approve Herndon taking over the retiring agent's book of business. Indeed, State Farm refused to assign Herndon *any* accounts from his business. Herndon informed his manager of his belief that State Farm denied him policies and the book of business from the retiring agent because of his race. His manager did not deny this or investigate the issue, but just issued a warning to Herndon not to "go there" or words to that effect. After this complaint, State Farm retaliated against Herndon by denying him any policy assignments for the remainder of his time at the Firm, subjecting him to increased scrutiny, and ultimately terminating him.

68.      In addition, State Farm awarded several of Herndon's non-African American colleagues' permission to open second or even third agencies, lucrative business opportunities State Farm denied Herndon.

69.      Pursuant to State Farm's discriminatory policies and practices and in retaliation for making a protected complaint of race discrimination, State Farm subjected Herndon to heightened, unwarranted, and discriminatory scrutiny and discipline. State Farm terminated Herndon after he sold some auto insurance policies to ride-share drivers. Herndon had sold the policies because a State Farm underwriter told him he was authorized do so.  State Farm later informed Herndon that the underwriter had been mistaken, and that ride-share driver policies were not approved in Texas. Herndon immediately contacted his customers and informed them that their ride-share driver policies would be terminated. Nonetheless, State Farm refused to renew his contract and terminated his Agent Agreement. A few days later, State Farm announced it would immediately begin offering ride-share driver polices in Texas, plainly demonstrating the reason for Herndon's termination was pretextual.

70.     State Farm did not similarly target, discipline, or terminate Agents who are not African American, even those who engaged in serious violations of State Farm policies.

71.     As a result of State Farm's discriminatory practices and unlawful conduct, Herndon has suffered substantial damages. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

Plaintiff Markus Tolson

72.     Plaintiff Markus Tolson became a State Farm Agent in October 2009, after he worked for several years as a licensed sales representative for another State Farm Agent in Houston.

73.     Despite Tolson's significant experience with State Farm and in the sale of insurance products, State Farm denied Tolson business opportunities and resources regularly provided to non-African American Agents.

74.     Tolson initially selected the River Oaks neighborhood in Houston for his agency location. At that time, State Farm needed to find a new Agent to take over an existing agency in River Oaks that had a considerable book of business. Consistent with its discriminatory policies and practices, however, State Farm instead gave the location to a non-African American Agent and placed Tolson back into a pool of Agents waiting for a location assignment. State Farm eventually assigned Tolson the less lucrative Greater Heights territory, where he was required to start an agency from scratch with no established book of business. Tolson was forced to remain in his territory, and State Farm did not offer him a more lucrative agency or location for the remainder of his employment.

75.     Despite being assigned to a less lucrative territory without an existing book of business, Tolson worked hard to achieve success at State Farm. He earned President's Club and

Chairman's Circle distinctions. Nevertheless, pursuant to its discriminatory practices, State Farm denied Tolson policy assignments and compensation. For example, Tolson received only a handful of policy assignments throughout his tenure at State Farm, while his non-African American colleagues received policy assignments worth hundreds of thousands of dollars, which generated substantial revenues, referrals, and additional business and compensation. Tolson often pointed out to State Farm management that non-African American agents in his region were receiving far more policy distributions than he was. State Farm never investigated or addressed Tolson's concerns and State Farm continued its policy of assigning non-African American agents the lion-share of policy assignments.

76. Despite State Farm's discriminatory policies and practices, Tolson continued to excel, especially in the sale of financial products. As Tolson sold more financial products, he grew concerned that State Farm, consistent with its policy and practice, would target him and subject him to increased scrutiny because of his race. Tolson expressed this fear to his manager that State Farm would single him out for increased scrutiny and discipline because he was a high-achieving African American Agent. To be diligent and attempt to protect himself, Tolson required his employees complete more compliance training than State Farm required.

77. However, consistent with State Farm's discriminatory practices, and in retaliation for complaining of racial discrimination, Tolson faced heightened scrutiny and unwarranted and differential discipline. State Farm terminated Tolson after one of his employees allegedly violated a State Farm policy, even though Tolson was unaware of the alleged violation and fired the sales representative as soon as he learned about the situation. State Farm did not similarly target, discipline, or terminate non-African American Agents, even those who engaged in serious violations of State Farm policies.

78.     Tolson participated in the discriminatory State Farm Termination Review Plan, and CEO Michael Tipsord made the final decision to terminate him because of his race.

79.     As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Tolson has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

Jeffrey Flowers

80.     With nearly a decade of experience in the insurance industry, Flowers was recruited by State Farm to become an Agent in or around 2002. Flowers applied to open his agency in Michigan, where there were two available locations, one in the prosperous town of Canton and another in the predominantly African American, working-class town of Pontiac. Flowers expressed interest in Canton, but State Farm instead steered Flowers to Pontiac pursuant to its racial steering practices. State Farm assigned a white Agent to the more lucrative Canton location. Flowers was forced to remain in this less lucrative territory for the remainder of his State Farm tenure.

81.     According to publicly available census data, the population of Pontiac, Michigan is nearly 50 percent African American, and it has a median household income of approximately $33,000 and a poverty rate of 32 percent. In such a depressed area, "optional" products such as life insurance and bank products were beyond the reach of the average prospective client. Further, a majority of Pontiac residents were renters rather than homeowners, meaning there is significantly less need for home insurance. Accordingly, Flowers was forced to rely almost exclusively on a single product, auto insurance, to build his book of business.

82.     Despite State Farm denying him a more lucrative agency location, Flowers excelled as an Agent. He achieved President's Club and qualified for the Firm's life insurance trip, among other achievements and accolades. However, consistent with its treatment of other African American Agents, State Farm denied Flowers business opportunities and valuable business resources and support, including but not limited to policy assignments, throughout his tenure because of his race.

83.     In or around 2007, Flowers relocated his family to Tennessee and Flowers split his time between Pontiac, Michigan and Tennessee. Flowers obtained State Farm's permission for this arrangement and continued to perform strongly, including earning the President's Club distinction award three times.

84.     Although Flowers continued to perform at a high level as a State Farm Agent, in approximately 2017, State Farm began subjecting Flowers to heightened, unwarranted scrutiny, consistent with its discriminatory review and discipline practices.

85.     In approximately 2019, State Farm claimed it audited his book of business and claimed his office lacked proper oversight because of his living arrangement. Specifically, State Farm complained that some of Flowers's clients had higher liability coverage before they joined State Farm. Flowers explained that most of his clients were lower income with fewer assets, such as a home, that would require higher liability coverage. He explained that many of his clients had been sold more expensive insurance products by their prior insurers than they needed before they became clients of Flowers and State Farm. Flowers told State Farm that he did not believe it was ethical to sell higher liability coverage to lower income customers who did not require it, simply to make more money. State Farm told Flowers that if a customer had a higher liability coverage

before coming to State Farm, Flowers should sell a policy with similar liability coverage, regardless whether it was appropriate for the client's needs.

86.     State Farm's treatment of Flowers was plainly discriminatory.  The Firm's heightened scrutiny and complaints that Flowers was traveling between Michigan and Tennessee stood in stark contrast to their treatment of non-African American Agents who had similar living arrangements and who were not subjected to any criticism or heightened scrutiny. Indeed, a white Agent with an agency in Michigan lived in New Jersey and traveled to Michigan only one week a month, far less time in the office than Flowers, but was not audited or subjected to increased scrutiny. State Farm management demanded an in-person meeting with Flowers to discuss the audit and living arrangement because, as the State Farm manager told Flowers, management "wanted him to sweat," or words to that effect.

87.     Following the audit, State Farm continued to harass Flowers and subject him and his business to unwarranted and unfair scrutiny. Among other things, State Farm required Flowers to submit a monthly report detailing any new policies he wrote and what liability coverage the client had before joining State Farm. Management told Flowers that it would claim rate manipulation if Flowers continued to write policies with lower liability coverage than the client had prior to State Farm, regardless of the customer's needs. Having seen State Farm target and terminate a litany of successful African American Agents, Flowers had no choice but to leave the Firm and was constructively discharged in December 2019.

88.     As a result of State Farm's unlawful conduct and discriminatory policies and practices, Flowers has suffered substantial harm. He has lost wages and other benefits, suffered emotional distress, and his career and reputation have been irreparably damaged.

Brooke Cluse

89.     Plaintiff Brooke Cluse became a State Farm TICA Agent in September 2011.
Cluse was well-equipped to succeed as a State Farm Agent, having worked for several years as a
claims representative and public affairs specialist at State Farm in Texas and Louisiana. Despite
Cluse's significant experience with State Farm, State Farm has denied Cluse business
opportunities, support, and resources regularly provided to non-African American Agents.

90.     State Farm denied Cluse the opportunity to open an agency in her home state of
Louisiana, having opted to give the few available agency locations to non-African American
Agents. As a result, Cluse was forced to relocate and open her agency in Houston, Texas.
Although Cluse applied for three open agency locations in Houston, State Farm steered her to the
location of a former African American Agent who had been terminated for being unable to build
a successful business in the territory. Consistent with its racial steering and race-matching
practices, State Farm steered Cluse to this territory even though it had been unable to sustain the
prior African American Agent. State Farm represented that the agency had a $2 million book of
business. However, after Cluse opened her agency, she discovered the book of business was
substantially less than the amount State Farm promised. Cluse has been forced to remain in this
territory, and State Farm has not since offered her a more lucrative agency or location.

91.     At State Farm's direction, Cluse invested a substantial amount of her own money
to establish her agency, purchase sales leads, and hire staff. Cluse is still in debt from the
considerable expenses associated with opening a new agency with State Farm without the
sizeable book of business promised by State Farm when she accepted the assignment.
Nevertheless, Cluse worked hard and received her full Agent contract in or around 2013.

92.     Despite State Farm denying her a more lucrative agency location and existing
book of business, Cluse has succeeded as an Agent. Nevertheless, pursuant to its discriminatory

practices, State Farm has denied Cluse policy assignments and other business opportunities. For example, when Agents left State Farm, Cluse received only a handful of policy assignments throughout her tenure at State Farm, while her non-African American colleagues received policy assignments worth hundreds of thousands of dollars, which have generated substantial revenues, referrals, and additional business and compensation.

93.     After experiencing and watching State Farm's differential treatment of African American Agents, Cluse sought help and reform by lodging complaints about the Firm's discriminatory practices. For example, Cluse complained to her Sales Leader and Vice President of Agency about the discriminatory policy assignments given to white Agents but denied to her and other African American Agents; she also raised the unfair targeting of African American Agents in audits and for alleged compliance violations while white Agents who engage is similar or more egregious violations are not subjected to the same level of scrutiny or punishment.

94.     State Farm took no corrective action in response to Cluse's complaints and instead targeted Cluse for retaliation.  Consistent with State Farm's hostile, retaliatory culture and discriminatory practices, following her complaints, Cluse herself faced heightened scrutiny and unwarranted and differential discipline. In or around October 2019, Cluse received a complaint from a customer about an individual on her team. Cluse immediately investigated the complaint, terminated the employee, and reported the incident to State Farm. Rather than credit Cluse for being proactive, State Farm launched an unwarranted audit of Cluse's entire book of business. In or around March 2020, State Farm alleged it had found one instance of "rate manipulation" by an employee three years prior. State Farm then sanctioned Cluse by rescinding her bank certification. As a result, Cluse can no longer offer bank products, which can be lucrative and help attract and retain clients. In Cluse's long tenure at State Farm, white agents

who engaged in similar or worse "infractions" have not been similarly targeted or punished by State Farm.

95.     Cluse has continued to try to help the Firm address its discriminatory practices, to no avail and to her detriment. After State Farm CEO Michael Tipsord issued a statement about State Farm's commitment to diversity following the social justice movement spurred by the killing of George Floyd, Cluse alerted him by email of "the disparities between African American and White Agents, especially here in Texas and in Louisiana" and the systematic lack of opportunities and support for African American Agents at State Farm. She asked for accountability for these inequities. Mr. Tipsord did not respond to her email, but a Senior Vice President acknowledged to Cluse that State Farm has been slow to meet the calls for diversity and that the Agents who receive the bulk of the resources and policy assignment are not African American. However, the Senior Vice President offered no remedy to Cluse's complaints other than to acknowledge their existence.  Cluse's call for accountability has not been answered, and she is not aware of any investigation or corrective action taken by the Firm into her complaints or those lodged by many other African American Agents and employees at State Farm.

96.     As a result of State Farm's unlawful conduct and discriminatory policies and practices, Cluse has suffered, and continues to suffer, substantial harm. She has lost wages and other benefits, suffered emotional distress, and her career and reputation have been irreparably damaged.

Vvonaka Richardson

97.     Plaintiff Vvonaka Richardson became a State Farm TICA Agent in June 2019, after she worked for several years as a licensed sales representative for another State Farm Agent in Tuscaloosa, Alabama.

27

98.     Despite Richardson's significant experience with State Farm and in the sale of insurance products, State Farm denied Richardson business opportunities, support, and resources regularly provided to non-African American Agents, and denied her a full Agent contract.

99.     Richardson was assigned to open her agency in Mobile, Alabama. At that time, two senior State Farm Agents had recently died, and State Farm needed to find new Agents to take over their considerable books of business. State Farm promised Richardson a substantial portion of the two books of business. Consistent with its discriminatory policy assignment practices, however, State Farm instead denied Richardson the amount of policies it promised and instead assigned the majority of the policies and books of business to a white TICA Agent.

100.    At State Farm's direction, Richardson made her business plan (and expense budget) based on the value of the promised policies. Despite denying her the amount of policies it promised, State Farm refused to allow her to adjust these production goals and instead evaluated her performance based on these inflated numbers.

101.    Despite being assigned significantly less in assets than State Farm promised, Richardson worked hard to achieve success at State Farm. Indeed, two senior African American Agents assured Richardson that she was performing well as a TICA Agent.

102.    Throughout her tenure, Richardson's direct manager subjected her to a hostile work environment. In addition to denying Richardson opportunities and resources as described above, her manager discussed sex in front of her and attempted to solicit a sexual relationship in exchange for promising benefits, including her permanent Agent contract. Richardson repeatedly rejected her manager's advances and was subjected to threats and retaliation as a result.

103.    Like many State Farm Agents, Richardson lost several team members as a result of the Covid-19 pandemic. In or around April 2020, State Farm told Richardson that she had 60

days to get a new team in place or she would not be given a full Agent contract. Richardson hired and trained a new team, at great expense to herself, and in the middle of a pandemic, and submitted a new action plan to State Farm. However, State Farm refused to alter her production requirements or support her in any way despite the economic turmoil and uncertainty during Covid. Consistent with the Firm's discriminatory practices, Richardson understands that State Farm provided support and granted exceptions during the pandemic to TICA Agents who were not African American, including by extending their TICA contracts.

104.    Richardson asked State Farm management and its CEO for an extension of her TICA contract in light of the pandemic. State Farm denied her request and denied her a full Agent contract in the summer of 2020. Richardson understands that State Farm gave white TICA Agents who did not meet production goals extensions and full Agent contracts. Indeed, a majority of the TICA Agents denied contracts in Richardson's TICA class were African American, despite being a substantial minority in the class.

105.    Richardson complained of race discrimination and disparate treatment to State Farm management, including CEO Michael Tipsord and the newly appointed Chief Diversity Officer Victor Terry, to no avail. Richardson did not even receive a response to her serious allegations of race discrimination. Like other African Americans who dared to complain, State Farm retaliated against Richardson, including by refusing to assist her efforts to build a successful agency at State Farm and refusing to extend her a full Agent contract.

106.    As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Richardson has suffered substantial harm. She has lost wages and other benefits, suffered emotional distress, and her career and reputation have been irreparably damaged.

29

Vera Dixon

107.     Plaintiff Vera Dixon became a State Farm TICA Agent in June 2019, after a successful career in information technology. However, pursuant to its firm-wide discriminatory practices, State Farm denied Dixon business opportunities, support, and resources it regularly provided to non-African American Agents at State Farm, and denied her a full Agent contract.

108.     After working with State Farm to obtain insurance for her church, Dixon met with a State Farm Sales Leader (a white male) in Chesapeake, Virginia, who encouraged her to pursue a career as a State Farm Agent. The Sales Leader provided Dixon with target revenues for her business plan, which he claimed were based on performance in the territory. Dixon relied on his experience as to what was achievable in the market but later learned that the numbers he provided were significantly higher than those of most experienced Agents in the region achieved. The unrealistic target numbers in Dixon's business plan, however, were the ones she was held accountable to in evaluating whether she qualified for a full Agent contract.

109.     Dixon was initially offered an existing agency in Smithfield, Virginia with a considerable book of business. State Farm instead gave the Smithfield agency and its book of business to three white males, at least two of whom were TICA Agents.

110.     With Smithfield unavailable, Dixon applied to two agencies: Norfolk and Chesapeake. The Norfolk agency had an existing book of business whereas the Chesapeake agency had no policies or book of business and needed to be built from "scratch." State Farm assigned Dixon to Chesapeake, and gave Norfolk to a white male TICA Agent, who she understands later got his full Agent contract as a result of the favorable territory assignment. Accordingly, Dixon was required to start an agency from scratch in Chesapeake. Dixon's Sales

Leader informed her that he would give her an existing book of business later, but Dixon never received a single policy distribution during her tenure.

111.    State Farm instructed Dixon to open her agency and sign a three-year lease on the expensive Cedar Road, claiming the location was showing the most growth.  Dixon later learned that another Agent had recently closed her agency due to a lack of business.

112.    During the application and interview process, Dixon informed State Farm that part of her business plan was to sell policies in North Carolina, where she lived a majority of her life and where she had a strong network. State Farm assured Dixon she could sell insurance policies in North Carolina as long as she paid a small fee to obtain the appropriate North Carolina licenses. However, after Dixon was given her TICA contract, State Farm refused to allow Dixon to develop customers or sell policies outside of Virginia. State Farm allowed at least five non-African American Agents in Dixon's Virginia region to sell and do business in North Carolina.

113.    Despite being denied a book of business or any policies, Dixon worked hard to achieve success at State Farm. However, just as Dixon was staffing and training her team, the Covid-19 pandemic hit, which led to staffing shortages and made prospecting for new clients far more difficult. Without an existing book of business to generate revenues, Dixon was forced to continue to invest her own assets into the agency and defer paying herself a salary. Dixon sought assistance and guidance from State Farm but received only advice to spend more money on purchasing leads and hiring staff.

114.    Dixon complained of race discrimination and retaliation on several occasions. For example, in early 2020, Dixon raised issues of race discrimination to State Farm management. Dixon asked if she could speak with an attorney before meeting with human resources. State

Farm refused Dixon's request and told her that her case was closed. Later, Dixon requested a meeting with her Sales Leader to discuss her discriminatory treatment, but he refused to meet with her as well. After Dixon complained of discrimination, but before she was told that she would not receive her full Agent contract, Dixon's Sales Leader admitted: "I don't want to have to work with you in a year from now." Dixon complained to State Farm management regarding her Sales Leader's acknowledged animus, to no avail. Ultimately, State Farm refused to extend to Dixon a full Agent contract.

115.    As a result of State Farm's unlawful conduct and discriminatory policies and practices, and in retaliation for complaining of racial discrimination, Dixon has suffered substantial harm. She has lost wages and other benefits, suffered emotional distress, and her career and reputation have been irreparably damaged.

## <u>CLASS ALLEGATIONS</u>

116.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who work or worked for State Farm as Agents or Term Independent Contractor Agents. The proposed class meets all requirements for class certification under Federal Rule of Civil Procedure 23.

117.    The class of African American employees and former employees is so numerous and geographically disbursed that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1).

118.    There are numerous questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. FED. R. CIV. P. 23(a)(2).

119. The claims alleged by Plaintiffs are typical of the claims of the class members. FED. R. CIV. P. 23(a)(3).

120. Plaintiffs will fairly and adequately represent and protect the interests of the class, and they have retained competent and experienced counsel to represent the class. FED. R. CIV. P. 23(a)(4).

121. The proposed class meets the requirements for certification under Rule 23(b)(2) and Rule 23(b)(3). The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3).

122. The issues of determining liability and equitable and injunctive relief, among other issues, are appropriate for certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF
### 42 U.S.C. § 1981

123. Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

124. 42 U.S.C. § 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, and conditions of the contractual relationship.

125. State Farm maintains a nationwide set of uniform, discriminatory employment policies and practices and engaged in a pattern or practice of systemic race discrimination against

African Americans that constitutes illegal intentional racial discrimination in violation of 42 U.S.C. § 1981.

126.    Through the conduct alleged herein, State Farm denied Plaintiffs and other African American Agents opportunities and resources valuable to their careers because of their race. State Farm also discriminated against Plaintiffs and all other similarly situated African American Agents in compliance auditing, discipline, termination, compensation, performance evaluation, promotions, and in other terms and conditions of their employment.

127.    Plaintiffs and all those similarly situated were subjected to and harmed by State Farm's systemic and individual discrimination.

128.    On behalf of themselves and the class they seek to represent, Plaintiffs request the relief set forth below.

## COUNT II

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 1981

129.    Plaintiffs Herndon, Tolson, Cluse, Richardson, and Dixon, individually, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

130.    Plaintiffs engaged in protected activity by complaining of their unlawful treatment.

131.    Plaintiffs suffered retaliation and harm because of their protected activity, in violation of 42 U.S.C. § 1981.

132.    On behalf of themselves, individually, Plaintiffs Herndon, Tolson, Cluse, Richardson, and Dixon request the relief set forth below.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF
### 42 U.S.C. § 2000e *et seq.*

133.     Plaintiff Richardson, on behalf of herself and those similarly situated, realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

134.     Plaintiff Richardson filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), which placed Defendants on notice of the representative allegations contained in this Complaint.  Plaintiff Richardson has exhausted her administrative remedies and received a Notice of Right to Sue from the EEOC and timely filed her individual and class Title VII claims.[3]

135.     Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of race.

136.     By its conduct as alleged herein, Defendants unlawfully discriminated against Richardson and those similarly situated in violation of Title VII, under both disparate treatment and disparate impact theories of liability.

137.     Plaintiff Richardson and all those similarly situated were subjected to and harmed by State Farm's systemic and individual discrimination.

---

[3] The parties entered into a tolling agreement to toll the time for Plaintiff Richardson file her Title VII claims.

138.    On behalf of herself and the class she seeks to represent, Plaintiff Richardson requests the relief set forth below.

## COUNT IV

### SEX DISCRIMINATION AND HARASSMENT IN VIOLATION OF
### 42 U.S.C. § 2000e *et seq.*

139.    Plaintiff Richardson realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

140.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee on the basis of sex.

141.    By its conduct as alleged herein, Defendants unlawfully discriminated against Richardson based on her sex in violation of Title VII.

142.    Plaintiff Richardson was harmed by Defendant's conduct.

143.    On behalf of herself, Plaintiff Richardson requests the relief set forth below.

## COUNT V

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 2000e *et seq.*

144.    Plaintiff Richardson realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

145.    Plaintiff Richardson engaged in protected activity by complaining of her unlawful treatment.

146.     Plaintiff Richardson suffered retaliation and harm because of her protected

activity, in violation of Title VII.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court find in favor of them and

the class they seek to represent and against Defendants as follows:

a.   Certify this case as a class action;

b.   Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of
record as Class Counsel;

c.   Declare the State Farm acts, conduct, policies and practices alleged herein are
unlawful and violate the federal statutes identified in the Counts alleged against them
set forth above;

d.   Declare that State Farm engages in a pattern and practice of racial discrimination
against African Americans and employs policies and practices that have an unlawful
disparate impact on African Americans;

e.   Order that State Farm stop discriminating and retaliating against African Americans;

f.   Order Plaintiffs and all others similarly situated reinstated to their appropriate
positions, promotions, and seniority, and otherwise make Plaintiffs whole;

g.   Award Plaintiffs and all others similarly situated the value of all compensation and
benefits lost and that they will lose in the future as a result of State Farm's unlawful
conduct;

h.   Award Plaintiffs and all other all others similarly situated compensatory and punitive
damages;

i.   Award Plaintiffs and all others similarly situated prejudgment interest and attorneys'
fees, costs, and disbursements, as provided by law;

j.   Award Plaintiffs and all others similarly situated such other make whole equitable,
injunctive, and legal relief as this Court deems just and proper to end the
discrimination and fairly compensate Plaintiffs;

k.   Declare that State Farm's actions and conduct constitute unlawful retaliation as to
Plaintiffs Herndon, Tolson, Cluse, Richardson, and Dixon, individually, pursuant to
42 U.S.C. § 1981;

l.  Declare that State Farm's actions and conduct constitute unlawful sex discrimination and retaliation as to Plaintiff Richardson, individually, pursuant to 42 U.S.C. § 2000e *et seq.*; and

m. Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided for by Rule 38 of the Federal Rules of

Civil Procedure.

Dated: October 4, 2022

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

*/s/ Suzanne E. Bish*

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com
Sbish@sfltd.com
Grobot@sfltd.com

Justin L. Leinenweber
LEINENWEBER BARONI & DAFFADA, LLC
120 N. LaSalle Street, Suite 2000
Chicago, Illinois 60602
(312) 380-6635
justin@ilesq.com

Benjamin L. Crump (pro hac vice)
BEN CRUMP LAW, PLLC
122 S. Calhoun St.
Tallahassee, FL 32301
(800) 713-1222
court@bencrump.com

Nabeha Shaer (pro hac vice)
BEN CRUMP LAW, PLLC
633 Pennsylvania Ave NW, Fl. 2

Washington, DC 20004
(800) 958-1444
nabeha@bencrump.com