**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF**
**ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| ALTON WILLIAMS, BRANDON HERNDON, MARKUS TOLSON, JEFFREY FLOWERS, BROOKE CLUSE, VVONAKA RICHARDSON, VERA DIXON, and STAN CHAVIS on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., STATE FARM LIFE INSURANCE CO., STATE FARM FIRE AND CASUALTY CO., STATE FARM GENERAL INSURANCE CO., and STATE FARM BANK, F.S.B., <br><br> Defendants. | Case No. 20-cv-01121 <br><br> Honorable Lindsay C. Jenkins <br><br> Honorable M. David Weisman |

**JOINT STATUS REPORT**

Pursuant to Magistrate Judge M. David Weisman's Order dated April 1, 2026 (Dkt. 367), the Parties submit this Joint Status Report.

**I.      Phase I Deposition Schedule**

      **A.      Fact Depositions – Individual Plaintiffs**

1.      State Farm and Plaintiffs are collaborating on scheduling the depositions of Named Plaintiff Stanley Chavis, Alton Williams, Vvonaka Richardson, and Brooke Cluse.  Defendants have proposed May 28 for the deposition of Stanley Chavis.

      **B.      Fact Depositions – State Farm Witnesses**

2.      The Parties have scheduled the fact depositions of Sonya Robinson on May 20, 2026 and Victor Terry on June 2, 2026.  Both of these fact depositions were identified by Plaintiffs as requested deponents in the October 10, 2025 Joint Status Report.  Dkt. 340.

3.      In the October 10, 2025 Joint Status Report, Plaintiffs also stated they seek the depositions of former CEO Michael Tipsord; current CEO John Farney; former Chief Agency, Sales & Marketing Officer and Executive Vice President Rand Harbert; current Chief Agency, Sales & Marketing Officer and Executive Vice President Kristyn Cook; "Market Area Senior Vice Presidents;" "Head of TICA program and personnel who decided to terminate TICA program;" and "other members of State Farm management TBD."  Dkt. 340.

4.      Plaintiffs anticipate deposing several fact witnesses, as previously described in the parties' October 10, 2025, Status Report. (Dkt. 340.). On April 6, counsel for State Farm informed Plaintiffs that former Chief Diversity Officers Sonya Robinson is available for a deposition on May 20, and Victor Terry is available on June 2. Counsel indicated that these witnesses have "no flexibility on their available dates," and did not provide availability for the other requested fact witnesses, including former CEO Michael Tipsord, current CEO John Farney, former Chief Agency, Sales & Marketing Officer and Executive Vice President Rand Harbert, and current Chief Agency, Sales & Marketing Officer and Executive Vice President Kristyn Cook. On April 16, Plaintiffs followed up by again requesting dates for the remaining individual fact witnesses but have not received a response. It is becoming increasingly apparent that State Farm's end goal is to run the clock on discovery and avoid these depositions entirely on technicality, as there is no basis for not deposing these individuals in class certification proceedings with national impact. We ask for a motion to compel on these issues to determine with finality these depositions moving forward.

2

5.      Below, State Farm has included what amounts to a five-page request for a protective order. Plaintiffs received this information less than two hours before the deadline for filing this status report and is unable to properly evaluate State Farm's argument, and does not have sufficient time to prepare a response in this status report. Plaintiffs propose that State Farm file a motion for protective order regarding these witnesses, and requests that the Court provide Plaintiffs with an opportunity to respond. This is consistent with the way the Court handled other disputed witness issues, including State Farm's desire to take the deposition of Brooke Cluse.

6.      State Farm objects to the deposition notices of Mr. Tipsord, Mr. Farney, Mr. Harbert, and Ms. Cook.  None of these individuals were identified in State Farm's Rule 26(a)(1) disclosures, and each are apex witnesses not properly subject to deposition at this time. Specifically, these depositions are subject to the apex doctrine as (1) these witnesses have no unique personal knowledge of the matters in dispute; (2) the information can be garnered from other witnesses or (3) less burdensome discovery methods; and (4) sitting for the deposition would impose a hardship in light of the officer's other duties. *Little v. JB Pritzker for Governor*, No. 18-6954, 2020 WL 868528, at *1 (N.D. Ill. Feb. 21, 2020) (internal quotation marks omitted).  Courts acknowledge that "the rationale behind the apex doctrine is that senior executives delegate tasks, and their knowledge of and involvement in granular issues is limited or non-existent and, in any event, not firsthand," *Alipourian-Frascogna v. Airways*, No. 21-0001, 2023 WL 5934897, at *8 (N.D. Ill. Sept. 12, 2023), and to protect executives from harassment.  *See Berning v. UAW Local 2209*, 242 F.R.D. 510, 514 (N.D. Ind. 2007) (granting motion for a protective order for a union president's deposition partly because "his position . . . is particularly vulnerable to unwarranted harassment and abuse.").  Under this framework, the apex doctrine requires litigants to use the discovery devices available "to obtain the information they need, which includes developing and

3

identifying reasons, where legitimate, to depose senior executives." *Airways*, at *8. Under the doctrine, nonetheless, "the party seeking to avoid discovery bears the burden of showing that good cause exists to prevent the discovery." *Kove IO, Inc. v. Amazon Web Servs., Inc.*, No. 18-8175, 2021 WL 12094206, at *5 (N.D. Ill. Oct. 26, 2021) (internal quotation marks and citation omitted).

7.      Plaintiffs cannot identify any information they seek from Tipsord, Farney, Cook or Harbert, for which those individuals would have unique knowledge. This alone should preclude any deposition of these individuals, as "courts have not hesitated to block efforts to depose high-ranking officials where ... the officials do not have unique personal knowledge of the facts underlying the events that lead to the lawsuit in question." *Lee v. City of Chicago*, No. 20-1508, 2021 WL 2399999, at *3 (citing *Little*, 2020 WL 868528, at *2) (holding that the governor should not be deposed where he lacked unique knowledge relevant to the litigation, as supported by other discovery); *Murillo v. Kohl's Corp.*, No. 16-196, 2016 WL 6090862, at *3 (E.D. Wis. Oct. 18, 2016) (holding that defendant's chief merchandising and customer officer should not be deposed where she lacked "any 'specialized' or 'unique' knowledge about the manner in which the defendants price[d] their merchandise").

8.      In this case, even if the apex individuals have personal knowledge related to Plaintiffs' claims, their knowledge is not unique and can be obtained from other witnesses— including during Rule 30(b)(6) depositions. In *Kove IO*, the Court acknowledged that the executive in question had personal knowledge and appeared in relevant emails, but it denied a motion to compel his deposition partly because Plaintiff sought Rule 30(b)(6) topics on which it also claimed the executive had "unique" personal knowledge. *Id.* at *7; *see also Downing v. SMC Corp. of Am.*, No. 20-01954, 2022 WL 22881777, at *3 (S.D. Ind. Mar. 7, 2022) (denying motion to compel deposition when "the Plaintiff's evidence may plausibly demonstrate that [Defendant's

President and COO] knew about the payment structure modification, [but] the record does not support the notion that [she] has unique personal knowledge about the events in this case."). Further, if Plaintiffs argue that these depositions are necessary because they believe that the apex individuals "may have different facts or perspectives," then these depositions cannot proceed as "caselaw does not support such a rule." *Kove IO,* 2021 WL 1209426, at *7.

9. Plaintiffs also have not demonstrated how the discovery they seek from these individuals cannot be garnered from other witnesses or other discovery methods—primarily, Rule 30(b)(6) and Rule 30(b)(1) deposition testimony. As discussed more fully below, State Farm has agreed to provide Rule 30(b)(6) witnesses to testify on a number of topics relevant to Phase I class certification discovery. Additionally, Plaintiffs took three Rule 30(b)(6) depositions in late 2024 and early 2025 which provided additional information about the appropriate scope of topics for which Plaintiffs claim they now need fact witness testimony from various apex witnesses. For one example, State Farm's Rule 30(b)(6) witness Jim Wright identified and provided details for the only instances during the class period when State Farm internally produced agent racial demographic data. *See* Wright Dep. at 125:7-20. Plaintiffs must accept this Rule 30(b)(6) testimony unless they have a good reason otherwise, which they have not provided. *See* 4/17/25 Tr. at 41:23-42:2 ("If you have a 30(b)(6) deponent who is saying we don't have these kinds of things, and then you're telling Ms. Andrews you don't have to accept that, you better have a good reason why you are not accepting that testimony."). Taken together, these Rule 30(b)(6) depositions will sufficiently inform Plaintiffs and obviate any purported need for apex depositions. *See Kove IO*, 2021 WL 12094206, at *7 ("If Plaintiff can obtain the information it needs from Rule 30(b)(6) witnesses (as yet to be determined), then it cannot establish that [the apex witness] has 'unique' personal knowledge that is unavailable from other sources.") (citing *Hallmark Licensing*

5

*LLC v. Dickens Inc.*, No. 17-2149, 2018 WL 6573435, at \*5 (E.D.N.Y. Dec. 13, 2018) (denying motion to compel apex deposition where at least "some of the information sought will be addressed during the 30(b)(6) deposition, with a deponent who has the best knowledge."). Also, Plaintiffs seek the depositions of lower-level State Farm employees who, unlike the apex deponents demanded by Plaintiffs, were actually involved in matters related to Plaintiffs' claims, and State Farm plans to produce such witnesses. Accordingly, it would be improper to consider permitting apex depositions until after those depositions occur. *See Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15-2207, 2017 WL 6059770, at \*3 (N.D. Ill. Dec. 7, 2017) (granting protective order for Defendant chairman's deposition when depositions were pending of fact witnesses "who [Defendant] contends were actually involved in the events at issue and can provide the information Plaintiffs seek.").

10.     Regarding the fourth apex factor, sitting for a deposition would impose a hardship on Farney and Cook, the two current executives sought for apex depositions. Farney is the President and CEO of State Farm—an insurer providing insurance and financial service products on more than 96 million policies and accounts and employing over 62,000 people. Cook is the head of State Farm's sales and distribution function and leads the sales and marketing organization for more than 18,000 State Farm independent contractor agents. The breadth of Farney's and Cook's work always warrants their entire attention, and supports the preclusion of these depositions. *See Little*, 2020 WL 868528, at \*2 (finding an oral deposition would "clearly impose a hardship" on the governor who attests "his official duties require his full-time attention even when he spends personal time with his family.").

11.     Finally, Tipsord's and Harbert's status as former executives do not alter this outcome, as depositions of former executives are also subject to the apex doctrine. *See Vital*

6

*Proteins, LLC v. Ancient Brands, LLC*, No. 22-02265, 2023 WL 5671857, at *4 n.2 (N.D. Ill. Sept. 1, 2023) ("this Court and many others have held that the doctrine *is* applicable to former executives and officials"); *see also Lee v. City of Chicago*, No. 20-1508, 2021 WL 2399999, at *3 (N.D. Ill. June 11, 2021) ("it is well-settled that the apex doctrine is no less applicable to former officials than to current officials.") (internal quotation marks and citations omitted); *see also Shao v. Allstate Ins. Co.*, No. 23-809, 2024 WL 1014172, at *1 (E.D. Va. Feb. 5, 2024) (applying apex doctrine to former company president and former regional executive). As stated above, Tipsord and Harbert do not have unique personal knowledge about the issues involved in Plaintiffs' claims. To the extent Plaintiffs believe they can elicit relevant testimony regarding their claims from Tipsord and Harbert, they can expect to have their relevant questions answered in Rule 30(b)(6) and (b)(1) depositions, as explained above.

12. State Farm reserves its right to object to any other deposition noticed by Plaintiffs, who have yet to identify any Senior Vice Presidents or "members of State Farm management TBD" they wish to depose despite the Phase I discovery deadline of July 31, 2026. To the extent that Plaintiffs identify any such Senior Vice Presidents or other members of State Farm management that were identified in State Farm's Rule 26(a)(1) disclosures, State Farm will meet and confer about such depositions in connection with Phase I discovery.

C. **Rule 30(b)(6) Depositions**

13. Pursuant to the Court's Order, the Parties met and conferred on Plaintiffs' proposed Rule 30(b)(6) topics. *See* Dkt. 367. To the extent that the Parties are in agreement on Rule 30(b)(6) testimony, State Farm is in the process of providing proposed deposition dates in June and July 2026. Below is a summary of where the Parties agree and disagree on each of Plaintiffs' proposed topics.

7

### a) Assignments of Existing Policies and Financial Products

**State Farm Position**: State Farm agreed to prepare a corporate representative to testify about the block assignments of existing policies and financial products for servicing from one independent contractor agent to another. State Farm also confirmed it would prepare its corporate representative to testify about the Assignment Consideration Tool, the Customer Service Expectations as relevant to the assignment issue, and the distribution of leads generated by State Farm through statefarm.com and the 1-800 number.

Regarding the Assignment Consideration Tool and Customer Service Expectations documents, the Parties disagree on whether the development and drafting of those documents is relevant.

**Plaintiffs Position**: State Farm has agreed to produce a Rule 30(b)(6) corporate designee to testify to State Farm's practices for assignment of products, State Farm's criteria for assignments, as well as leads, and how those criteria and processes may have changed during the class period. The parties dispute whether the customer service expectations and the Assignment Consideration Tool are within the scope of this topic, and whether deponents can testify about the purpose of the assignment policies and practices. As explained above, the Agency Consideration Tool is an important facet of policy assignments, which is one of the challenged practices in this case, and is therefore highly relevant to certification.

### b) Agency Opportunity Selection Process

**State Farm Position**: State Farm agreed to prepare a corporate representative to testify about how an agent candidate applies for and selects an available agent opportunity for which to compete, and criteria considered in determining who receives an opportunity when more than one candidate applies for an available opportunity.

The Parties disagree on the relevance of how State Farm decides to create a new agency opportunity, as agent opportunities are published and agent candidates determine which opportunity they may choose to pursue.

State Farm also agreed to prepare its corporate representative to testify about matters relating to agent eligibility for a multi-office agent ("MOA"). Because Plaintiffs do not allege that a putative class representative applied for and did not receive a MOA opportunity, State Farm objects on relevance grounds to expanding the topic to (a) the decision to open and post a MOA opportunity for MOA-eligible agent candidates, and/or (b) questions relating to the selection of MOA-eligible agent candidates seeking the same opportunity.

**Plaintiffs Position**: State Farm has agreed to produce a Rule 30(b)(6) witness about how agent candidates apply for and select available agent opportunities, and the criteria used to determine who is selected for such an opportunity. State Farm refuses, however, to produce a corporate representative to testify about how State Farm chooses to open an opportunity in the first instance, including its review of market and territory data, arguing that it is not relevant to this lawsuit.

This echoes a well-tread dispute between the parties. Plaintiffs allege that State Farm steers African American Agents to worse territories, whereas State Farm alleges that Agents select their own territories. But as explained above, State Farm's decision to open a territory in the first place—

8

whether by allowing another Agent to expand, hiring a TICA, etc.—is immensely relevant to this challenged practice and class certification.

### c) Term Independent Contractor Agents ("TICAs")

**State Farm Position**: State Farm agreed to prepare a corporate representative to testify about the independent contractor relationship between a TICA and State Farm, the process to determine whether to offer a new agent's agreement at the end of a TICA agreement's term (including the application, if any, of the TICA Checkpoint Assessments and Production Summary Reports), and the decision to sunset the TICA agreement in 2022.

Plaintiffs said they want to expand this topic to include information regarding agent interns. Because the operative complaint does not contain any allegations regarding agent interns, and all named Plaintiffs were appointed as independent contractor agents following completion of the agent intern program, State Farm objects on relevance grounds to expanding the topic to include the process whereby an agent intern is appointed as an independent contractor agent and receives an agent's agreement with State Farm. Plaintiffs also said they want to expand this topic to include information regarding why State Farm chose to include the criteria found in the TICA Checkpoint Assessments and Summary Reports, to which State Farm said it would object as irrelevant, as the criteria did not change during the Relevant Time Period.

**Plaintiffs Position**: State Farm has agreed to present a Rule 30(b)(6) witness to testify about the TICA relationship, the decision-making for outcomes at the end of a TICA agreement's term, and the decision to disband the TICA program. State Farm refuses, however, to present testimony concerning TICA training during the Agent Intern program, which State Farm characterizes as irrelevant. As discussed above, the training provided to TICAs during this phase is relevant: How State Farm trains its TICAs reveals its priorities, criteria for success of agents, and its guidance to help TICAs accomplish their goals and otherwise meet benchmarks.

State Farm also refuses to prepare the witness to testify concerning why State Farm chose to include the criteria found in the Checkpoint Assessments and Summary Reports. As explained above and at length in prior reports, briefs, and motions, the rationale for adopting State Farm's practices is relevant to class certification.

### d) Compliance

The Parties generally agree on the scope of this topic as stated in State Farm's March 26, 2026 letter.

### e) Agency Resource Guide ("ARG") and Agency Field Leadership Online ("AFLO")

Plaintiffs agreed to withdraw this proposed topic as proposed; questions will be addressed within the scope of a specific Rule 30(b)(6) topic about the portions of the ARG and/or AFLO that pertain to that topic.

### f) Customer and Market Analysis

**State Farm Position**: The Parties disagree on the scope of what Plaintiffs intend by "customer and market analysis, including multicultural marketing efforts" and whether discovery relating to customers and markets as proposed is relevant. The Court has previously disallowed discovery on these issues as framed by Plaintiffs. *See* 11/20/25 Tr. at 28:5-15 (the Court denying

Plaintiffs' RFP "focus[ed]" on "information related to the conduct of State Farm towards African American customers.").

**Plaintiffs Position**: The parties have reached an impasse on this topic. Plaintiffs have described their position on the relevance of these topics above but briefly reiterates them here. Plaintiffs allege, among other things, race-matching between Agents and customers. State Farm's awareness of customer demographic patterns and how those market analyses impact Agents is therefore highly relevant to class certification.

### g) Agency and TICA Surveys and Diversity and Inclusion

The Parties generally agree on the scope of this topic as stated in State Farm's March 26, 2026 letter.

### h) Complaint Reporting and Handling

Plaintiffs stated they would re-write this Topic to narrow its breadth and avoid duplicating Topic D, as well as Jim Wright's December 2024 Rule 30(b)(6) testimony. To date, State Farm has not received Plaintiffs' revised topic.

## II. Written Discovery

14. Plaintiffs' amended responses to State Farm's interrogatories were due on April 24, 2026 (Dkt. 367), however, pursuant to Plaintiffs' request, State Farm agreed to extend the deadline to May 1, 2026. To date, Plaintiffs have not served their amended responses.

## III. State Farm's Document Production

### A. Status of Exchange of Letters Regarding Third and Fourth Set of RFPs

15. Per the Court's request (Dkt. 367), the Parties set forth the following regarding the exchange of letters regarding Plaintiffs' third and fourth set of RFPs:

16. Pursuant to the Court's April 1, 2026 Order, State Farm responded to Plaintiffs' Rule 37 letter on April 10. *Id*.

17. The Parties have yet to meet and confer on this correspondence, and intend to do so.

## IV. Plaintiffs' Identification of Main Outstanding Discovery Issues

### A. Refusal to Produce Key Categories of Documents

10

18.     The parties have conferred and reached impasse on several key categories of documents that State Farm refuses to produce as purportedly irrelevant or disproportionate. Resolution of these disputes will inform the parties' positions about ESI, as described below. Several of the disputes described here also recur in State Farm's objections to certain Rule 30(b)(6) topics discussed further below. Plaintiffs seek to expeditiously resolve the document disputes to ensure that there are sufficient documents to effectively question Rule 30(b)(6) witnesses.

19.     Plaintiffs identify these issues without waiving other document requests, ESI, or depositions, but to identify for the Court outstanding issues that hopefully will be sufficient to provide guidance on other requests, and to move the matter forward.

**B.      Reports, Studies, Analyses, Presentations, and High-Level Discussions About Challenged Practices and Agents (Fourth RFP No. 4, 6, 8, 11, 16, 19)**

20.     Plaintiffs have long sought reports and studies about the challenged practices—assignment of policies, investigations and discipline against agents, territory selection, the TICA program, and studies of Agents and TICAs' attrition, performance, and goals. The Plaintiffs' claim, fundamentally, that these corporate practices made African American Agents and TICAs worse off than their non-Black counterparts. For the District Court to assess this claim at class certification, it should know what makes an Agent better or worse off, and what policy levers would help or harm an agency.

21.     Plaintiffs have targeted the easiest places to find this information—reports and studies about these practices delivered to high-level State Farm executives, and executives' communications about them. Courts have compelled defendants to class actions to search for and produce "reports, presentations, or memoranda" summarizing and discussing its own studies of a contested practice, *see, e.g., Jackson v. Bank of Am., NA.,* No. 16-cv-0787, 2018 WL 3386336, at *7 (W.D.N.Y. July 12, 2018), and communications and guidance to human resources, managerial,

and/or supervisory employees on a challenged practice, *Zuniga v. Bernalillo Cnty.,* No. 11-cv-0877, 2013 WL 12333609, at \*14 (D.N.M. Jan. 10, 2013) (documents were relevant to commonality).

22. State Farm resists, claiming that because this is a race discrimination case, it need produce only studies of the challenged practices which include discussion of race. State Farm then claims that no such studies exist.

23. The studies Plaintiffs have requested exist, are relevant, and will be easy to produce. Indeed, after this Court found that a random sample of withheld ESI documents contained substantial relevant information and ordered State Farm to re-review ESI, State Farm produced documents demonstrating that there are documents labeled "Assignment Strategy" listing out corporate wide research into Policy Assignments, Territory Development and the Temporary Agent Servicing Program. *See also* (WILA00033768PROD; WILA00033770PROD-WILA00033774PROD) (discussing data runs made by State Farm for policy assignments); (NR_WILA00000443PROD). The documents make clear the research results were shared on an ongoing quarterly basis to State Farm's top executives. Defendant also produced a single document reflecting a high-level study of the TICA program. (WILA00017001PROD) (discussing ending the TICA contract and results of TICAs during the 13-month program); WILA00033222PROD (internal study of Block Assignment Considerations).

24. Similarly, documents demonstrate that State Farm's analysis of compliance and discipline issues is studied at a high level. For example, spreadsheets such as WILA00016986 demonstrate that State Farm compiles discipline data to analyze in the context of Market Area and examines the most frequent compliance issues found in each region. *See also* (WILA00016989PROD, WILA00016990PROD, and WILA00016993PROD). Yet, State Farm has

12

failed to produce any reports or correspondence with State Farm's executives regarding the quarterly analysis of compliance issues.

### C. Multicultural Marketing and Studies/Reports Regarding African American Customers or Markets (Fourth RFP No. 3)

25. Plaintiffs have alleged from the outset of the case that State Farm engages in race-matching—trying through a variety of practices to have African American Agents work with African American customers. One of the potential sources of race-matching is through multicultural/African American customer-targeted marketing: State Farm has specific techniques for outreach to different racial and ethnic communities that are pertinent to how State Farm connected customers in those communities with agents of the same race.

26. Plaintiffs thus seek information about State Farm's multicultural marketing efforts targeted toward Black prospective customers and how State Farm attempts to study, research, assess, or analyze potential markets, territories, or customers by race. State Farm objects to production of these documents, seeking to limit production solely to "related to marketing to Black customers by agents (as opposed to general corporate advertising or marketing)." *See* State Farm's Response to Plaintiff's Rule 37 Letter at 5. But this inappropriately skews away from companywide marketing and research efforts, which directly impacted agent outcomes and are most pertinent to class certification issues.

27. State Farm has produced discovery showing that information about companywide multicultural marketing efforts exists, is tied to agents, and is readily accessible. One document, again produced only after Court-ordered re-review, is a Multicultural Marketing PowerPoint for an April 15 meeting of State Farm's Agent Diversity Champion Network, in which State Farm stated "has steadily lost market share within diverse market segments over the last 5 years," including African Americans. (WILA00022128PROD). State Farm also stated "all [State Farm]

[c]reative and [m]essaging should be Cross Cultural that resonates with Hispanic Americans, African American, and Asian American," and discuss "[s]egment specific work will be critical to enhance relevancy and brand authenticity with Hispanics and African Americans specifically." (WILA00022129PROD). State Farm also expressly targeted creative, digital/social, and sponsorships for African Americans. (WILA00022135PROD; WILA00022103PROD) (discussing Marketing update for D&I Agent Champion Meeting); (WILA00022110PROD) (Confirming Multicultural Marketing Strategy – Sue Beigie update during April 2021 Agency D&I Champion Meeting); (WILA00022116PROD) (Recapping April 15 meeting, including Multicultural Marketing update. "Multicultural Millennial Target — over last 5 years, have lost market share within diverse market segments. Sonya…[has] recruiting efforts aligned with this gap focused on referrals and agent aspirants.")

### D. Training to Leadership About Challenged Practices (Agent Placement and Offices, Block Assignments, and TICA) (Fourth RFP Nos. 7, 10, 12)

28. Plaintiffs assert that African American agents were steered to less-profitable territories or restricted from expanding to multiple offices, received fewer assignments, and fared worse in the TICA program. To assess that theory and whether it occurred in a common manner, Plaintiffs have sought documents showing how State Farm trained its decision makers to handle and assign agents to cover open territories—creating multi-office agencies (MOAs), new market agents, agent placement plans, and customer service sales offices—and handle block assignments. Evidence that class members were subject to the same "operational protocols including guidelines" regarding a challenged practice is pertinent to commonality. *Then v. Great Arrow Builders, LLC*, 2022 WL 562807, at *6 (W.D. Pa. Feb. 23, 2022); *A.A. v. Cnty. of Riverside*, 2016 WL 10576640, at *5-6 (C.D. Cal. Mar. 14, 2016). Materials used in training managers to implement practices can

14

show how executives prepare managers to execute practices and to use any discretion. *Hills v. AT&T Mobility Servs., LLC*, 2021 WL 3088629 at *9 (N.D. Ind. July 22, 2021).

29.     State Farm asserts that it has completed its production on this issue, but further relevant documents are being withheld. Save for a few documents explaining certain agent-placement programs to field leadership, State Farm has not produced all training materials given to State Farm Field Leadership. The few documents produced so far point to a trove of further relevant documents. For example, State Farm has demonstrated that some central guidance to field leaders exists over whether to keep a departing agent's storefront open—rather than assigning policies to existing Agents—using the principle of "Aligning Customers to Agents." (WILA00033223PROD). State Farm directs field leadership to consider a variety of specialized concepts about which State Farm has not produced guidance, such as "MMDG data/APM 3.0 predictions," "Market segment of agent location," "book of business analysis." (WILA00033223PROD). Further, that same document provides general advice on how to keep a location as a TICA location (a location made for a newly appointed Agents) versus a Multi-Office Agent (MOA) location (a location for an Agent to get a second office). Guidance that State Farm issued on those criteria is essential to understand the extent to which State Farm influenced the decision making process.

30.     Further, State Farm has refused to produce training or guidance related to New Market Agents, documents related to Agent Placement Plans and Customer Service Offices. New Market Agents are individuals who start in an area with limited State Farm presence, typically without a book of business, to their complete detriment under State Farm's policies. (WILA00005594PROD) ("Agents selected for a new market agent opportunity do not receive a policy assignment at appointment."). Therefore, training materials related to New Market Agents,

such as when State Farm determines how to make a New Market Opportunity, how managing might differ from an established TICA opportunity are probative to Plaintiffs' claims.

### E.      TICA Training (Fourth RFP No. 17)

31.      Plaintiffs have requested training materials provided to TICAs. State Farm lodges a ludicrous, formalistic objection that "training materials for TICAs' do not exist," apparently hoping that this Court believes that it provides zero training to its newest agents, who are left rudderless to guess what they are supposed to do as the primary point of sale for State Farm products to the public.

32.      This is not a basis to withhold those training materials, which are immensely relevant. *See, e.g.*, *A.A. v. Cnty of Riverside*, 2016 WL 10576640 at *7 (C.D. Cal. Mar. 14, 2016) (finding that defendant's contention that training materials do not exist is insufficient to defeat plaintiff's motion to compel). How State Farm trains its TICAs reveals its priorities, criteria for success of agents, and its guidance to help TICAs accomplish their goals and otherwise meet benchmarks. Courts have held that training materials are relevant and should be produced. *Id.* at *6.

33.      There is also record evidence that such materials exist. State Farm appears to be relying on a hyper-technical position that when onboarding TICAs, State Farm designates them as "Agent Interns" and provides training in anticipation of establishing their TICA agencies in two phases. Phase 1 includes 10 weeks "of product training and marketing workshops." (WILA 00005472PROD). After an Agent Intern successfully completes the first phase, the Agent Intern moves to the second phase, "which is approximately seven weeks and will include non product training involving team leadership and business management activities, as well as field development time in an existing State Farm agent's office. *Id.*

16

34. Plaintiff Vera Dixon testified to the substantial training she received as an agent intern at the onset of the TICA program. As Dixon testified, "we would have computer-based training modules that we had to complete where we would have to go to Atlanta to class . . ." (Dixon Dep. at 54:9-12.) Completion of the agent intern training process was a prerequisite to becoming a TICA, and Dixon indeed participated in and successfully completed it. (*Id.* at 55-58). Those training materials should be produced.

**F. Assignment Consideration Tool and Related Documents (RFP No. 8, Topic A)**

35. Plaintiffs seek documents regarding one specific State Farm tool used for its distribution of policies, the Assignment Consideration Tool. The Assignment Consideration tool provides State Farm leadership with an Assignment Score to use when assigning policies of a departing State Farm Agent. The tool also uses agent demographic information and other Agent information to create a Consideration Score to use in determining policy assignments. (WILA 00004635PROD).

36. Yet other than two PowerPoint presentations and documents referencing consideration scores used in distributions, Plaintiffs have not received any other documents about the tool, and State Farm rejects providing additional information, whether through documents or testimony.

37. Plaintiffs seek documents regarding high-level discussions and guidance given for the Assignment Consideration Tool, including why State Farm chose certain factors to include and how the Company uses the tool in Agent Assignments. Plaintiffs have limited this request to State Farm's CEOs and Chiefs of Agency, and specific individuals referenced in the PowerPoint who developed the Assignment Tool. High-level statements about challenged practices are immensely probative of class issues. *See, e.g.*, *Brown v. Cook Cnty.*, 332 F.R.D. 229, 240-41 (N.D. Ill. 2019)

(hostile work environment class, commonality shown by statements from head public defender and chief of staff); *Brown v. Abercrombie & Fitch Co.,* 2015 WL 9690357, at *13 (C.D. Cal. July 16, 2015) (emails between leadership helped show a "broader, company-wide policy" echoing the experience of the individual plaintiffs).

> **G.** **Communications and Reports to the Board About Racial Demographics (Third RFP No. 5-6, Fourth RFP No. 2)**

38.     State Farm's document production demonstrates that there has been more race information presented to the Board and high level executives than was previously disclosed. As Plaintiffs have discussed previously, Board-level knowledge and involvement is a relevant consideration for class certification. *See, e.g.*, *Kunneman Properties LLC v. Marathon Oil Co.*, 2019 WL 5188355, at *3 (N.D. Okla. Oct. 15, 2019) (in class action based on denying well owners royalty interests, discovery into board minutes, communications, and presentations was appropriate as it "may be important to establishing class-wide treatment."); *Morgan v. Affiliated Foods Sw., Inc.*, 2016 WL 1676898, at *4-5 (E.D. Ark. Apr. 26, 2016) (in WARN act class action, court relied on board meetings minutes about layoffs).

39.     As part of State Farm's re-review of ESI, State Farm produced documents related to the disclosure of Agent race information to the Committee on Financial Services in the U.S. House of Representatives —Subcommittee on Diversity & Inclusion. (WILA00033315PROD, WILA00033517PROD, WILA00018983PROD). If State Farm was able to gather and prepare Agent race information for Congress, Plaintiffs reasonably believe that this disclosure would have also been shared with the Board of Directors, Compensation Committee, Board member, or high level executive. Based on this newly produced document revealing a disclosure, Plaintiffs reasonably believe there may be additional disclosures about the race of Agents, and request that State Farm search for and produce all incidents of such disclosures within seven days.

40. State Farm argued in its Rule 37 letter that this information does not exist because State Farm responded "8888"—the code indicating that data is not collected—for all agent demographic questions. That is incorrect. State Farm responded "7777"—the code that it does "collect information on a requested item" but "[did] not wish to share it"—on Agent racial demographics for every year Congress requested from 2017 to 2021 (WILA00033318PROD).

| Captive Agents who Identify as Black or African American | | | |
|---|---|---|---|
| In this subsection, we ask for information about diversity among captive agents (i.e., those who only sell or market the products of one company) who identify as Black or African American who worked with the company. | 2017 | 2018 | 2019 |
| 5AA. What number of captive agents working with the company identified as Black or African American? | 7777 | 7777 | 7777 |

| Captive Agent Diversity |
|---|
| 1) When a question requests a number as a response, please type only the number requested with no additional text. |
| 2) If you do not have the type of employee or contract with the type of worker we are asking about, please type "9999" into the answer box. |
| 3) If you do not collect information on a requested item, please type "8888" in the answer box. |
| 4) If you collect information on a requested item but do not wish to share it, please type "7777" in the answer box. |

## H. Enterprise Diversity Council (Fourth RFP No. 5)[1]

41. Plaintiffs have requested certain information about State Farm's Enterprise Diversity and Inclusion Council and its Diversity & Inclusion Governance Council. In the interest of moving forward, while reserving all rights, Plaintiffs agreed to a narrowed Request to learn only the identities of the members of these Councils and the agendas of these Councils' meetings. State Farm responds that Agents are not discussed at this Council, but Plaintiffs have narrowed the request at this point solely to the agendas of the Council to investigate that representation. If the Council indeed discussed Agents, it would be an important source of further discovery. If not, that would end the matter.

42. State Farm opposes, insisting that because a 30(b)(6) witness and counsel represent that the Council does not apply to Agents, that concludes the matter. But Plaintiffs have responded

---

[1] Plaintiffs intend to meet and confer about its request for documents related to a complaint about underrepresentation in the Agent Aspirant program. RFP No. 14.

with a narrow and targeted request—produce the names of the council members (which would reveal if the Council covers any Agency function leaders), and the agendas (which would reveal whether the Council indeed discussed Agency matters). This straightforward information is relevant and should be produced.

### I. Agent Complaints of Race Discrimination (Fourth RFP No. 20)

43. State Farm has produced a document showing that during the relevant time period Agent complaints of race discrimination "must be routed by SEC contact to Rand Harbert and Michael Trout." (WILA00021900PROD). Plaintiffs do not believe State Farm has reviewed or produced documents from Michael Trout. Plaintiffs seek only to ensure that State Farm has searched this source for agent race discrimination complaints and has proposed ESI terms accordingly.

### J. Analyses of Markets or Customers (Fourth RFP Nos. 3-4)

44. As described above, part of Plaintiffs' class claims focus on race-matching, which makes discovery into both agents and State Farm territories relevant to class certification. Plaintiffs have thus requested high-level information about State Farm's market analyses by demographics, and has agreed to limit those requests to analyses of African American or Black customers, as well as information from nine key State Farm executives about specific marketing efforts described in documents already produced (WILA00021318, WILA00022103, WILA00022110, WILA00022116, WILA00022124).

45. State Farm continues to resist this discovery, claiming that it does not collect racial demographic information on its customers. *See* State Farm's Response to Plaintiff's Rule 37 Letter at 4. Plaintiffs know this to be incorrect based on already-produced documents. (WILA00033374PROD) (listing how State Farm plans to build relationships in "diverse segments

of society" and "diverse markets"); (WILA00033340PROD) (describing how State Farm programs "assist diverse and low-income, underserved populations").

    **K.**    **Outstanding ESI Issues**

        **1.**    **Issues Pertaining to State Farm's ESI Responsive to its Third Set of Production of Documents**

            **a)**    <u>**Withheld Documents**</u>

46.    Despite over a year of negotiations, several issues remain outstanding with ESI from the Third Set of Requests for Production. After the Court permitted State Farm to use its own search terms and custodians as a first pass, with the understanding that "State Farm may have to go back to the well again," (Dkt. 327 at 19:1–3), in September 2025, State Farm produced just 839 documents responsive to its ESI protocol for the Third Set of Requests and represented that its ESI production was complete. (Dkt. 340). Then, in November 2025, the Court ordered State Farm to re-review the ESI it withheld "for documents that entail SVP-and-above level discussion of challenged practices, discuss State Farm's diversity efforts, this lawsuit, and SVP approval or insight into decisions related to agents opening multiple offices or receiving policy assignments, and produce relevant documents." (Dkt. 354). Approximately four months later, on March 31, 2026, State Farm finally completed the re-review, producing just 581 additional documents. Combined with its first production, State Farm is still withholding approximately 80 percent of the documents pulled for Plaintiffs' ESI review from its own narrow terms and custodians.

47.    The documents produced as part of the ESI re-review revealed that substantially more documents exist that were withheld in State Farm's first production. For example:

- A document revealing that State Farm produced, quarterly, a report regarding policy and territory assignments, including average sizes of books of business assigned.
- Documents reflecting numerous instances of complaints, including but not limited to, one of its Agents making racist comments, including one Agent calling his employee the n-word on a recorded line, another Agent making fun of affirmative action on a Zoom

meeting with scores of participants, a customer receiving an advertisement addressed to "token black," and several instances of Agents making racist comments on Facebook.

- State Farm also withheld scores of examples of high-level Senior Vice Presidents discussing, changing, and approving policy assignments, multi-office agent applications, and terminations. Some of these documents explicitly reference the racial demographics of the communities in them.

- State Farm also targeted its customers by race and provided summaries of racial marketing efforts to an Agent diversity affinity group.

- The House of Representatives Committee on Financial Services requested that State Farm provide Agent race information to the committee.

48.     While the re-review produced 581 new documents, there are still categories of documents missing from the Production. Specifically, the Court ordered State Farm to produce "documents that entail SVP--and--above level discussion of challenged practices." Yet those documents largely do not appear to have been produced. These documents do exist, as shown in the sample set of documents initially withheld. For example, State Farm produced a discussion between Firmwide Chief of Agency Rand Harbert and SVPs about an off-site meeting discussing changing the requirements for Agents to receive policy assignments. (NR_WILA00000444PROD). Plaintiffs reiterate their request to receive preparatory materials, agendas, meeting notes, reports/analyses, and conclusions for that and similar meetings. Plaintiffs address those concerns with additional search terms for their fourth set of requests for production of documents, discussed below.

### b)     <u>Redactions</u>

49.     State Farm heavily redacted documents produced as part of the re-review. State Farm improperly redacted Agent names in documents pertaining to Multi-Office Agent Selections, Agents making racist comments, block assignment selection, and termination of Agent contracts. State Farm also redacted the location of Multi-Offices selections, despite the fact that Plaintiffs' allege race matching through allocation of territories. Without agent names or locations, Plaintiffs

22

cannot cross-reference this information with other information produced in discovery, including eventual data productions. Indeed, Plaintiffs cannot tell whether the redacted agents are members of the class or not. It is extraordinarily challenging for Plaintiffs or the Court to assess, for instance, a claim of race-matching African American Agents to African American neighborhoods if State Farm will not tell us the names of the agents *or* the neighborhoods involved.

50.     Without names, Plaintiffs will also have difficulty making targeted further inquiries about the information produced. For instance, where documents demonstrate racist comments made by Agents, without Agent names, it is difficult to determine: 1) who made the comment, 2) who may have witnessed it, and 3) whether the Agent remained affiliated with State Farm after the incident. As just one egregious example, a recording was tendered where a State Farm Agent used the "n-word" to describe an employee to another person. (WILA00035647PROD). Despite this, State Farm edited the recording, bleeping out the name of the Agent and a witness's name.

51.     Plaintiffs provided a list of improper redactions to State Farm. Certain documents produced either attach or refer to documents that were not produced. Plaintiffs tendered a specific list below of documents that should be tendered.

**L.     ESI Requests for Plaintiffs' Fourth Set of Production of Documents**

52.     Plaintiffs served their Fourth Set of Class Requests for Production on October 22, 2025, and sent State Farm a letter setting forth issues and questions regarding its prior discovery responses and production on October 24, 2025, pursuant to this Court's instructions and orders (Dkts. 341, 342). Plaintiffs' Fourth Set of Requests were intended to fill the gaps left by State Farm's productions by that point. State Farm then presented objections and responses that represented it would not produce documents responsive to more than 30 of the 39 requests. State

23

Farm provided an ESI proposal that largely eschewed searching for ESI using the standard custodian and search term methodology proposed by Plaintiffs.

53.     Plaintiffs met and conferred in an attempt to bridge the divide between the parties as it pertained to document requests and ESI. Plaintiffs provided a revised ESI search term list for its Fourth Set of Requests of Production, which was intended to be both a narrow request and provide documents related to high-level discussions of the challenged practices and reports and studies of the challenged practices, among other things. On April 19, 2026, State Farm again objected to producing any additional ESI.

54.     Again, in an attempt to reach an agreement, Plaintiffs provide an even narrower set of ESI requests, primarily targeted at State Farm's highest-level executives (Former CEO Michael Tipsord, CEO John Farney, Former Chief of Agency Rand Harbert, Chief of Agency Krystin Cook) and small groups of employees who were identified in the discovery as being part of the challenged practices in the lawsuit. Plaintiffs provide this list without intending to waive any right to seek further ESI in the future, but believe this proposal may provide a path forward for the parties.

55.     Plaintiffs briefly describe their remaining ESI requests below:

| Rand Harbert, Kristyn Cook, Michael Tipsord, and John Farney Search Terms | | |
| --- | --- | --- |
| RFP | Search Terms/Custodians | Reason for the Request |
| No. 1 | "Diversity & Inclusion Update" OR "Workforce Trends" OR "House Finance Committee" Or "Maxine Waters" | Plaintiffs seek communications related to demographic reports regarding race of Agents which have been previously been tendered by State Farm. |
| No. 4 | "Diverse Marketing" OR "Marketing D&I" OR "multicultural creative" OR "Multicultural marketing" OR "Multi-Cultural Marketing"<br><br>Diversity or DEI OR D&I OR (diverse w/3 (agent OR TICA OR customer OR market OR client OR business OR territory OR employee OR independent)) | Plaintiffs seek reports and high-level discussions regarding State Farm's marketing to African American customers. The ESI search terms use State Farm's own terminology for diversity marketing. |

| No. 6 | ("policy assign*" OR "Block Assignment*" OR "TASP" OR "Agent Placement" Model OR "Agent Placement Planning tool" OR TICA OR "Agent Opportunity" OR "TRP" OR "Corrective Action") AND study OR analy* OR report* OR present* OR strateg* OR goal* OR BDD OR "Business Decision Document" | Plaintiffs seek high level discussions and reports regarding the challenged practices, including block assignments, TICA, termination, and discipline for Agents. The ESI search terms are limited to documents that say report, study or analyses or presentation, or goal, limiting the size of selected documents. |
|---|---|---|
| No. 8 | "Assignment Consideration Tool" OR "ACS Percent" OR "Assignment Consideration Score" OR "Agent Engagement Metric" OR "Block Assignment Considerations" OR "Block Assignment Strategies" OR "Customer Service Expectations" OR "Block Assignment Mapping" | Plaintiffs seek reports and high level discussions regarding the Assignment consideration tool, a tool used in block assignments by State Farm. The search terms are State Farm terminology used with the Assignment Consideration tool. |
| No. 9 | ("TICA") AND ("BDD" OR "Business Decision Document") | Plaintiffs seek further high level discussion about ending the TICA program/contract. The search terms refer to both TICA and the document noting the reasons for ending the program, "Business Decision Document." |
| No. 11 | ("MOA" OR "3rd office" OR "Third Office") AND ("criteria" OR "Selection" OR requirement* OR "expectation setting" OR "Approval" OR study OR analy* OR report* OR present* OR strateg* OR goal* OR BDD) | Plaintiffs seek reports regarding Multi-Office Agents and Third Offices. The search terms are limited to MOA-short for multi office agent and 3rd offices. |
| No. 16 | ("Agent Placement Model" OR "Local Market Context" OR "TICA expectation setting process" OR "TICA Evaluation" OR New Market Agent) AND study or analy* OR report* OR present* OR strateg* OR goal* OR BDD OR "Business Decision Document" | Plaintiffs seek reports regarding the TICA program, including specific topics of how to create a new TICA market, New Market Agents (Agents who did not start with a book of business), and evaluation of TICAs for permanent contracts. |
| No. 19 | Investable or best OR success* or succeed or ideal w/25 (Agent* OR study OR analy* OR report* OR present* OR strateg* OR goal*) | Plaintiffs seek reports regarding what makes a Agent successful and worth investing in. |
| No. 22 | (nigg* OR negr* OR colored OR coon OR spook* OR ghetto*) AND "Agent" OR "TICA" | This search term group is to garner documents regarding Agents making racist comments which was ordered produced by the Magistrate Judge.<br><br>State Farm has represented that counting only those documents that also use the word "Agent" or "TICA," these offensive words appeared in over 1,700 documents. |

25

| | Other Custodian Search Terms | |
|---|---|---|
| **RFP** | **Search Terms/Custodians** | **Reason for the Request** |
| No. 2 | ((complain* OR allege* OR report*) w/10 discrim* w/10 (race OR racial)) AND (TICA OR Agent)<br><br>((complain* OR allege* OR report*) w/10 retaliat* w/10 (race OR racial)) AND (TICA OR Agent)<br><br>Proposed Custodian:<br>Michael Trout | In documents produced, Michael Trout was listed as a person who should receive complaints of race discrimination from Agents. |
| No. 8 | "Assignment Consideration Tool" OR "ACS Percent" OR "Assignment Consideration Score" OR "Agent Engagement Metric" OR "Block Assignment Considerations" OR "Block Assignment Strategies" OR "Customer Service Expectations" OR "Block Assignment Mapping"<br><br>Custodians:<br>Don Paul, Bryan Mounce or Jason Cryer | For the reasons stated above, Plaintiffs seek high level discussions about the Agent Consideration Tool a model used in assigning policies. Don Paul, Bryan Mounce, and Jason Cryer are listed as contacts on a PowerPoint about the tool. |
| No. 9 | ("TICA") AND ("BDD" OR "Business Decision Document")<br><br>Proposed Custodians:<br>Jim Wright, Donna Rahovri, Kim Van Ryswyk | This Request seeks information related to ending the TICA contract/program. The persons selected are involved with the TICA contract/program. |
| No. 11 | ("MOA" OR "3rd office" OR "Third Office") AND ("criteria" OR "Selection" OR "requirements" OR "expectation setting" OR "Approval" OR study OR analy* OR report* OR present* OR strateg* OR goal* OR BDD)<br><br>Custodians: Donna Rahorvi, Bryan Mounce | Plaintiffs seek high level discussions regarding the MOA program and the Third offices. The two custodians selected are either listed in documents as being responsible for answering questions about the MOA (Bryan Mounce) or declared themselves experts on MOA evaluation (Donna Rahorvi). |
| No. 16 | "Agent Placement Model" OR "Local Market Context"<br><br>("TICA expectation setting process" OR "TICA Evaluation" OR "New Market Agent") AND study or analy* OR report* OR present* OR strateg* OR goal* OR BDD OR "Business Decision Document"<br><br>Custodians: Jim Wright, Donna Rahorvi, Kim Van Ryswyk | Plaintiff seek high level discussions regarding the TICA contract/program, including how territories get selected as TICA territories, how persons are selected as TICAs, and how TICAs are evaluated to get a full contract.<br><br>The custodians selected are heavily involved in the TICA program, including Jim Wright who testified he was in charge of the program, Donna Rahorvi (listed as an expert on TICA evaluation), and Kim Van Ryswyk, a direct report of Jim Wright. |

| No. 22 | (nigg* OR negr* OR colored OR coon OR spook* OR ghetto*) AND "Agent" OR "TICA"<br><br>Custodians:<br>Michael Trout, Victor Terry, Sonya Robinson, Brad Montgomery, Jim Wright, MA SVPs | This search term group is to garner documents regarding Agents making racist comments which was ordered produced by the Magistrate Judge.<br><br>State Farm has represented that from the relatively narrow list of custodians, and counting only those documents that also use the word "Agent" or "TICA," these offensive words appeared in over 1,700 documents. |
|---|---|---|

## V. Sufficiency of State Farm's Production – State Farm's Statement

56. Pursuant to the Court's April 1, 2026 Order, State Farm substantially completed its document production and produced its privilege log on April 21, 2026. *Id.*

57. As State Farm has previously advised the Court, consistent with the guidance in the January 9, 2024 Phasing Order regarding the scope of Phase I Class Certification discovery (*see* Dkt. 154 at 3-4), State Farm's document production to date encompasses materials relating to each of the decisions challenged in the operative complaint, including documents regarding the manner in which such decisions are made, the identity of the relevant decision makers, the criteria considered in connection with those decisions. In addition, State Farm has produced information from the Relevant Time Period (January 1, 2016 to present) regarding the following categories of discovery sought by Plaintiffs:

a) The Termination Review Plan, including the total number and demographics of all eligible independent contractor agents who participated in the Termination Review process (confirming that no agent, regardless of race, received a reversal of the termination decision);

b) Termination letters sent to independent contractor agents;

c) Complaints of race discrimination made by independent contractor agents against a State Farm employee, and the investigation of such complaints;

d) Demographic information about independent contractor agents presented to the State Farm Mutual Board of Directors;

e) Agent files of the Individual Plaintiffs;

27

f) The decision to sunset the TICA Agreement in 2022;

g) Termination review related documents for all 107 individuals who requested and underwent a termination review during the relevant period;

58. Despite the instructions in the Court's April 6, 2026 Order (Dkt. 367) to have "a discussion with State Farm" before the next Status Hearing about "any issues regarding general sufficiency of production with specific examples," State Farm was unaware of the specific issues that Plaintiffs intended to bring to the Court's attention at the upcoming May 6, 2026 status hearing until State Farm received Plaintiffs' draft of the joint status report at 5:02 p.m. on April 28, 2026. Those limited issues that were raised with State Farm prior to the receipt of the draft status report are specifically enumerated in the following paragraphs. State Farm will endeavor to review the remaining issues raised by Plaintiffs before the May 6, 2026 status hearing, however, it notes that to date, none of these issues as currently presented have been the subject of "discussion with State Farm," as directed by the Court.

59. State Farm further notes that many of the alleged "deficiencies" raised by Plaintiffs above have been the subject of prior status hearings, and appear to be an effort by Plaintiffs to re-open issues that have been resolved by the Court. As just one example, on May 21, 2025, the Court held a status hearing at which time it issued rulings on 11 separate requests from Plaintiffs' 3rd Set of RFPs, including RFP Nos. 5 and 6. *See* Dkt. 314. State Farm complied with the Court's rulings regarding RFP Nos. 5 and 6 and produced the responsive documents in 2025. *See* Dkt. 317. Nevertheless, Plaintiffs raise these RFPs (and others to which State Farm previously responded) above, apparently asking the Court to order production of materials beyond those

28

previously required.[2]  Plaintiffs provide no support for such requests, let alone establish that such additional discovery would be relevant and proportionate.

60.     **State Farm's Re-Review of ESI Production**: Plaintiffs' position regarding the alleged deficiencies in State Farm's re-review of ESI responsive to their Third Set of RFPs, Nos. 23 and 24 was the subject of email communications between the parties.  Specifically, on April 24, 2026, Plaintiffs sent an email regarding alleged deficiencies in State Farm's production of additional ESI documents.  State Farm responded to that email on April 27, 2026, confirming that it had produced ESI pursuant to the Court's orders and believed its production to be complete.  No further discussions were held.

61.     **Redactions in certain State Farm documents:** The parties also exchanged emails on April 24 and April 27 regarding redactions in certain State Farm documents, however, no meet and confer was held.

62.     **Congressional Inquiry Documents**: Regarding Paragraph 46 in the March 31, 2026 Joint Status Report (Dkt. 366) referencing a congressional inquiry, the Court ordered Plaintiffs to "review recently produced documents and discuss with State Farm."  Dkt. 367. Plaintiffs never emailed about nor proposed a meet and confer on this topic, although they have included it in their discussion above.  State Farm further notes that Plaintiffs have selectively included information from this document (which was produced as confidential and subject to the terms of the protective order in this case), and omitted the portions relating to independent contractor agents in which the "8888" code was used, thereby confirming that State Farm does not

---

[2] Also in this Joint Status Report, Plaintiffs raise issues with State Farm's production responsive to Fourth Set of RFP Nos. 2, 3, 6, 7, 8, 17, and 19.  These Requests repeat RFPs from Plaintiffs' Third Set of RFPs. *Compare generally* Dkt. 345-1 (Plaintiffs' Fourth Set of RFPs) *with* Dkt. 309 (5/19/25 Joint Status Report).  Per the Court's order, State Farm responded accordingly.  *See* Dkt. 354 ("As to issues related to Plaintiffs' Fourth Set of RFPs . . . [a]s to any requests State Farm contends are duplicative, State Farm shall respond as it deems appropriate.").

collect information for agents who identify as Black or African American about (i) the number of policies sold, (ii) revenue generated, or (iii) distribution of types of products sold. With respect to the number of independent contractor agents who identify as Black or African American (i.e., the response for which "7777" was used), State Farm produced documents containing that information to Plaintiffs more than a year ago.

63. **Additional ESI Searches**: As required by the ESI Protocol, State Farm provided Plaintiffs detailed search protocols for the First, Third and Fourth Set of RFPs, detailing the manner of document collection, and where a search term/custodial approach was employed, identifying custodians and search terms. The search terms employed for Plaintiffs' Third Set of RFPs were the subject of prior status hearings before the Court. *See* Dkts. 309, 317 (at ¶ 7), 321, 324, 324-1, 333. Based upon these discussions, the Court ordered State Farm to use for these RFPs the terms/custodians submitted to the Court in July 2025 and the terms/custodians for RFP Nos. 24 and 26 as negotiated and discussed with the Court. *See* Dkt. 338, 9/18/25 Tr. at 3:24-4:3.

64. For the Fourt Set of RFPs, Plaintiffs sent additional proposed searches and custodians in their March 26, 2026 Rule 37 letter, to which State Farm responded on April 10, 2026. Thereafter, the parties exchanged emails regarding these proposed additional search terms, with State Farm requesting that Plaintiffs please identify which of the proposed searches were not duplicative of or substantially similar to searches previously run (and referring Plaintiffs back to the previously provided hit reports for those searches). No meet and confer was held on these issues. Plaintiffs' proposal in Section IV.L., above, while narrowed from the prior correspondence, still contains certain searches that are largely duplicative of those previously conducted. State Farm is in the process of evaluating the latest proposal.

Dated: April 30, 2026

Respectfully submitted,

By: */s/ Justin L. Leinenweber*
Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD.
303 W. Madison St., Suite 2600
Chicago, IL 60606
(312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com
grobot@sfltd.com


Benjamin L. Crump (pro hac vice)
Nabeha Shaer (pro hac vice)
Sue-Ann Nicole Robinson (pro hac vice)
BEN CRUMP LAW, PLLC
122 S. Calhoun St.
Tallahassee, FL 32301
(800) 713-1222
court@bencrump.com
nabeha@bencrump.com
sueann@bencrump.com


Justin L. Leinenweber
JUSTIN L. LEINENWEBER, PC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 857-3405
justin@ilesq.com


*Attorneys for Plaintiffs and Putative Class*

By: */s  Amy C. Andrews*
Patricia Brown Holmes
Joseph A. Cancila, Jr.
Amy C. Andrews
Joseph Anthony Steadman
RILEY SAFER HOLMES & CANCILA LLP
1 S. Dearborn St., Suite 2200
Chicago, IL 60603
(312) 471-8700
pholmes@rshc-law.com
jcancila@rshc-law.com
aandrews@rshc-law.com
jsteadman@rshc-law.com


Michael A. Warner, Jr.
FRANCZEK P.C.
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606
(312) 786-6118
maw@franczek.com


*Attorneys for Defendants*

31